UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

CONCORD CAPITAL MANAGEMENT, LLC
  f/k/a InsCap Management, LLC,

Case No.: 11 CIV 5545 (DLC)

                                 Plaintiff,

           -against-

GARY BRECKA,

                            Defendant.

------------------------------------------------------------------------x

<u>COMPLAINT</u>

Trial by Jury Demanded
[ ] Yes  [x] No

Plaintiff, CONCORD CAPITAL MANAGEMENT, LLC f/k/a InsCap Management, LLC, by its attorneys, Strassberg & Strassberg, P.C., as and for its complaint against the defendant GARY BRECKA, respectfully alleges as follows:

<u>The Parties</u>

1.  CONCORD CAPITAL MANAGEMENT, LLC f/k/a InsCap Management, LLC ("Concord") is a limited liability company duly organized and existing under and by virtue of the laws of the State of Delaware with a principal place of business in the County and State of New York and members residing in New York, New Jersey, Connecticut, Tennessee and Texas.

2.  Upon information and belief, at all times herein set forth, defendant GARY BRECKA ("Brecka") resides at 28491 Altessa Way, Apt. 202 Bonita Springs Florida 34135, in the County of Lee.

<u>Jurisdiction and Venue</u>

3.  This court has jurisdiction over this proceeding pursuant to 28 U.S.C. Section 1332. This action is a civil action between citizens of different states. Concord is a limited liability company organized in Delaware with a principal place of business in the State of New York,

with members residing in New York, New Jersey, Connecticut and Tennessee. Defendant resides in the State of Florida. The amount in controversy exceeds $75,000, exclusive of interest and costs. Brecka owes Concord $750,000, exclusive of interest, plus legal fees pursuant to a written contract of guaranty whereby Brecka guaranteed to Concord the repayment (up to $750,000) of a debt owed by Life Asset Group, LLC's ("LAG") pursuant to a Term Loan and Security Agreement whereby LAG borrowed from and failed to repay Concord $2,500,000.

4. Venue is properly placed in this court because a substantial part of the events giving rise to Concord's claim occurred in New York, New York and Concord and Brecka selected and consented to venue in this forum.

<u>Background</u>

5. On or about May 2, 2008 Concord and LAG, by its Chief Executive Officer, Brecka, entered into a Term Loan and Security Agreement ("LAG Loan Agreement").

6. A copy of the LAG Loan Agreement is made a part hereof, marked Exhibit "1".

7. Pursuant to the LAG Loan Agreement, on or about May 2, 2008, LAG, by its Chief Executive Officer, Brecka, requested to borrow $2,500,000 from Concord pursuant to a written notice of borrowing ("LAG Notice of Borrowing")

8. A copy of the LAG Written Notice of Borrowing is made a part hereof, marked Exhibit "2".

9. Concord made the $2,500,000 proceeds of the loan available to LAG in an account designated by it ("The Loan").

10. The Loan to LAG is evidenced by a promissory note dated May 2, 2008 and executed by its Chief Executive Officer, Brecka ("LAG Promissory Note").

11. A copy of the LAG Promissory Note is made a part hereof, marked Exhibit "3".

12. On or about October 14, 2008 Concord and LAG, by its President, Norm Caldwell, entered into a Limited Waiver and First Amendment to the LAG Loan Agreement ("LAG Amended Loan Agreement"), which, amongst other things, increased the principal amount available to LAG to $2,800,000.00 under the LAG Amended Loan Agreement (the "Amended Loan").

13. A copy of the LAG Amended Loan Agreement is made a part hereof, marked Exhibit "4".

14. The Amended Loan to LAG is evidenced by an Amended and Restated Note dated October 14, 2008 and executed by LAG's President, Norm Caldwell, ("LAG Amended Promissory Note").

15. A copy of the Amended LAG Promissory Note is made a part hereof, marked Exhibit "5".

16. Pursuant to the terms of the LAG Amended Loan Agreement and Amended LAG Promissory Note, The Amended Loan was due and payable no later than May 2, 2009.

17. LAG failed to make payment and the full $2,800,000 plus interest remains outstanding on The Amended Loan.

### AS AND FOR A FIRST CLAIM FOR RELIEF
(Breach of Contract - Guaranty)

18. Concord repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "17" inclusive, with the same force and effect as if more fully set forth at length herein.

19. On or about May 2, 2008 Brecka executed a personal guaranty whereby Brecka irrevocably and unconditionally guaranteed to Concord the punctual payment and performance

of LAG's obligations or liabilities to Concord, up to $750,000, under, amongst other things, the LAG Loan Agreement and the LAG Promissory Note ("Brecka Guaranty"). The Brecka Guaranty further provides that "The fact that at any time for from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligations of the Guarantor to the Lender with respect to the Guaranteed Obligations."

20. A copy of the Brecka Guaranty is made a part hereof, marked Exhibit "6".

21. On or about May 24, 2011 pursuant to written demand, Concord demanded payment pursuant to the Brecka Guaranty ("Demand Letter").

22. A copy of the Demand Letter is made a part hereof, marked Exhibit "7".

23. Despite due demand pursuant to the Brecka Guarnty, Brecka failed to remit payment.

24. As a result of the aforesaid Brecka is indebted to Concord in the sum of $750,000.00 with interest from May 2, 2009.

## AS AND FOR A SECOND CLAIM FOR RELIEF
(Breach of Contract – Guaranty, Legal Fees)

25. Concord repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "24" inclusive, with the same force and effect as if more fully set forth at length herein.

26. Pursuant to the terms of the Brecka Guaranty, at paragraph 1.8, Brecka agreed to pay all out-of-pocket expenses (including court costs and attorneys' fees) incurred by Concord in the enforcement of the Brecka Guaranty.

27. Concord has and will incur attorneys' fees, costs and expenses in an amount to be determined by the court.

WHEREFORE, plaintiff demands judgment against defendants as follows:

<u>ON THE FIRST CLAIM FOR RELIEF</u>

A.  Judgment against the defendant GARY BRECKA for the sum of $750,000.00 with

interest from May 2, 2009.

B.  The costs and disbursements of this action.

C.  For such other, further and different relief as to this Court may seem just and proper.

<u>ON THE SECOND CLAIM FOR RELIEF</u>

D.  Judgment against the defendant GARY BRECKA for legal fees in an amount to be

determined by the court.

E.   The costs and disbursements of this action.

F.  For such other, further and different relief as to this Court may seem just and proper.

Dated: New York, New York
       August 8, 2011

Yours, etc.,
STRASSBERG & STRASSBERG, P.C.
Attorneys for Plaintiff

By: _____
       Robert Strassberg, Esq. (RS-9628)
57 West 38th Street 8th Floor
New York, New York 10018
(212) 736-9500

COMPLAINT EXHIBIT "1"

EXECUTION COPY

$2,500,000

TERM LOAN AND SECURITY AGREEMENT

by and between

LIFE ASSET GROUP, LLC,
as Borrower,

and

INSCAP MANAGEMENT, LLC,
as Lender

Dated as of May 2, 2008

NY 71391948

## TABLE OF CONTENTS

ARTICLE I      DEFINITIONS AND RELATED MATTERS ...............................1
   SECTION 1.1      Definitions................................................................1
   SECTION 1.2      Related Matters.......................................................11

ARTICLE II      AMOUNTS AND TERMS OF THE CREDIT FACILITY ...........12
   SECTION 2.1      Loan. .....................................................................12
   SECTION 2.2      Use of Proceeds.....................................................12
   SECTION 2.3      Notes, Etc. .............................................................13
   SECTION 2.4      Interest...................................................................13
   SECTION 2.5      Repayments and Prepayments. ..............................14
   SECTION 2.6      Manner of Payment................................................15
   SECTION 2.7      Taxes......................................................................15

ARTICLE III      CONDITIONS TO CLOSING AND LOAN...............................16
   SECTION 3.1      Closing Conditions ................................................16

ARTICLE IV      CREATION OF SECURITY INTEREST..................................19
   SECTION 4.1      Grant of Security Interest ......................................19
   SECTION 4.2      Negotiable Collateral .............................................19
   SECTION 4.3      Collection of Accounts, General Intangibles, and Negotiable Collateral................................................19
   SECTION 4.4      Filing of Financing Statements; Commercial Tort Claims; Delivery of Additional Documentation Required.....................20
   SECTION 4.5      Power of Attorney..................................................20
   SECTION 4.6      Right to Inspect......................................................21
   SECTION 4.7      Account Control Agreements ...................................21

ARTICLE V      REPRESENTATIONS AND WARRANTIES............................21
   SECTION 5.1      Organization...........................................................22
   SECTION 5.2      Power; Authorization; Enforceability ......................22
   SECTION 5.3      No Violation............................................................22
   SECTION 5.4      Governmental Approvals.........................................22
   SECTION 5.5      Subsidiaries............................................................22
   SECTION 5.6      Financial Information..............................................22
   SECTION 5.7      No Material Adverse Changes; Solvency ..................23
   SECTION 5.8      Litigation................................................................23
   SECTION 5.9      Agreements; Applicable Law ...................................23
   SECTION 5.10      Taxes.....................................................................23
   SECTION 5.11      ERISA....................................................................24
   SECTION 5.12      Title to Property.....................................................24
   SECTION 5.13      Intellectual Property, Etc. ......................................24
   SECTION 5.14      Environmental Condition.........................................25
   SECTION 5.15      Use of Proceeds; Margin Regulations.......................25
   SECTION 5.16      Investment Company Acts........................................26
   SECTION 5.17      Labor Matters.........................................................26
   SECTION 5.18      Capitalization.........................................................26
   SECTION 5.19      Disclosure ..............................................................26

| | | |
|---|---|---|
| SECTION 5.20 | Liens | 26 |
| SECTION 5.21 | Legal Names, Type of Organization, Jurisdiction of Organization, Etc | 26 |
| SECTION 5.22 | Deposit Accounts and Securities Accounts | 26 |
| SECTION 5.23 | Commercial Tort Claims | 27 |
| SECTION 5.24 | Debt | 27 |
| ARTICLE VI | AFFIRMATIVE COVENANTS | 27 |
| SECTION 6.1 | Financial Statements and Other Reports | 27 |
| SECTION 6.2 | Accounting, Records and Inspection, Etc | 28 |
| SECTION 6.3 | Limited Liability Company Existence, Etc | 29 |
| SECTION 6.4 | Payment of Taxes and Other Obligations | 29 |
| SECTION 6.5 | Maintenance of Properties | 29 |
| SECTION 6.6 | Maintenance of Insurance | 29 |
| SECTION 6.7 | Conduct of Business | 30 |
| SECTION 6.8 | Additional Guaranties and Collateral | 30 |
| SECTION 6.9 | Environmental Compliance | 31 |
| SECTION 6.10 | Guarantor Reports | 31 |
| SECTION 6.11 | Disclosure Updates | 31 |
| SECTION 6.12 | Post-Closing Actions | 31 |
| ARTICLE VII | NEGATIVE COVENANTS | 32 |
| SECTION 7.1 | Liens | 32 |
| SECTION 7.2 | Debt | 32 |
| SECTION 7.3 | Restricted Payments | 32 |
| SECTION 7.4 | Investments and Acquisitions | 32 |
| SECTION 7.5 | Expenditures | 33 |
| SECTION 7.6 | Minimum Net Income | 33 |
| SECTION 7.7 | Restriction on Fundamental Changes | 33 |
| SECTION 7.8 | Asset Disposition; Event of Loss | 33 |
| SECTION 7.9 | Transactions with Affiliates | 33 |
| SECTION 7.10 | Amendments of Charter Documents and Other Agreements | 34 |
| SECTION 7.11 | Negative Pledges, Etc | 34 |
| SECTION 7.12 | Issuance of Equity Interests | 34 |
| SECTION 7.13 | Subsidiaries | 34 |
| SECTION 7.14 | Accounting Principles | 34 |
| SECTION 7.15 | Change of Legal Names; Type of Organization; Jurisdiction of Organization, Etc | 34 |
| SECTION 7.16 | Deposit Accounts and Securities Accounts | 35 |
| ARTICLE VIII | EVENTS OF DEFAULT | 35 |
| SECTION 8.1 | Events of Default | 35 |
| SECTION 8.2 | Remedies | 37 |
| ARTICLE IX | MISCELLANEOUS | 39 |
| SECTION 9.1 | Expenses | 39 |
| SECTION 9.2 | Indemnity | 39 |
| SECTION 9.3 | Demand; Protest | 40 |
| SECTION 9.4 | Lender's Liability for Collateral | 40 |

NY 71391948

SECTION 9.5      Waivers; Amendments in Writing. .................................................................40
SECTION 9.6      Cumulative Remedies; Failure or Delay...........................................................41
SECTION 9.7      Notices, Etc .....................................................................................................41
SECTION 9.8      Successors and Assigns.....................................................................................42
SECTION 9.9      Confidentiality ..................................................................................................42
SECTION 9.10     Governing Law ..................................................................................................43
SECTION 9.11     Choice of Forum. ...............................................................................................43
SECTION 9.12     Setoff...................................................................................................................43
SECTION 9.13     Headings .............................................................................................................43
SECTION 9.14     Severability ........................................................................................................43
SECTION 9.15     Survival of Agreements, Representations and Warranties .........................43
SECTION 9.16     Execution in Counterparts................................................................................44
SECTION 9.17     Complete Agreement; Third Party Beneficiaries...........................................44
SECTION 9.18     No Fiduciary Duties or Partnership; Limitation of Liability, Etc. ..............44
SECTION 9.19     WAIVER OF TRIAL BY JURY ........................................................................44

**EXHIBITS**

| | |
|---|---|
| Exhibit A | Form of Notice of Borrowing |
| Exhibit B | Form of Note |
| Exhibit C | Form of Officer's Certificate |
| Exhibit D | Form of Pledge Agreement |
| Exhibit E | Form of Personal Guaranty |
| Exhibit F | Form of Solvency Certificate |
| Exhibit G | Form of Compliance Certificate |

**SCHEDULES**

| | |
|---|---|
| Schedule 1.1(a) | Repurchase Payments |
| Schedule 1.1(b) | Borrower Account |
| Schedule 1.1(c) | Lender Account |
| Schedule 5.8 | Litigation |
| Schedule 5.13(a) | Intellectual Property Rights |
| Schedule 5.13(b) | Use of Name and Marks |
| Schedule 5.13(c) | Third Party IP Rights |
| Schedule 5.14 | Environmental Condition |
| Schedule 5.18 | Capitalization |
| Schedule 5.21 | Legal Names; Type of Organization; Jurisdiction of Organization |
| Schedule 5.22 | Deposit Accounts and Securities Accounts |
| Schedule 5.23 | Commercial Tort Claims |
| Schedule 5.24 | Debt |
| Schedule 7.1(b) | Liens |
| Schedule 7.6 | Projections |

iii

## TERM LOAN AND SECURITY AGREEMENT

**TERM LOAN AND SECURITY AGREEMENT**, dated as of May 2, 2008 (as amended, supplemented or otherwise modified from time to time, this "Agreement"), by and between LIFE ASSET GROUP, LLC, a Delaware limited liability company (the "Borrower"), and INSCAP MANAGEMENT, LLC (the "Lender").

**WHEREAS**, the Borrower has requested an extension of credit from the Lender (i) to partially fund the Repurchase (as defined below) in the amounts and to the Persons listed in Schedule 1.1(a), (ii) to refinance the existing indebtedness owed by the Borrower to the Lender pursuant to the terms of that certain Amended and Restated Promissory Note, dated as of April 22, 2008 (the "Promissory Note"), and (iii) for working capital needs and general corporate purposes of the Borrower as permitted under this Agreement.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS AND RELATED MATTERS

**SECTION 1.1    Definitions.**  The following terms with initial capital letters have the following meanings:

"Account" means an "account" as defined in the UCC, and any and all supporting obligations in respect thereof.

"Account Control Agreement" means an agreement in form and substance satisfactory to the Lender entered into with respect to any Deposit Account or Securities Account of the Borrower or any Guarantor, pursuant to which the Lender shall have "control" (with the meaning of the Uniform Commercial Code) over such account.

"Account Debtors" means any Person who is obligated under, with respect to an Account, Chattel Paper, or a General Intangible.

"Acquisition" means (whether by purchase, exchange, issuance of Equity Interests, merger, amalgamation, consolidation or other combination, reorganization or any other method) any transaction or series of related transactions for the purpose of or resulting in (i) the acquisition by the Borrower of any other Person, which Person would then, under GAAP, become consolidated with the Borrower, or (ii) the acquisition by the Borrower of all or any substantial amount of the assets of any other Person or any division or line of business of any other Person.

"Additional Documents" is defined in Section 4.4(c).

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such first Person. The term "control" means the possession, directly or indirectly,

1

of the power, whether or not exercised, to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlled" and "common control" have correlative meanings. Unless otherwise indicated, "Affiliate" refers to an Affiliate of the Borrower.

"Agreement" is defined in the Preamble and includes all Schedules and Exhibits.

"Applicable Law" means all applicable provisions of all (i) constitutions, treaties, statutes, laws, rules, regulations, codes, guidelines and ordinances of any Governmental Authority, (ii) Governmental Approvals and (iii) orders, decisions, directed duties, judgments, awards and decrees of any Governmental Authority (including common law and principles of public policy).

"Asset Disposition" means any sale, lease or other disposition (including by way of a sale-leaseback transaction, license or sublicense and including any Event of Loss), in any single transaction or series of related transactions, by the Borrower of any of its assets.

"Bankruptcy Code" means Title 11 of the United States Code (11 U.S.C. Section 101 *et seq.*), as amended from time to time.

"Board of Directors" means the board of directors (or comparable managers) of the Borrower or any committee thereof duly authorized to act on behalf of the board of directors (or comparable managers).

"Books" means the Borrower's now owned or hereafter acquired books and records (including (1) all of its Records indicating, summarizing, or evidencing its assets (including the Collateral) or liabilities, (2) all of the Borrower's Records relating to its business operations or financial condition, and (3) all of its goods or General Intangibles related to such information).

"Borrower" is defined in the Preamble, and includes any successors.

"Borrower Account" means the account identified in Schedule 1.1(b) or such other account as the Borrower may hereafter designate by notice to the Lender.

"Borrower Collateral" means all of the Borrower's now owned or hereafter acquired right, title, and interest in and to each of the following:

    (a)     all of its Accounts,

    (b)     all of its Books,

    (c)     all of its Commercial Tort Claims,

    (d)     all of its Deposit Accounts,

    (e)     all of its Equipment,

2

(f)    all of its General Intangibles,

(g)    all of its Inventory,

(h)    all of its Investment Property (including all of its securities and Securities Accounts),

(i)    all of its Negotiable Collateral,

(j)    money or other assets of Borrower that now or hereafter come into the possession, custody, or control of the Lender, and

(k)    the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any and all Accounts, Books, Deposit Accounts, Equipment, General Intangibles, Inventory, Investment Property, Negotiable Collateral, Real Property, money, or other tangible or intangible property resulting from the sale, exchange, collection, or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof.

"Budget" is defined in Section 6.12(a).

"Business Day" means any day that is not a Saturday, Sunday or other day on which banks in New York, New York are authorized or required to close.

"Capital Expenditures" means, for any period, with respect to any Person, and without duplication, all additions to property, plant and equipment and other expenditures (whether paid in cash or accrued and including Capitalized Leases entered into during the period) of such Person during such period with respect to property, plant and equipment that are required to be capitalized under GAAP on the balance sheet of such Person.

"Capitalized Leases" means, with respect to any Person, all leases of (or other arrangements conveying the right to use) real or personal or movable property that are required to be capitalized under GAAP on the balance sheet of such Person. The amount of any Capitalized Lease shall be the capitalized amount thereof determined in accordance with GAAP.

"Change of Control" means (a) the Guarantor shall cease to own directly 100% of both the economic and voting interest in the Equity Interests of the Borrower, other than as a result of the exercise by the Lender of any of its rights under the Option Agreement or (b) any "person" or "group" (within the meaning of Section 13(d) and 14(d)(2) of the Securities Exchange Act of 1934) shall become the "beneficial owner" (as defined in Rule 13d-3 and 13d-5 under the Securities Exchange Act of 1934), directly or indirectly, of a sufficient number of shares of all classes of Equity Interests then outstanding of the Borrower ordinarily entitled to vote in the election of directors, empowering such "person" or "group" to elect a majority of the Board of Directors of the Borrower, who did not have such power before such transaction.

"Chattel Paper" means "chattel paper" as defined in the UCC, including electronic chattel paper and tangible chattel paper.

3

"Closing Date" means May 2, 2008 or such later date on which all conditions set forth in Section 3.1 have been satisfied or waived.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all assets and interests in assets and proceeds thereof now owned or hereafter acquired by Borrower in or upon which a Lien is granted under any of the Loan Documents.

"Collateral Documents" means, collectively, this Agreement, the Pledge Agreement, the Personal Guaranty, each Account Control Agreement, all financing statements, each filing made with respect to Lender's security interest in any registered Intellectual Property Rights and all other documents executed or delivered from time to time in connection therewith or otherwise creating or purporting to create a Lien, security interest or guaranty in favor of the Lender to secure the Borrower's obligations under the Loan Documents, in each case as amended from time to time.

"Collections" means *all* cash, checks, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, and tax refunds).

"Commercial Tort Claim" means a "commercial tort claim" as defined in the UCC.

"Commercial Tort Claim Assignment" is defined in Section 4.4(b).

"Commonly Controlled Entity" means an entity, whether or not incorporated, that is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes the Borrower and that is treated as a single employer under Section 414 of the Code.

"Compliance Certificate" is defined in Section 6.1(d).

"Contingent Obligation" means, as to any Person, (i) any obligation, direct or indirect, contingent or otherwise, of such Person with respect (a) to any Debt or other obligation of another Person, including any direct or indirect guarantee of such Debt or obligation, (b) to maintain the net worth, working capital, equity capital, solvency or financial condition of another Person, or (c) otherwise to assure or hold harmless the holders of Debt or other obligation of another Person against loss in respect thereof (in whole or in part), or (ii) any Hedging Contract of such Person.

"Contractual Obligation" means, as applied to any Person, any provision of any security issued by that Person or any provision of any agreement or other instrument to which that Person is a party or by which it or any of the properties owned or leased by it is bound or otherwise subject.

"Debt" means, with respect to any Person, without duplication: (i) all obligations for borrowed money or with respect to deposits or advances of any kind; (ii) all obligations evidenced by bonds, indentures, debentures, notes, loan agreements or other similar instruments;

4

(iii) all obligations of such Person under conditional sales or other title retention agreements relating to property acquired by such Person; (iv) all obligations to pay the deferred purchase price of property or services, except trade accounts payable arising in the ordinary course of business that are not overdue by more than 60 days; (v) all obligations under Capitalized Leases of such Person; (vi) all obligations of others secured by a Lien on any asset owned by such Person whether or not such obligation or liability is assumed; (vii) all obligations of such Person, contingent or otherwise, in respect of any letters of credit or bankers' acceptances; (viii) all Contingent Obligations of such Person; (ix) all obligations under facilities for the discount or sale of receivables; and (x) all obligations in respect of the liquidation value of all mandatorily redeemable preferred Equity Interests of such Person.

"Default" means any condition or event that, with the giving of notice or lapse of time or both, would, unless cured or waived, become an Event of Default.

"Deposit Account" means any "deposit account" as defined in the UCC.

"Dollars" and "$" means lawful money of the United States of America.

"Employment Agreement" is defined in Section 3.1(k).

"Environmental Damages" means all claims, judgments, damages, losses, penalties, liabilities (including strict liability), costs and expenses, including costs of investigation, remediation, defense, settlement and reasonable attorneys' fees and consultants' fees, that are incurred at any time as a result of the existence of Hazardous Material upon, about or beneath any Real Property or migrating or threatening to migrate to or from any Real Property, or arising in any manner whatsoever out of any violation of Environmental Requirements.

"Environmental Lien" means a Lien in favor of any Governmental Authority for Environmental Damages.

"Environmental Requirements" means all Applicable Laws relating to Hazardous Materials or the protection of human health or the environment, including all requirements pertaining to reporting, permitting, investigation and remediation of releases or threatened releases of Hazardous Materials into the environment, or relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials.

"Equipment" means "equipment" as defined in the UCC, and includes machinery, machine tools, motors, furniture, furnishings, fixtures, vehicles (including motor vehicles), computer hardware, tools, parts, and goods (other than consumer goods, farm products, or Inventory), wherever located, including all attachments, accessories, accessions, replacements, substitutions, additions, and improvements to any of the foregoing.

"Equity Interests" means, with respect to any Person, all (i) shares, interests, participations or other equivalents (howsoever designated) of capital stock, membership interest and other equity interests of such Person and (ii) rights (other than debt securities convertible into capital stock or other equity interests), warrants or options to acquire any such capital stock or other equity interests.

5

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Event of Default" is defined in Section 8.1.

"Event of Loss" means, with respect to any assets of Borrower, the loss thereof or of the use thereof due to theft, destruction or damage, or the condemnation, confiscation or seizure thereof, or requisition of title thereto or the use thereof by any Governmental Authority or any other Person, whether or not acting under color of governmental authorization, provided that no such event shall constitute an Event of Loss unless the gross proceeds received or to be received by Borrower equal, or the assets that are the subject of such Event of Loss have an aggregate replacement value of, $10,000 or more.

"Excluded Taxes" is defined in Section 2.7(a).

"Fair Market Value" means, with respect to any asset or property, the sale value that could be obtained in an arm's-length transaction, for cash, between a willing seller and a willing buyer, neither of whom is under pressure or compulsion to complete the transaction.

"Fiscal Year" means the fiscal year of the Borrower, which shall be the 12-month period ending on December 31 in each year. "Fiscal Quarter" or "fiscal quarter" means any quarter of a Fiscal Year.

"GAAP" means generally accepted accounting principles as in effect in the United States of America from time to time.

"General Intangible" means general intangibles (as that term is defined in the Code), including payment intangibles, contract rights, rights to payment, rights arising under common law, statutes, or regulations, choses or things in action, goodwill, Intellectual Property Rights, blueprints, drawings, purchase orders, customer lists, monies due or recoverable from pension funds, route lists, rights to payment and other rights under any royalty or licensing agreements, infringement claims, computer programs, information contained on computer disks or tapes, software, literature, reports, catalogs, insurance premium rebates, tax refunds, and tax refund claims, and any and all supporting obligations in respect thereof, and any other personal property other than Accounts, Deposit Accounts, goods, Investment Property, and Negotiable Collateral.

"Governing Documents" means, as to any Person, the certificate or articles of incorporation, the certificate of formation, the bylaws, the operating agreement, the limited liability company or partnership agreement or other organizational or governing documents of such Person.

"Governmental Approval" means an authorization, consent, approval, permit or license issued by, or a registration or filing with, any Governmental Authority.

"Governmental Authority" means the government of any nation, any state or political subdivision thereof and any agency, authority, instrumentality, regulatory body or other

6

entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any court, tribunal or arbitrator of competent jurisdiction.

"Guarantor" means Gary Brecka.

"Hazardous Materials" means any substance (i) the presence of which requires investigation or remediation under any Applicable Law; (ii) that is or becomes defined as a "hazardous waste" or "hazardous substance" under any Applicable Law, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. Section 9601 *et seq.*) or the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.); (iii) that is toxic, explosive, corrosive, inflammable, infectious, radioactive, carcinogenic, mutagenic, or otherwise hazardous and is or becomes regulated by any Governmental Authority; (iv) the presence of which on any Real Property causes or threatens to cause a nuisance upon the Real Property or to adjacent properties or poses or threatens to pose a hazard to any Real Property or to the health or safety of Persons on or about any Real Property; or (v) without limitation, that contains gasoline or other petroleum hydrocarbons, polychlorinated biphenyls or asbestos.

"Hedging Contract" means, for any Person, any interest rate, commodity, foreign exchange or other hedging agreement (including swaps, collars, caps and forward contracts) between such Person and one or more financial institutions providing for the transfer or mitigation of fluctuations of interest rates, exchange rates or other prices either generally or under specific contingencies.

"HSH Hybrid Program" means the premium finance warehouse facility to be entered to by and among Senior Preferred Investments S.A., as borrower, Concord Capital Funding, LLC and Concord Capital Funding Inc., as premium finance lender, HSH Nordbank AG, London Branch, as wholesale lender, LaSalle Bank, as servicer, and the other parties thereto.

"Indemnified Liabilities" is defined in Section 9.2(a).

"Indemnitee" is defined in Section 9.2(a).

"Insolvency" means, with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent" means pertaining to a condition of Insolvency.

"Intellectual Property Right" means (i) any patent, copyright, trademark, servicemark, trade name, trade secret or other intellectual property right, (ii) all registrations and applications to register any such patent, copyright, trademark, servicemark, trade name or other intellectual property right with any Governmental Authority and all renewals and extensions thereof, and (iii) the goodwill of the business associated with or relating to any such trademark, servicemark, trade name or other intellectual property right.

"Interest Payment Date" means the last Business Day of each March, June, September and December while the Loan is outstanding.

7

"Inventory" means "inventory" as defined in the UCC.

"Investment" means, as applied to any Person, (i) any direct or indirect acquisition by that Person of securities or partnership or membership interests or other interest of any other Person, or all or any substantial part of the business or assets of any other Person, and (ii) any direct or indirect loan, advance or capital contribution by that Person to any other Person.

"Investment Property" means "investment property" as defined in the UCC, and any and all supporting obligations in respect thereof.

"Lender" is defined in the Preamble.

"Lender Account" means the account identified in Schedule 1.1(c) or such other account as the Lender may hereafter designate by notice to the Borrower.

"Letter-of-Credit Right" means "letter-of-credit right" as defined in the UCC.

"Lien" means any lien, mortgage, deed of trust, pledge, security interest, charge, hypothecation, or encumbrance of any kind (including any conditional sale or other title retention agreement or any capital lease or any financing lease having the same economic effect as any of the foregoing) and any agreement to give or refrain from giving any lien, mortgage, deed of trust, pledge, security interest, charge, hypothecation, or other encumbrance of any kind.

"Loan" is defined in Section 2.1(a).

"Loan Documents" means, collectively, this Agreement, the Note, the Collateral Documents and any other agreement, instrument or other writing executed or delivered by the Borrower in connection herewith, and all amendments, exhibits and schedules to any of the foregoing.

"Material Adverse Effect" or "Material Adverse Change" means (i) a material adverse effect on or (ii) a material adverse change in, as the case may be, any one or more of the following: (A) the business, assets, results of operations, condition (financial or otherwise), profitability or prospects of the Borrower, (B) the ability of the Borrower or the Guarantor to perform its obligations under the Loan Documents to which it is a party, (C) the Collateral, or the Lender's Liens on the Collateral or the priority of such Liens, or (D) the validity, legality or enforceability of any Loan Document, any material provision therein, or the rights or remedies of the Lender thereunder.

"Maturity Date" means May 2, 2009, or such earlier date on which the Loan shall become due and payable in accordance with the terms of this Agreement and the other Loan Documents.

"Multiemployer Plan" means a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

NY 71391948

"<u>Negotiable Collateral</u>" means letters of credit, letter of credit rights, instruments, promissory notes, drafts, documents, and Chattel Paper, and any and all supporting obligations in respect thereof.

"<u>Net Income</u>" means, for any period, the net income of the Borrower (excluding extraordinary non-cash gains but including non-cash extraordinary losses) for that period.

"<u>Non-Cash Proceeds</u>" means any notes, debt securities, other rights to payment, Equity Interests or other consideration received from an Asset Disposition, except cash and cash equivalents.

"<u>Note</u>" is defined in <u>Section 2.3(a)</u>.

"<u>Notice of Borrowing</u>" is defined in <u>Section 2.1(b)</u>.

"<u>Obligations</u>" means all present and future obligations and liabilities of the Borrower of every type and description arising under or in connection with the Loan Documents due or to become due to the Lender or any Person entitled to indemnification under the Loan Documents, or any of their respective successors, transferees or assigns, whether for principal, interest (including, without limitation, interest accruing after the maturity of the Loan and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), reimbursement obligations, cash collateral cover, fees, expenses, indemnities or other amounts (including attorneys' fees and expenses) and whether due or not due, direct or indirect, joint and/or several, absolute or contingent, voluntary or involuntary, liquidated or unliquidated, determined or undetermined, and whether now or hereafter existing, renewed or restructured.

"<u>Option Agreement</u>" means that certain Option Agreement, dated as of the date hereof, among the Borrower, the Lender and the Guarantor.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation, as defined in Title IV of ERISA, or any successor.

"<u>Permitted Dispositions</u>" means (a) sales or other dispositions of equipment that is substantially worn, damaged, or obsolete in the ordinary course of business, (b) sales of Inventory to buyers in the ordinary course of business, (c) the use or transfer of money or cash equivalents in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents, and (d) the licensing, on a non-exclusive basis, of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business.

"<u>Permitted Liens</u>" means, with respect to any asset, the Liens (if any) permitted to exist on such asset under <u>Section 7.1</u>.

"<u>Person</u>" means an individual, a corporation, a partnership, a limited liability company, a trust, an unincorporated organization or any other entity or organization, including a government or any agency or political subdivision thereof.

9

"Personal Guaranty" is defined in Section 3.1(f).

"Plan" means, at a particular time, any employee benefit plan that is covered by ERISA and in respect of which the Borrower or a Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Pledge Agreement" is defined in Section 3.1(c).

"Post-Default Rate" is defined in Section 2.4(a)(ii).

"Projections" is defined in Section 3.1(i).

"Promissory Note" is defined in the Preamble.

"Real Property" means, with respect to any Person, each parcel (or portion thereof) of real property, improvements and fixtures thereon and appurtenances thereto now or hereafter owned or leased or occupied by such Person.

"Record" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

"Reinvestment Notice" means a written notice executed by a Senior Officer of the Borrower stating that no Default or Event of Default has occurred and is continuing and that the Borrower intends and expects to use all or a specified portion of the cash proceeds of an Event of Loss to acquire, construct, develop, improve or repair assets necessary to its business.

"Release" means the release, deposit, disposal or leakage at, into, upon or under any land, water or air, or otherwise into the environment or into the indoor air, including by means of burial, disposal, discharge, emission, injection, spillage, leakage, seepage, leaching, dumping, pumping, pouring, escaping, emptying, migrating, placement and the like (including the disposal of barrels, containers, and other closed receptacles containing Hazardous Materials).

"Reorganization" means, with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

"Repurchase" means the repurchase by the Borrower of all of its Equity Interests held by the individuals designated as "sellers" in Exhibit A to the Option Agreement.

"Restricted Payment" means (i) any dividend, distribution or payment, direct or indirect, to or for the benefit of any holder of any Equity Interests of the Borrower now or hereafter outstanding, except (a) a dividend or other distribution payable solely in shares or equivalents of the same class of Equity Interests of the Person paying such dividend or making such distribution or (b) the issuance of Equity Interests upon the exercise of outstanding

NY 71391948

warrants, options or other rights, or (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Equity Interests of the Borrower now or hereafter outstanding.

"Securities Account" means a "securities account" as defined in the UCC.

"Securities Act" means the Securities Act of 1933, as amended from time to time.

"Senior Officer" means the chairman of the Board of Directors, the President, the Chief Executive Officer, the Chief Operating Officer, the Chief Financial Officer, the Treasurer or any Vice President in charge of a principal business unit or division of the Borrower.

"Single Employer Plan" means any Plan that is covered by Title IV of ERISA, but which is not a Multiemployer Plan.

"Solvent" means, with respect to any Person as of any date, that: (i) the amount, at "fair valuation," or "present fair salable value" (whichever is the applicable test under Section 548 and other relevant provisions of the Bankruptcy Code and the relevant state fraudulent conveyance or transfer laws) of such Person's assets is in excess of the total amount of such Person's debts and liabilities, including contingent liabilities, (ii) such Person is able to pay its debts and liabilities, including contingent liabilities, as they become due; (iii) such Person does not have unreasonably small capital or assets to carry on such Person's business as theretofore operated and as proposed to be operated, and (iv) such Person does not intend to, or does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature, in each case as of such date. The meaning of the terms "fair valuation" and "present fair salable value" and the other terms used in this definition, and the calculation of assets, debts and liabilities shall be determined and made in accordance with the relevant provisions of the Bankruptcy Code and applicable state fraudulent conveyance or transfer laws.

"Subsidiary" means, with respect to any Person, any other Person of which more than 50% of the total voting power of the Equity Interests entitled to vote in the election of the board of directors (or other Persons performing similar functions) are at the time directly or indirectly owned by such first Person.

"Taxes" means any and all present or future income, stamp and other taxes, charges, fees, levies, duties, deductions, imposts, withholdings or other assessments, together with any interest and penalties, additions to tax and additional amounts imposed by any Governmental Authority upon any Person.

"UCC" means the Uniform Commercial Code, as in effect from time to time in the relevant jurisdiction.

SECTION 1.2     Related Matters.

(a)     Construction.  Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular, the singular includes the plural, the part includes the whole, "including" is not limiting.  The words "hereof," "herein," "hereby," "hereunder" and similar terms in this Agreement refer to this Agreement as a whole (including

11

the Preamble, the Preliminary Statements, the Schedules and the Exhibits) and not to any particular provision of this Agreement. Article, section, subsection, exhibit, schedule, recital and preamble references in this Agreement are to this Agreement unless otherwise specified. References in this Agreement to any agreement, other document or law "as amended" or "as amended from time to time," or to amendments of any document or law, shall include any amendments, supplements, replacements, renewals, waivers or other modifications. References in this Agreement to any law (or any part thereof) include any rules and regulations promulgated thereunder (or with respect to such part) by the relevant Governmental Authority, as amended from time to time.

(b)    **Accounting Terms and Determinations.**  Unless otherwise specified herein (and whether or not expressly stated), all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP.

## ARTICLE II

## AMOUNTS AND TERMS OF THE CREDIT FACILITY

SECTION 2.1    <u>Loan</u>.

(a)    **Term Loan.**  The Lender agrees, upon the terms and subject to the conditions set forth in this Agreement, to make a term loan (the "<u>Loan</u>") to the Borrower on the Closing Date in an aggregate principal amount equal to $2,500,000.  Once repaid, the Loan incurred hereunder may not be reborrowed.

(b)    **Notice of Borrowing.**  When the Borrower desires to borrow pursuant to this <u>Section 2.1(b)</u>, the Borrower shall deliver to the Lender a written request therefor in the form of <u>Exhibit A</u> (a "<u>Notice of Borrowing</u>") at least one (1) Business Day in advance, or such lesser period as may be agreed by the Lender.

(c)    **Funding of Loan.**  Not later than 4:00 p.m. (New York time) or such later time as may be agreed to by the Borrower and the Lender, and subject to and upon satisfaction of the applicable conditions set forth in Article III as determined by the Lender, the Lender shall make the proceeds of the Loan available to the Borrower in Dollars in immediately available funds in the Borrower Account.

SECTION 2.2    <u>Use of Proceeds</u>.  The proceeds of the Loan shall be used by the Borrower (i) to partially fund the Repurchase in the amounts and to the Persons listed in <u>Schedule 1.1(a)</u>, (ii) to refinance the Promissory Note, and (iii) for working capital needs and general corporate purposes of the Borrower in accordance with the Budget.

NY 71391948

**SECTION 2.3    Notes, Etc.**

(a)    **Loan Evidenced by Note.**  The Loan made by the Lender to the Borrower shall be evidenced by a promissory note duly executed by the Borrower substantially in the form of Exhibit B (the "Note"), dated the Closing Date, in the amount of $2,500,000.

(b)    **Notation of Amounts and Maturities, Etc.**  The Lender is hereby irrevocably authorized to record on the schedule attached to the Note (or a continuation thereof) the information contemplated by such schedule.  The failure to record, or any error in recording, any such information shall not, however, affect the obligations of the Borrower hereunder or under the Note to repay the principal amount of the Loan evidenced thereby, together with all interest accrued thereon.  All such notations shall constitute conclusive evidence of the accuracy of the information so recorded, in the absence of manifest error.

**SECTION 2.4    Interest.**

(a)    **Interest Rate and Payment.**

(i)    The Loan shall bear interest on the unpaid principal amount thereof, from and including the Closing Date to and excluding the due date or the date of any repayment thereof, at a rate per annum equal to twelve percent (12%).

(ii)    Notwithstanding the foregoing provisions of this Section 2.4(a), while an Event of Default exists, the Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to two percent (2%) above the rate otherwise applicable thereto (the "Post-Default Rate") from the date of occurrence of such Event of Default, in the case of an Event of Default under Section 8.1(a), Section 8.1(f) or Section 8.1(g), or, in the case of any other Event of Default, from the date of written demand by the Lender, and in each case for so long as such Event of Default is continuing.

(iii)    The initial payment of accrued interest on the Loan shall be due and payable in arrears on the 90th day following the Closing Date and thereafter accrued interest shall be payable in arrears (A) on each Interest Payment Date; (B) in the case of any interest accrued at the Post-Default Rate, on demand; and (C) when the Loan shall become due (whether at maturity, by reason of prepayment, acceleration or otherwise).

(b)    **Computations.**  Interest on the Loan shall be computed on the basis of a 365 or 366-day year, as applicable, and the actual number of days elapsed.

(c)    **Maximum Lawful Rate of Interest.**  The rate of interest payable on the Loan or other amount shall in no event exceed the maximum rate permissible under Applicable Law.  If the rate of interest payable on the Loan or other amount is ever reduced as a result of this section and at any time thereafter the maximum rate permitted by Applicable Law shall exceed the rate of interest provided for in this Agreement, then the rate provided for in this Agreement shall be increased to the maximum rate provided by Applicable Law for such period as is required so that the total amount of interest received by the Lender is that which would have been received by the Lender but for the operation of the first sentence of this section.

NY 71391948

**SECTION 2.5** <u>Repayments and Prepayments.</u>

(a)    **Repayment.**  The Loan shall be paid in full on the Maturity Date; <u>provided</u> that, if no Default or Event of Default exists on the Maturity Date, the Borrower may, by written notice to the Lender, elect to pay the Loan in full on August 2, 2009, and the Loan shall bear interest on the outstanding principal amount thereof at the Post-Default Rate from and including the Maturity Date to and excluding the date of repayment in full thereof.

(b)    **Mandatory Prepayment.**

(i)    On each date on or after the Closing Date upon which the Borrower receives any cash proceeds from any Event of Loss then, unless a Reinvestment Notice shall be delivered in respect thereof promptly, but in no event later than five (5) days from the date of receipt by the Borrower of such cash proceeds, the Loan shall be prepaid by an amount equal to the amount of such cash proceeds.

(ii)    On each date on or after the Closing Date upon which the Borrower receives any cash proceeds from the HSH Hybrid Program, the Loan shall be prepaid by an amount equal to the amount of such cash proceeds.

(iii)    The Borrower shall give the Lender not less than five (5) Business Days' prior written notice of the date on which a mandatory prepayment pursuant to this <u>Section 2.5(b)</u> will be made.  Each mandatory prepayment shall be made together with accrued interest on the amount prepaid.  Mandatory prepayments shall be made without premium or penalty.

(c)    **Optional Prepayments.**

(i)    The Borrower may, at its option, at any time or from time to time, prepay the Loan in whole or in part, without premium or penalty, on any Business Day, <u>provided</u> that any prepayment shall be in an aggregate principal amount of at least $100,000 and in integral multiples thereof (or, alternatively, the whole amount of the Loan then outstanding).

(ii)    If the Borrower elects to prepay the Loan under this <u>Section 2.5(c)</u>, the Borrower shall deliver to the Lender a notice of optional prepayment not later than 10:00 a.m. (New York time) on the second Business Day preceding the proposed prepayment date.  Any notice of optional prepayment shall be irrevocable, and the payment amount specified in such notice shall be due and payable on the date specified in such notice, together with interest accrued thereon to such date.

(d)    **Payments Set Aside.**  To the extent the Lender receives payment of any amount under the Loan Documents, whether by way of payment by the Borrower, setoff, as proceeds of Collateral or otherwise, which payment is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, other law or equitable cause, in whole or in part, then, to the extent of such payment received, the Obligations or part thereof intended to be satisfied thereby

14

shall be revived and continue in full force and effect, together with all Collateral therefor, as if such payment had not been received by the Lender.

### SECTION 2.6     Manner of Payment.

(a)     Except as otherwise expressly provided, the Borrower shall make each payment under the Loan Documents to the Lender in Dollars and in immediately available funds, without any deduction whatsoever, including any deduction for any setoff, recoupment, counterclaim or Taxes (other than Excluded Taxes), by depositing such payment in the Lender Account not later than 1:00 p.m. (New York time) on the due date thereof. Any payments received after 1:00 p.m. (New York time) on any Business Day shall be deemed received on the next succeeding Business Day.

(b)     Whenever any payment to be made hereunder shall be due on a day that is not a Business Day, such payment shall instead be made on the next succeeding Business Day, together with interest accrued during the period of such extension.

### SECTION 2.7     Taxes.

(a)     If the Borrower is required by Applicable Law to make any deduction or withholding in respect of any Taxes (other than Excluded Taxes) from any amount payable under any Loan Document to or for the account of the Lender, the Borrower shall pay to or for the account of the Lender, on the date such amount is payable, such additional amounts as the Lender reasonably determines may be necessary so that the net amounts received by it or for its account, in the aggregate, after all applicable deductions or withholdings, shall equal the amount that the Lender would have been entitled to receive if no deductions or withholdings were made. "Excluded Taxes" means, with respect to any payment to the Lender, any taxes imposed on or measured by the overall net income (including a franchise tax based on net income) of the Lender by the jurisdiction in which it is incorporated, maintains its principal executive office or in which the office from which it lends hereunder is located. If the Borrower shall deduct or withhold any Taxes from any payments under the Loan Documents, it shall provide to the Lender (i) a statement setting forth the amount and type of Taxes so deducted or withheld, the applicable rate and any other information or documentation that the Lender may reasonably request and (ii) as promptly as possible after payment is made to the relevant Governmental Authority, a certified copy of any original official receipt received by the Borrower showing payment.

(b)     If the Lender is required by law to make any payment on account of Taxes (other than Excluded Taxes) on or in relation to any sum received or receivable by it under any Loan Document, or any liability for Taxes (other than Excluded Taxes) in respect of any such payment is imposed, levied or assessed against the Lender, then the Borrower shall pay when due such additional amounts as the Lender determines to be necessary so that the amount received by it, less any such Taxes paid, imposed, levied or assessed, including any Taxes (other than Excluded Taxes) imposed on such additional amounts, shall equal the amount that the Lender would have been entitled to retain in the absence of the payment, imposition, levy or assessment of such Taxes.

15

(c)    If requested by the Borrower, the Lender shall furnish to the Borrower, on the Closing Date, two executed copies of IRS Form W-9 establishing the Lender's legal entitlement on the Closing Date to an exemption from U.S. withholding tax with respect to all payments to be made under the Loan Documents.

## ARTICLE III

## CONDITIONS TO CLOSING AND LOAN

SECTION 3.1    Closing Conditions.  The occurrence of the Closing Date shall be subject to satisfaction of the following:

(a)    Execution of Agreement; Note.  The Lender shall have received a duly executed counterpart of this Agreement and the Note from the Borrower.

(b)    Corporate Documents.  The Lender shall have received:

(i)    a certificate from a Senior Officer of the Borrower, in the form of Exhibit C, attesting to the resolutions authorizing its execution, delivery, and performance of this Agreement and the other Loan Documents and authorizing specific officers of the Borrower to execute the same;

(ii)    copies of the Borrower's Governing Documents, as amended, modified, or supplemented to the Closing Date, certified by a Senior Officer of the Borrower;

(iii)    a certificate of status with respect to the Borrower, dated within ten (10) days prior to the Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of the Borrower, which certificate shall indicate that the Borrower is in good standing in such jurisdiction;

(iv)    certificates of status with respect to the Borrower, each dated within thirty (30) days prior to the Closing Date, such certificates to be issued by the appropriate officer of the jurisdictions (other than the jurisdiction of organization of the Borrower) in which its failure to be duly qualified would constitute a Material Adverse Change, which certificates shall indicate that the Borrower is in good standing in such jurisdictions; and

(v)    copies of the Borrower's and/or Guarantor's licenses, as applicable, issued by the appropriate officer of the jurisdictions in which its failure to be licensed as a viatical and/or life settlement broker would constitute a Material Adverse Change.

(c)    Pledge Agreement.  The Guarantor shall have duly authorized, executed and delivered the Pledge Agreement in the form of Exhibit D (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Pledge Agreement"), together with all certificates representing the shares of Equity Interests pledged thereunder, as well as powers with respect thereto endorsed in blank.  The Guarantor shall have taken all

16

actions necessary or, in the reasonable opinion of the Lender, desirable to perfect and protect the security interests purported to be created by the Pledge Agreement, and the Pledge Agreement shall be in full force and effect.

(d)     **Other Collateral Documents.**  The Lender shall have received the Account Control Agreements, duly executed, and each such document shall be in full force and effect.

(e)     **Lien Searches.**  The Lender shall have received the results of UCC financing statement, pending suit, fixture filing, federal and state tax lien and judgment searches as the Lender shall have requested of the Borrower, and such termination statements or other documents as may be necessary to confirm that the Collateral is subject to no other Liens in favor of any Persons (other than Permitted Liens).

(f)     **Personal Guaranty.**  The Guarantor shall have executed and delivered the Personal Guaranty in the form of Exhibit E (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Personal Guaranty"), guarantying all of the obligations of the Borrower as more fully provided in the Personal Guaranty, and such guaranty shall be in full force and effect.

(g)     **Payment of Taxes.**  The Lender shall have received satisfactory evidence (including a certificate of a Senior Officer of the Borrower) that all tax returns required to be filed by the Borrower have been timely filed and all Taxes upon the Borrower or its properties, assets, income, and franchises have been paid prior to delinquency, except such Taxes, if any, as are being contested in good faith and as to which adequate reserves have been established in accordance with GAAP.

(h)     **Option Agreement.**  The Borrower and the Guarantor shall have executed and delivered to the Lender the Option Agreement and such agreement shall be in full force and effect.

(i)     **Financial Statements; Projections.**  No later than two (2) Business Days prior to the Closing Date, the Lender shall have received and be satisfied with (i) true and correct copies of audited financial statements of the Borrower for the Fiscal Year ended December 31, 2006, (ii) copies of the unaudited financial statements of the Borrower for the Fiscal Year ended December 31, 2007, and (iii) quarterly revenue projections of the Borrower for the Fiscal Year ended after the Closing Date (the "Projections"), which Projections shall be in form and substance satisfactory to the Lender.

(j)     **Solvency Certificate.**  The Lender shall have received a solvency certificate from a Senior Officer of the Borrower in the form of Exhibit F.

(k)     **Employment Agreement.**  The Lender shall have received a certified copy of the employment agreement entered into by the Borrower with the Guarantor and any (the "Employment Agreement"), which Employment Agreement shall be in form and substance satisfactory to the Lender and certified as true, correct and complete by a Senior Officer of the Borrower, together with a certificate of a Senior Officer of the Borrower stating that such

17

agreement remain in full force and effect and that the Borrower is not in breach or default of any of its obligations under such agreement.

(l)     **PATRIOT Act, Etc.**  The Lender shall have received, sufficiently in advance of the Closing Date, any information the Lender may have requested to comply with applicable anti-money laundering and anti-terrorist laws and regulations, including the OFAC Laws and Regulations.

(m)     **Fees and Expenses Paid.**  The Borrower shall have paid (i) all fees due on or before the Closing Date and (ii) all expenses reimbursable by the Borrower under this Agreement or any other Loan Document for which the Borrower shall have been billed on or before the Closing Date.

(n)     **Due Diligence.**  The Lender shall have completed its business, legal, and collateral due diligence, including a review of Borrower's books and records and verification of Borrower's representations and warranties to the Lender, the results of which shall be satisfactory to the Lender.

(o)     **Absence of Litigation Events.**  There shall not have been issued any injunction, order or decree that prohibits or limits any of the transactions contemplated by the Loan Documents and there shall not be any action, suit, proceeding or investigation pending or, to the reasonable best knowledge of the Borrower, currently threatened against the Borrower or the Lender that (i) draws into question the validity, legality or enforceability of any Loan Document or the ability of any such Person to consummate the transactions contemplated thereby or (ii) might result, either individually or in the aggregate, in any Material Adverse Change.

(p)     **Repurchase.**  The Repurchase shall have been consummated in accordance with the terms and conditions of the agreements entered into in connection with the Repurchase and all Applicable Laws.  The Lender shall have received copies of all the documents relating to the Repurchase, which documents shall be in form and substance satisfactory to the Lender and shall be certified as true, correct and complete by a Senior Officer of the Borrower.

(q)     **Corporate and Capital Structure.**  All agreements relating to, and the corporate and capital structure of, the Borrower, and all organizational documents of the Borrower, in each case as the same will exist on the Closing Date after giving effect to the Repurchase, shall be satisfactory to the Lender.  Immediately after giving effect to the Repurchase and the amendment and restatement of the Borrower's operating agreement, the Guarantor shall be the record and beneficial owner of not less than 100% of the Equity Interests of the Borrower.

(r)     **Amendment of LLC Operating Agreement.**  The Borrower's operating agreement shall have been amended, and such operating agreement, as amended, shall be in form and substance satisfactory to the Lender in its sole discretion.

(s)     **Notice and Approval of Borrowing.**  The Borrower shall have delivered to the Lender a Notice of Borrowing as and when required pursuant to Section 2.1(b).

18

NY 71391948

(t)    **No Default.**  No Default or Event of Default shall exist or result from the making of the Loan.

(u)    **No Material Adverse Change.**  No Material Adverse Change shall have occurred since the date of the financial statements referred to in <u>Section 5.6(a)</u>.

(v)    **Representations and Warranties.**  The representations and warranties contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

(w)    **Licenses; Approvals.**  The Borrower shall have received all licenses, approvals or evidence of other actions required by any Governmental Authority in connection with the execution and delivery by the Borrower of the Loan Documents or with the consummation of the transactions contemplated thereby.

(x)    **General.**  All other documents and legal matters in connection with the transactions contemplated by this Agreement shall have been delivered or executed or recorded in form and substance satisfactory to the Lender, and the Lender shall have received all such counterpart originals or certified copies thereof as the Lender may request.

## ARTICLE IV

## CREATION OF SECURITY INTEREST

**SECTION 4.1    Grant of Security Interest.**  The Borrower hereby grants to the Lender a continuing security interest in all of its right, title, and interest in all currently existing and hereafter acquired or arising Borrower Collateral in order to secure prompt repayment of any and all of the Obligations in accordance with the terms and conditions of the Loan Documents and in order to secure prompt performance by the Borrower of each of its covenants and duties under the Loan Documents.  The Lender's Liens in and to the Borrower Collateral shall attach to all Borrower Collateral without further act on the part of the Lender or the Borrower.  Anything contained in this Agreement or any other Loan Document to the contrary notwithstanding, except for Permitted Dispositions, the Borrower has no authority, express or implied, to dispose of any item or portion of the Collateral.

**SECTION 4.2    Negotiable Collateral.**  In the event that any Borrower Collateral, including proceeds, is evidenced by or consists of Negotiable Collateral, and if and to the extent that Lender determines that perfection or priority of the Lender's security interest is dependent on or enhanced by possession, the Borrower, immediately upon the request of the Lender, shall endorse and deliver physical possession of such Negotiable Collateral to the Lender.

**SECTION 4.3    Collection of Accounts, General Intangibles, and Negotiable Collateral.**  At any time after the occurrence and during the continuation of an Event of Default, the Lender or the Lender's designee may (a) notify Account Debtors of the Borrower that the Borrower's Accounts, Chattel Paper, or General Intangibles have been assigned to the Lender or

19

that the Lender has a security interest therein, or (b) collect the Borrower's Accounts, Chattel Paper, or General Intangibles directly.

SECTION 4.4    Filing of Financing Statements; Commercial Tort Claims; Delivery of Additional Documentation Required.   (a)  The Borrower authorizes the Lender to file any financing statement necessary or desirable to effectuate the transactions contemplated by the Loan Documents, and any continuation statement or amendment with respect thereto, in any appropriate filing office without the signature of the Borrower where permitted by applicable law. The Borrower hereby ratifies the filing of any financing statement filed without the signature of the Borrower prior to the date hereof.

(b)     If the Borrower acquires any Commercial Tort Claims after the date hereof, the Borrower shall promptly (but in any event within three (3) Business Days after such acquisition) deliver to the Lender a written description of such Commercial Tort Claim and shall deliver a written agreement, in form and substance satisfactory to the Lender, pursuant to which the Borrower shall pledge and collaterally assign all of its right, title and interest in and to such Commercial Tort Claim to the Lender, as security for the Obligations (a "Commercial Tort Claim Assignment").

(c)     At any time upon the request of the Lender, the Borrower shall execute or deliver to the Lender any and all financing statements, original financing statements in lieu of continuation statements, fixture filings, security agreements, pledges, assignments, Commercial Tort Claim Assignments, endorsements of certificates of title, and all other documents (collectively, the "Additional Documents") that the Lender may request, in form and substance satisfactory to the Lender, to create, perfect and continue perfected or to better perfect the Lender's Liens in the assets of the Borrower (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), to create and perfect Liens in favor of the Lender in any Real Property acquired after the Closing Date, and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents.  To the maximum extent permitted by applicable law, the Borrower authorizes the Lender to execute any such Additional Documents in the Borrower's name and authorizes the Lender to file such executed Additional Documents in any appropriate filing office.  In addition, on such periodic basis as the Lender shall require, the Borrower shall (i) provide the Lender with a report of all new material patentable, copyrightable, or trademarkable materials acquired or generated by the Borrower during the prior period, (ii) cause all material patents, copyrights, and trademarks acquired or generated by the Borrower that are not already the subject of a registration with the appropriate filing office (or an application therefor diligently prosecuted) to be registered with such appropriate filing office in a manner sufficient to impart constructive notice of the Borrower's ownership thereof, and (iii) cause to be prepared, executed, and delivered to the Lender supplemental schedules to the applicable Loan Documents to identify such patents, copyrights, and trademarks as being subject to the security interests created thereunder.

SECTION 4.5    Power of Attorney.  The Borrower hereby irrevocably makes, constitutes, and appoints the Lender (and any of the Lender's officers, employees, or agents designated by the Lender) as the Borrower's true and lawful attorney, with power to (a) if the Borrower refuses to, or fails timely to execute and deliver any of the documents described in Section 4.4, sign the name of the Borrower on any of the documents described in Section 4.4, (b)

20

at any time that an Event of Default has occurred and is continuing, sign the Borrower's name on any invoice or bill of lading relating to the Borrower Collateral, drafts against Account Debtors, or notices to Account Debtors, (c) send requests for verification of the Borrower's Accounts, (d) endorse Borrower's name on any of its payment items (including all of its Collections) that may come into the Lender's possession, (e) at any time that an Event of Default has occurred and is continuing, make, settle, and adjust all claims under the Borrower's policies of insurance and make all determinations and decisions with respect to such policies of insurance, and (f) at any time that an Event of Default has occurred and is continuing, settle and adjust disputes and claims respecting the Borrower's Accounts, Chattel Paper, or General Intangibles directly with Account Debtors, for amounts and upon terms that Lender determines to be reasonable, and the Lender may cause to be executed and delivered any documents and releases that the Lender determines to be necessary. The appointment of the Lender as the Borrower's attorney, and each and every one of its rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully and finally repaid and performed and the Lender's obligations to extend credit hereunder are terminated.

SECTION 4.6    Right to Inspect. The Lender and its officers, employees, or agents shall have the right, from time to time hereafter to inspect the Books of the Borrower and make copies or abstracts thereof and to check, test, and appraise the Collateral, or any portion thereof, in order to verify the Borrower's financial condition or the amount, quality, value, condition of, or any other matter relating to, the Collateral.

SECTION 4.7    Account Control Agreements. The Borrower agrees that it will not transfer assets out of any of its Deposit Accounts or Securities Accounts; provided, however, that so long as no Event of Default has occurred and is continuing or would result therefrom, the Borrower may use such assets (and the proceeds thereof) to the extent not prohibited by this Agreement or the other Loan Documents and, if the transfer is to another bank or securities intermediary, so long as the Borrower, the Lender, and the substitute bank or securities intermediary have entered into an Account Control Agreement. The Borrower agrees that it will take any or all reasonable steps that the Lender requests in order for the Lender to obtain control in accordance with Sections 9-104, 9-105, 9-106, and 9-107 of the UCC with respect to any of its Securities Accounts, Deposit Accounts, Chattel Paper, Investment Property, and Letter-of-Credit Rights. No arrangement contemplated hereby or by any Account Control Agreement in respect of any Securities Accounts or other Investment Property shall be modified by the Borrower without the prior written consent of the Lender. Upon the occurrence and during the continuance of a Default or Event of Default, the Lender may notify any bank or securities intermediary to liquidate the applicable Deposit Account or Securities Account or any related Investment Property maintained or held thereby and remit the proceeds thereof to the Lender Account.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

On the Closing Date, the Borrower makes the following representations and warranties, all of which shall survive the execution and delivery of this Agreement and the Note and the making of the Loan:

21

SECTION 5.1    Organization.  The Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, has full limited liability company power and authority to own or lease its properties and carry on its business as heretofore conducted and as proposed to be conducted, and is qualified or licensed to do business as a foreign corporation in all jurisdictions where the nature or conduct of its business or its property makes such qualification or licensing necessary.

SECTION 5.2    Power; Authorization; Enforceability.  The Borrower has all requisite legal and limited liability company power to enter into this Agreement and each other Loan Document to which it is a party and to carry out and perform all of its obligations under the terms hereof and thereof.  All limited liability company action on the part of the Borrower and its managers, officers, directors and/or members, as applicable, that is necessary for the authorization, execution and delivery of this Agreement and each other Loan Document to which it is a party and, for the performance of the Borrower's obligations under this Agreement and each other Loan Document to which it is a party, has been taken and has not been rescinded. This Agreement and each other Loan Document constitutes the valid and binding obligations of the Borrower, enforceable against it in accordance with their respective terms, except as enforcement may be limited by equitable principles and by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to creditors' rights generally.

SECTION 5.3    No Violation.  The execution, delivery and performance by the Borrower of this Agreement or any other Loan Document, or the consummation of the transactions contemplated hereby and thereby will not (i) violate any provision of the certificate of formation or operating agreement of the Borrower, (ii) except for consents that have been obtained and are in full force and effect, conflict with, result in a breach of, or constitute (or, with the giving of notice or lapse of time or both, would constitute) a default under, or require the approval or consent of any Person pursuant to, any Contractual Obligation of the Borrower, or violate any Applicable Law binding on the Borrower, or (iii) result in the creation or imposition of any Lien upon any asset of the Borrower, or any income or profits therefrom, except for Liens in favor of the Lender under the Loan Documents.

SECTION 5.4    Governmental Approvals.  Except for filings and recordings in connection with the perfection of Liens created by the Loan Documents, no Governmental Approval is or will be required to be obtained or made by the Borrower in connection with the execution, delivery and performance by the Borrower of any Loan Document to which it is a party or the transactions contemplated thereby or to ensure the legality, validity or enforceability thereof.

SECTION 5.5    Subsidiaries.  On the Closing Date, the Borrower has no Subsidiaries and owns no Equity Interests of any other Person.

SECTION 5.6    Financial Information.

(a)    The balance sheet of the Borrower as of December 31, 2006 and the Borrower's statements of income, members' equity and cash flow for the Fiscal Year then ended, certified by Theiss, Lipner & Co., LLP, independent certified public accountants of the Borrower, copies of which have been delivered to the Lender, were prepared in accordance with

NY 71391948

GAAP consistently applied and fairly present in all material respects the Borrower's financial position, as of the date thereof, and the Borrower's results of operations and cash flow for the period then ended.  The Borrower on such date did not have any material Contingent Obligations, liabilities for Taxes or long-term leases, forward or long-term commitments or unrealized losses from any unfavorable commitments that are not reflected in the foregoing statements or in the notes thereto and that, individually or in the aggregate, are material.

(b)    The Borrower's unaudited balance sheet as of December 31, 2007 and the Borrower's related statement of income, members' equity and cash flow for the period then ended, certified by a Senior Officer, copies of which have been delivered to the Lender, were prepared in accordance with GAAP consistently applied (except to the extent noted therein) and fairly present in all material respects the Borrower's financial position as of such date and the results of operations and cash flow for the period then ended, subject to the absence of footnotes and normal year-end audit adjustments.  The Borrower on such date did not have any material Contingent Obligations, liabilities for Taxes or long-term leases, forward or long-term commitments or unrealized losses from any unfavorable commitments that are not reflected in the foregoing statements or in the notes thereto and that, individually or in the aggregate, are material.

(c)    The Projections delivered to the Lender prior to the Closing Date have been prepared in good faith and are based on reasonable assumptions at the time of delivery thereof and on the Closing Date, and there are no statements or conclusions in the Projections which are based upon or include information known to the Borrower to be misleading at the time of preparation thereof or on the Closing Date in any material respect or which fail to take into account material information known to the Borrower at the time of preparation thereof or on the Closing Date, the Borrower believes that the Projections are reasonable and attainable, it being recognized by the Lender, however, that projections as to future events are not to be viewed as facts and that the actual results during the period or periods covered by the Projections may differ from the projected results.

SECTION 5.7    No Material Adverse Changes; Solvency.  Since the date of the financial statements referred to in Section 5.6(a), there has been no Material Adverse Change. The Borrower is and will be Solvent giving effect to the making of the Loan hereunder.

SECTION 5.8    Litigation.  Except as set forth on Schedule 5.8, the Borrower is not a party to, and, to the Borrower's knowledge, is not threatened with, any litigation, suit, action, investigation, proceeding or controversy before any Governmental Authority relating to its business, operations, assets or financial condition, or in any way involving the Loan Documents or the transactions contemplated thereby.

SECTION 5.9    Agreements; Applicable Law.  The Borrower is not in violation of any Applicable Law, or in default under its charter or bylaws or any of its Contractual Obligations, except where such violation or default could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

SECTION 5.10    Taxes.  All United States federal income tax returns and all other material tax returns required to be filed by the Borrower have been filed and all Taxes

23

required to have been paid by the Borrower have been paid, except such Taxes, if any, as are being contested in good faith and as to which adequate reserves have been established in accordance with GAAP. To the reasonable best knowledge of the Borrower, there have not been asserted or proposed to be asserted any Tax deficiency against the Borrower (except deficiencies that, individually or in the aggregate, could not reasonably be expected to be material) that is not reserved against on the financial books of the Borrower.

SECTION 5.11  ERISA.  Other than exceptions to any of the following that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect: (a) neither a Reportable Event nor an "accumulated funding deficiency" (within the meaning of Section 412 of the Code or Section 302 of ERISA) has occurred during the five year period prior to the date on which this representation is made or deemed made with respect to any Plan, and each Plan has complied in all respects with the applicable provisions of ERISA and the Code; (b) no termination of a Single Employer Plan has occurred, and no Lien in favor of the PBGC or a Plan has arisen, during such five-year period; (c) the present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Plan allocable to such accrued benefits; (d) neither the Borrower nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or could reasonably be expected to result in a liability under ERISA; and (e) no such Multiemployer Plan is in Reorganization or Insolvent.

SECTION 5.12  Title to Property.  The Borrower has good title to or valid and subsisting leasehold interests in all of its property reflected in its books and records as being owned or leased by it. No such property is subject to any Lien, other than Permitted Liens. The Borrower does not own any Real Property.

SECTION 5.13  Intellectual Property, Etc.

(a)   Schedule 5.13(a) contains a complete and correct list of all the Borrower's Intellectual Property Rights. Except as set forth on Schedule 5.13(a), the Borrower owns or has the exclusive right to use pursuant to license, sublicense, agreement or permission all Intellectual Property Rights, free from any Lien and free from any requirement of any past, present or future royalty payments, license fees, charges or other payments, conditions or restrictions whatsoever.

(b)   Except as set forth on Schedule 5.13(b), there are no contractual restrictions or limitations pursuant to any orders, decisions, injunctions, judgments, awards or decrees of any Governmental Authority on the Borrower's right to use the name and mark "Life Asset Group" in the conduct of the Borrower's business as presently carried on by it.

(c)   Except as set forth on Schedule 5.13(c), the Intellectual Property Rights do not infringe any third party right. The Borrower is not aware of any claim regarding the validity of any of the Intellectual Property Rights, or any claim that any of the Intellectual Property Rights infringe any third party right.

24

NY 71391948

**SECTION 5.14    Environmental Condition.**  Except as set forth on Schedule 5.14,

(a)    each Real Property leased or operated by the Borrower is free from contamination from any Hazardous Materials, except contamination that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  To the best knowledge of the Borrower, there has been no material Release or threatened Release of any Hazardous Materials at any Real Property currently or previously owned by the Borrower or at any third-party location to which the Borrower transported or arranged for the disposal or treatment of Hazardous Materials.  To the reasonable best knowledge of the Borrower, no polychlorinated biphenyls (PCBs) (including PCBs contained in dielectric fluid in any transformers, capacitors, ballasts or other equipment) or asbestos is stored, used or located on, or has been disposed of at, any Real Property owned, leased or operated by the Borrower, except to the extent that such storage, use, location or disposal, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  The Borrower or, to the reasonable best knowledge of the Borrower, any prior owner or other user of any Real Property has not caused or suffered, or is reasonably expected to cause or suffer, any material Environmental Damages.

(b)    the Borrower or, to the reasonable best knowledge of the Borrower, any prior owner or other user of any Real Property owned, leased or operated by the Borrower or any adjacent property has received notice of any actual or alleged material violation of Environmental Requirements, or notice of any actual or alleged material liability for Environmental Damages in connection with the Real Property leased or operated by the Borrower or such adjacent property.  There exists no order, judgment or decree, and there is not pending or, to the best knowledge of the Borrower, threatened, any action, suit, proceeding or investigation relating to any actual or alleged liability arising out of the presence or suspected presence of Hazardous Material, any actual or alleged violation of Environmental Requirements or any actual or alleged liability for Environmental Damages in connection with any Real Property leased or operated by the Borrower or the business or operations of the Borrower (except for non-material Environmental Damages) nor, to the reasonable best knowledge of the Borrower, does there exist any basis for such action, suit, proceeding or investigation being instituted or filed.

**SECTION 5.15    Use of Proceeds; Margin Regulations.**  (a) The proceeds of the Loan will be used (i) to partially fund the Repurchase in the amounts and to the Persons listed in Schedule 1.1(a), (ii) to refinance the existing indebtedness owed by the Borrower to the Lender pursuant to the Promissory Note, and (iii) for working capital needs and general corporate purposes of the Borrower in accordance with the Budget.

(b)    The Loan will not be used to purchase or carry any margin stock (within the meaning of Regulations T, U, and X) or to extend credit for the purpose of purchasing or carrying any margin stock.  Neither the making of the Loan nor the use of the proceeds thereof will violate or be inconsistent with the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

25

SECTION 5.16   Investment Company Acts.   The Borrower is not an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

SECTION 5.17   Labor Matters.   There are no material strikes or other labor disputes or grievances pending or, to the reasonable best knowledge of the Borrower, threatened against the Borrower.  There are no collective bargaining agreements to which the Borrower is a party.

SECTION 5.18   Capitalization.   The authorized, issued and outstanding Equity Interests of the Borrower as of the Closing Date is set forth on Schedule 5.18.  All of the issued and outstanding shares of Equity Interests of the Borrower have been duly authorized, validly issued and are fully paid, nonassessable, free and clear of all Liens (other that the Liens in favor of the Lender), and such shares were issued in compliance with all Applicable Laws.  On the Closing Date, the Borrower has no outstanding securities convertible into or exchangeable for, or warrants, options or other rights for the purchase or acquisition from the Borrower of, any shares of its Equity Interests, except as contemplated in the Option Agreement.

SECTION 5.19   Disclosure.   The information in each document, certificate or written statement (other than the Projections) furnished to the Lender by or on behalf of the Borrower with respect to the business, assets, prospects, profitability, results of operation or financial condition of the Borrower for use in connection with the transactions contemplated by this Agreement or any other Loan Document at the time of delivery thereof, was true and correct in all material respects and did not omit, when considered as a whole, any material fact necessary in order to make the statements made not misleading, in light of the circumstances under which they were made.

SECTION 5.20   Liens.   The Lender's Liens on, and security interest in, all right, title and interest of the Borrower in the Collateral granted under the Loan Documents and the proceeds thereof, are validly created, perfected, and first priority Liens and superior in right to any other Person (except Permitted Liens).

SECTION 5.21   Legal Names, Type of Organization, Jurisdiction of Organization, Etc.   Schedule 5.21 attached hereto contains the Borrower's exact legal name, the type of organization of the Borrower, whether or not the Borrower is a registered organization, the Borrower's jurisdiction of organization, the Borrower's organizational identification number (if any) and the address of the Borrower's chief executive office.  To the extent that the Borrower does not have an organizational identification number on the date hereof and later obtains one, the Borrower shall promptly thereafter notify the Lender of such organizational identification number and shall take all actions satisfactory to the Lender to the extent necessary to maintain the security interest of the Lender in the Collateral intended to be granted hereby fully perfected and in full force and effect.

SECTION 5.22   Deposit Accounts and Securities Accounts.   Set forth on Schedule 5.22 are all of the Borrower's Deposit Accounts and Securities Accounts, including, with respect to each bank or securities intermediary (i) the name and address of such Person, and

NY 71391948

(ii) the account numbers of the Deposit Accounts or Securities Accounts maintained with such Person.

SECTION 5.23    Commercial Tort Claims.  As of the Closing Date, Borrower does not hold any Commercial Tort Claims, except as set forth on Schedule 5.23.

SECTION 5.24    Debt.  Set forth on Schedule 5.24 is a true and complete list of all Debt of the Borrower outstanding immediately prior to the Closing Date that is to remain outstanding after the Closing Date and such Schedule accurately reflects the aggregate principal amount of such Debt and the principal terms thereof.

## ARTICLE VI

## AFFIRMATIVE COVENANTS

So long as any principal or interest on the Loan is outstanding or unpaid or any other Obligation remains unpaid hereunder:

SECTION 6.1    Financial Statements and Other Reports.  The Borrower shall deliver, or cause to be delivered, to the Lender:

(a)    within ninety (90) days after the end of each Fiscal Year, the Borrower's balance sheet as of the end of such Fiscal Year and the related statements of income, members' equity and cash flow for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year, all in reasonable detail and accompanied by an unqualified report thereon of Theiss, Lipner & Co, LLC, or other independent certified public accountants of recognized national standing selected by the Borrower and satisfactory to the Lender;

(b)    within forty-five (45) days after the end of each Fiscal Quarter, a balance sheet of the Borrower as of the end of such Fiscal Quarter and the Borrower's related unaudited statement of income, members' equity and cash flow for such Fiscal Quarter, setting forth in each case in comparative form the corresponding figures for the corresponding Fiscal Quarter of the prior Fiscal Year, all in reasonable detail and certified by a Senior Officer of Borrower as fairly presenting in all material respects the Borrower's financial condition as of the dates indicated, and its results of operations and cash flow for the periods indicated, in conformity with GAAP, subject to normal year-end adjustments and the absence of footnotes;

(c)    no later than thirty (30) days prior to the first day of each Fiscal Year of the Borrower, a budget in form reasonably satisfactory to the Lender (including budgeted statements of income, statements of cash flow, balance sheets for the Borrower) for each quarter during such Fiscal Year prepared in detail and setting forth, with appropriate discussion, the principal assumptions upon which such budgets are based;

(d)    together with each delivery of financial statements pursuant to Sections 6.1(a) and 6.1(b) above, a certificate of a Senior Officer of the Borrower substantially in the form of Exhibit G (a "Compliance Certificate"), duly completed;

27

(e)     within one Business Day after any Senior Officer of the Borrower becomes aware of the occurrence of any Default or Event of Default, a certificate of such Senior Officer setting forth the details thereof and the action that the Borrower is taking or proposes to take with respect thereto;

(f)     promptly after, and in any event within fifteen (15) days after, the Borrower knows or has reason to know thereof, notice of any of the following events: (i) the occurrence of any Reportable Event with respect to any Plan, a failure to make any required contribution to a Plan, the creation of any Lien in favor of the PBGC or a Plan or any withdrawal from, or the termination, Reorganization or Insolvency of, any Multiemployer Plan; or (ii) the institution of proceedings or the taking of any other action by the PBGC or the Borrower or any Commonly Controlled Entity or any Multiemployer Plan with respect to the withdrawal from, or the termination, Reorganization or Insolvency of, any Plan;

(g)     within two (2) Business Days after the Borrower obtains knowledge of the threat or commencement of litigation or proceedings affecting the Borrower, or of any material development in any pending or threatened litigation or proceedings, which litigation or proceedings, if adversely determined, could reasonably be expected to have a Material Adverse Effect or which question the validity or enforceability of any Loan Document, notice providing reasonable details about the threat or commencement of such litigation or proceedings or about such material development;

(h)     within one Business Day after any Senior Officer obtains knowledge of the threat or commencement of regulatory proceedings by any Governmental Authority affecting the licensing of the Borrower or any of its employees, including, but not limited to, suspension or revocation of any license to act as a viatical settlement broker or life settlement broker in any of the jurisdictions requiring such licensure, or of any material development in any pending or threatened regulatory proceeding, notice providing reasonable detail about the threat or commencement of such regulatory proceeding or about any such material development;

(i)     within five (5) Business Days after receipt thereof, copies of all final reports or letters submitted to the Borrower by its independent certified public accountants in connection with each audit of the financial statements of the Borrower made by such accountants, including any management report;

(j)     within five (5) Business Days after the receipt thereof by any Senior Officer of the Borrower, a copy of any notice, summons, citation or written communication concerning any actual, alleged, suspected or threatened violation of Environmental Requirements, or liability of the Borrower for Environmental Damages; and

(k)     from time to time such additional information regarding the Borrower or its business, assets, liabilities, prospects, results of operations or condition (financial or otherwise) as the Lender may reasonably request.

SECTION 6.2     Accounting, Records and Inspection, Etc.     The Borrower shall maintain a system of accounting established and administered in accordance with GAAP consistently applied, and will set aside on its books all such proper reserves as shall be required

28

by GAAP. The Borrower shall keep and maintain complete books and records that are accurate and correct in all material respects. The Borrower shall permit such Persons as the Lender may designate, at reasonable times and as often as may be requested, under reasonable circumstances, to (a) visit and inspect any of its properties, (b) inspect and copy its books and records, and (c) discuss with its officers and employees, its investment bankers and its independent accountants, its business, assets, liabilities, prospects, results of operations or financial condition.

SECTION 6.3    Limited Liability Company Existence, Etc. The Borrower shall at all times preserve and keep in full force and effect its existence as a limited liability company and all licenses, material rights, franchises and other Governmental Approvals.

SECTION 6.4    Payment of Taxes and Other Obligations. The Borrower shall (a) timely file or cause to be filed all Tax returns and reports required to be filed by it, or be included in any Tax return that is required to include it, and pay and discharge all Taxes imposed upon it or any of its properties or in respect of any of its franchises, business, income or property before any interest or penalty shall be incurred with respect to such Taxes and (b) timely pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its other material obligations of any nature; provided, however, that, in the case of each of clause (a) and (b), unless (i) any failure to so pay or discharge any such Taxes or other obligations could not reasonably be expected to have a Material Adverse Effect, or (ii) the validity or amount thereof is being contested in good faith and by appropriate proceedings and so long as any reserves or other appropriate provisions as may be required by GAAP shall have been made therefor.

SECTION 6.5    Maintenance of Properties. The Borrower shall maintain or cause to be maintained in good repair, working order and condition (ordinary wear and tear excepted) all properties and other assets that are material to the conduct of its business, and from time to time shall make or cause to be made all appropriate repairs, renewals and replacements thereto.

SECTION 6.6    Maintenance of Insurance.

(a)    The Borrower shall cause to be maintained with financially sound and reputable insurance companies insurance in at least such amounts, of such character and against at least such risks as is usually maintained by companies of established repute engaged in the same or a similar business in the same general area. The Borrower shall cause all liability insurance policies to name the Lender as additional insured. Each insurance policy covering Collateral shall include endorsements or stipulations providing that coverages will not be cancelled or materially diminished without at least 30 days' prior written notice to the Lender and further providing that coverage in favor of the Lender will not be impaired in any way by any act, omission or default of the Borrower or any other Person. In connection with all policies of insurance covering Collateral, the Borrower will provide the Lender with such loss payable or other endorsements as the Lender may require.

(b)    (i) All property loss or damage insurance policies with respect to any assets of the Borrower shall contain lenders loss payable endorsements in favor of the Lender in form and substance satisfactory to it, which shall provide that all insurance proceeds payable

29

after the insurer has received written notice from the Lender that an Event of Default then exists (until a contrary notice is received), shall be payable directly to the Lender, (ii) all insurance policies shall (A) provide that no cancellation, reduction in amount or material adverse change in coverage thereof shall be effective until at least thirty (30) days after receipt by the Lender of written notice thereof, (B) insure the interests of the Lender regardless of any breach of or violation by the Borrower or any other Person of any warranties, declarations or conditions contained therein, and (C) provide that the Lender shall have no obligation or liability for premiums, commissions, assessments or calls in connection with such insurance or in connection with any representation or warranty made by the Borrower in connection with obtaining of such insurance, and (iii) all business interruption and extra expense insurance shall name the Lender as a loss payee.

(c)    The Borrower shall (i) provide the Lender certificates of renewal with respect to each policy of insurance promptly upon receipt of same or (ii) notify the Lender within three (3) Business Days of receipt of notice by the Borrower of any non-renewal of any insurance policy. If at any time after the Closing Date the Borrower obtains any new property loss or damage insurance policy, the Borrower shall, within thirty (30) days after such new policy is obtained, give notice to the Lender describing the new insurance and provide to the Lender certificates of insurance evidencing such policy, including endorsements as required hereby, and if requested by the Lender a copy of such policy.

**SECTION 6.7    Conduct of Business.** The Borrower shall engage only in the businesses in which the Borrower is engaged on the date hereof. The Borrower shall conduct its business in compliance with all Applicable Law and all its Contractual Obligations except to the extent any noncompliance could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

**SECTION 6.8    Additional Guaranties and Collateral.**

(a)    Upon the acquisition by the Borrower of any fee interest in Real Property or other asset with a Fair Market Value in excess of $25,000 that is not then subject to a first priority Lien in favor of the Lender, the Borrower shall execute and deliver to the Lender (i) a mortgage or other Collateral Document creating such a first priority Lien, and (ii) such other documents as are required by the Lender. The Borrower, at its own expense, shall execute and deliver, or cause to be executed and delivered, and thereafter cause to be registered, filed or recorded with the appropriate Governmental Authority, any and all documents and instruments deemed by the Lender to be necessary or desirable for the creation and perfection of the foregoing Liens and shall pay all Taxes and fees related to such registration, filing or recording.

(b)    Concurrently with the receipt by or for the account of the Borrower of Non-Cash Proceeds of any Asset Disposition, the Borrower shall promptly perform or cause to be performed all actions the Lender considers necessary or advisable to grant, create, perfect and maintain perfected a first priority security interest in such Non-Cash Proceeds in favor of the Lender.

(c)    Upon establishing or opening any new Deposit Account or Securities Account in accordance with the provision of Section 7.16 hereof, the Borrower shall cause each

30

depositary bank or securities intermediary, as applicable, to enter into an Account Control Agreement with respect to each such Deposit Account and Securities Account.

SECTION 6.9     Environmental Compliance.  The Borrower shall comply in all material respects with all Environmental Requirements and shall not cause or permit to exist on any Real Property owned, leased or operated by the Borrower any Hazardous Materials, unless the presence of such materials is necessary for the conduct of the business of the Borrower, all necessary Governmental Approvals for such activity have been obtained and there is no material risk that any Environmental Damages could result from such activity.

SECTION 6.10     Guarantor Reports.  The Borrower shall cause the Guarantor to deliver its annual financial statements at the time when the Borrower provides its audited financial statements to the Lender, and copies of all federal income tax returns as soon as the same are available and in any event no later than thirty (30) days after the same are required to be filed by law.

SECTION 6.11     Disclosure Updates.  The Borrower shall, promptly and in no event later than five (5) Business Days after obtaining knowledge thereof, notify the Lender of any written information, exhibit or report furnished to the Lender containing any untrue statement of a material fact or omitting to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made.  The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the affect of amending or, modifying this Agreement or any of the Schedules hereto.

SECTION 6.12     Post-Closing Actions.  The Borrower hereby agrees to deliver to the Lender:

(a)     within thirty (30) days after the Closing Date, a detailed quarterly budget (including budgeted statements of income, statements of cash flow and balance sheets) for the Borrower covering the Fiscal Year ending December 31, 2008, and setting forth, with appropriate discussion, the principal assumptions upon which such budget is based (the "Budget"), which Budget shall be in form and substance satisfactory to the Lender;

(b)     within ninety (90) days after the Closing Date, the Borrower's balance sheet for the Fiscal Year ended December 31, 2007, and the related statements of income, members' equity and cash flow for such Fiscal Year, accompanied by an unqualified report thereon of Theiss, Lipner & Co, LLC, or other independent certified public accountants of recognized national standing selected by the Borrower and satisfactory to the Lender; and

(c)     within thirty (30) days after the Closing Date, certificates of insurance for the business and properties of the Borrower, in form and substance satisfactory to the Lender and naming the Lender as an additional insured and/or as loss payee, and stating that such insurance shall not be canceled or the amount of coverage thereunder materially reduced without at least thirty (30) days' prior written notice by the insurer to the Lender.

31

# ARTICLE VII

## NEGATIVE COVENANTS

So long as any principal or interest on the Loan is outstanding or unpaid or any other Obligation remains unpaid hereunder:

SECTION 7.1    Liens.  The Borrower shall not, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any of its assets or property, tangible or intangible, or any income or profits therefrom, whether now owned or hereafter acquired, except:

(a)    Liens securing the Obligations;

(b)    Liens existing on the Closing Date and listed on Schedule 7.1(b) hereto;

(c)    (i) Liens for taxes, assessments or charges of any Governmental Authority for claims that are not material and are not yet due or are being contested in good faith by appropriate proceedings, and, in each case, with respect to which adequate reserves or other appropriate provisions are being maintained in accordance with GAAP; (ii) statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen, bankers and other Liens imposed by law and created in the ordinary course of business; (iii) Liens incurred and deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security benefits or to secure the performance (including by way of surety bonds or appeal bonds) of tenders, bids, leases, contracts, statutory obligations or similar obligations or arising as a result of progress payments under contracts, in each case in the ordinary course of business and not relating to the repayment of Debt; and (iv) building restrictions, zoning laws and other statutes, laws, rules, regulations, ordinances and similar restrictions; provided that clauses (i), (ii) and (iii) shall not apply to (A) Environmental Liens, (B) Liens that, under Applicable Law, would have priority over the Liens granted to the Lender or (C) Liens imposed under ERISA; and

(d)    any attachment or judgment Lien not constituting an Event of Default.

SECTION 7.2    Debt.  The Borrower shall not, directly or indirectly, create, incur, assume, guarantee, or otherwise become or remain liable with respect to, any Debt, except:

(a)    the Obligations; and

(b)    Debt existing on the Closing Date and listed on Schedule 5.22 hereto.

SECTION 7.3    Restricted Payments.  The Borrower shall not make, directly or indirectly, declare, pay or make, or agree to declare, pay or make, any Restricted Payment.

SECTION 7.4    Investments and Acquisitions.  The Borrower shall not, directly or indirectly, make or own any Investment or make any Acquisition, except Investments in (i) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United

32

States, in each case maturing within one year from the date of acquisition thereof, (ii) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and having, at the time of acquisition, the highest rating obtainable from either Standard & Poor's Rating Group or Moody's Investors Service, Inc., (iii) commercial paper having, at the time of acquisition, the highest rating obtainable from either Standard & Poor's Rating Group or Moody's Investors Service, Inc., (iv) demand deposits, certificates of deposit, other time deposits, and bankers' acceptances maturing within one year from the date of acquisition thereof issued by any bank operating under the laws of the United States or any state thereof or the District of Columbia that has combined capital and surplus of not less than $500,000,000, or (v) institutional money market funds that are rated "AAA" by Standard & Poor's Rating Group and "Aaa" by Moody's Investors Service, Inc. organized under the laws of the United States of America or any state thereof substantially all of whose assets are securities of the types described in the foregoing clauses (i), (ii), (iii), and (iv); provided, however, that the Borrower shall not make or own any of the Investments in the foregoing clauses (i), (ii), (iii), (iv) and (v) in Deposit Accounts or Securities Accounts unless the Borrower and the applicable securities intermediary or bank have entered into Account Control Agreements governing such Investments in order to perfect (and further establish) the Lender's Liens in such Investments. Subject to the foregoing proviso, the Borrower shall not establish or maintain any Deposit Account or Securities Account unless Lender shall have received an Account Control Agreement in respect of such Deposit Account or Securities Account.

SECTION 7.5   Expenditures. The Borrower shall not make any expenditures in any quarter in excess of 102% of the amount set forth for expenditures in the Budget for such quarter.

SECTION 7.6   Minimum Net Income. The Borrower shall not permit Net Income as of the last day of any Fiscal Quarter to be less than fifty percent (50%) of the projected Net Income set forth in Schedule 7.6 for such Fiscal Quarter; it being agreed that such projected Net Income shall not include any income from contracts that the Borrower anticipates receiving from the Lender.

SECTION 7.7   Restriction on Fundamental Changes. The Borrower shall not directly or indirectly, (a) enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its Equity Interests, (b) liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), (c) convey, sell, lease, license, assign, transfer, or otherwise dispose of, in one transaction or a series of transactions, all or any substantial part of its assets.

SECTION 7.8   Asset Disposition; Event of Loss. The Borrower shall not directly or indirectly, make or agree to make, any Asset Disposition, other than Permitted Dispositions.

SECTION 7.9   Transactions with Affiliates. The Borrower shall not directly or indirectly, enter into any transaction with any of its Affiliates, unless such transaction is on fair and reasonable terms no less favorable to the Borrower than those terms that might be obtained at the time in a comparable arm's length transaction with a Person who is not an

NY 71391948

Affiliate or, if such transaction is not one that by its nature could be obtained from such other Person, is on fair and reasonable terms and was negotiated in good faith.

SECTION 7.10   Amendments of Charter Documents and Other Agreements.  The Borrower shall not (a) amend its Governing Documents in any respect that increases the payment obligations of the Borrower, affects the validity or enforceability of any Loan Document or Lien thereunder or that otherwise could reasonably be expected to have a Material Adverse Effect, (b) amend, modify or change any Employment Agreement without obtaining the prior written consent of the Lender, or directly or indirectly pay or provide, or agree to pay or provide, any form of compensation, including, without limitation, any bonus or other incentive payment or right, to any of the employees covered by the Employment Agreements other than the compensation paid pursuant to the terms of the Employment Agreements and explicitly set forth therein or (c) amend or terminate any other material agreement, instrument or license to which it is a party or by which it is bound.

SECTION 7.11   Negative Pledges, Etc.  The Borrower shall not enter into or otherwise become subject to, directly or indirectly, any agreement prohibiting or restricting the Borrower in any manner (including by way of covenant, representation or default), from (a) incurring, creating or assuming any Debt or Lien upon any of its assets, (b) selling or otherwise disposing of any of its assets, (c) making any Investments or Capital Expenditures, (d) suffering any change of control, or (e) amending any Loan Document, except that any such prohibition or restriction may prohibit or restrict (i) Debt or Liens to be incurred, created or assumed, to the same (but no greater) extent as such incurrence, creation or assumption is prohibited or restricted under the Loan Documents, and (ii) dispositions of assets, Investments or Capital Expenditures, to the same extent (but no greater) as such dispositions, Investments or Capital Expenditures are prohibited or restricted under the Loan Documents, or (iii) any change of control that also constitutes a Change of Control.

SECTION 7.12   Issuance of Equity Interests.  The Borrower shall not issue any Equity Interests to any Person, except in connection with the Option Agreement.

SECTION 7.13   Subsidiaries.  The Borrower shall not establish, create or acquire any Subsidiary.

SECTION 7.14   Accounting Principles.  The Borrower shall not make any change in the accounting principles underlying the financial statements described in Sections 5.6(a) and 5.6(b), except for changes mandated by GAAP.

SECTION 7.15   Change of Legal Names; Type of Organization; Jurisdiction of Organization, Etc.  The Borrower shall not change its name, its type of organization, its status as a registered organization, its jurisdiction of organization, its location or organizational identification number; provided, however, that the Borrower may change its name upon at least thirty (30) days prior written notice to the Lender of such change and so long as in connection with any such name change, the Borrower shall have provided to the Lender all financing statements necessary to perfect and continue perfected the Lender's Liens in the Collateral and taken all actions requested by the Lender to maintain the Lender's Liens in the Collateral.

34

**SECTION 7.16**    Deposit Accounts and Securities Accounts.  The Borrower shall not establish or open any Deposit Accounts or Securities Accounts, other than those accounts listed on Schedule 5.22 hereto, without the Lender's prior written consent.

## ARTICLE VIII

## EVENTS OF DEFAULT

**SECTION 8.1**    Events of Default.  The occurrence of any one or more of the following events, acts or occurrences shall constitute an event of default (each an "Event of Default"):

(a)    **Failure to Make Payments.**  The Borrower (i) shall fail to pay as and when due (whether at stated maturity, upon acceleration, upon required prepayment or otherwise) any principal of the Loan, or (ii) shall fail to pay any interest, fees or other amounts payable under the Loan Documents within three (3) Business Days of the date when due under the Loan Documents; or

(b)    **Default in Other Debt.**  (i) The Borrower shall default in the payment (whether at stated maturity, upon acceleration, upon required prepayment or otherwise), beyond any period of grace provided therefor, of any principal of or interest on any Debt with a principal amount in excess of $10,000, or (ii) any other breach or default (or other event or condition) shall occur under any agreement, indenture or instrument relating to any such Debt, if the effect of such breach or default (or such other event or condition) is to cause, or to permit the holder or holders of the Debt (or a Person on behalf of such holder or holders) to cause (upon the giving of notice, the lapse of time or both, or otherwise), the Debt to become or be declared due and payable, or required to be prepaid, redeemed, purchased or defeased (or an offer of prepayment, redemption, purchase or defeasance be made), prior to its stated maturity (other than prepayments, redemptions, purchases (or offers therefor) required in connection with asset dispositions, events of loss or excess cash flow); or

(c)    **Breach of Certain Covenants.**  The Borrower shall fail to perform, comply with or observe any agreement, covenant or obligation under Section 6.1(e), Section 6.3 (insofar as it requires the preservation of the Borrower's existence at a limited liability company) or any Section of Article VII; or

(d)    **Other Defaults Under Loan Documents.**    The Borrower or the Guarantor shall fail to perform, comply with or observe any agreement, covenant or obligation under any provision of any Loan Document (other than those provisions referred to in Sections 7.1(a) and 7.1(c)) and such failure shall not have been remedied within ten (10) days after a Senior Officer of the Borrower becomes aware of such failure; or

(e)    **Breach of Warranty.**  Any representation or warranty or certification made or furnished by the Borrower under any Loan Document shall prove to have been false or incorrect in any material respect when made (or deemed made); or

(f)    **Involuntary Bankruptcy; Appointment of Receiver, Etc.**  There shall be commenced against the Borrower or the Guarantor an involuntary case seeking the liquidation

35

or reorganization of the Borrower or the Guarantor under Chapter 7 or Chapter 11, respectively, of the Bankruptcy Code or any similar proceeding under any other Applicable Law or an involuntary case or proceeding seeking the appointment of a receiver, liquidator, sequestrator, custodian, trustee or other officer having similar powers of the Borrower or the Guarantor or to take possession of all or a substantial portion of its property or to operate all or a substantial portion of its business, and any of the following events occur: (i) the Borrower or the Guarantor consents to the institution of such involuntary case or proceeding; (ii) the petition commencing the involuntary case or proceeding is not timely controverted; (iii) the petition commencing such involuntary case or proceeding remains undismissed and unstayed for a period of sixty (60) days; or (iv) an order for relief shall have been issued or entered therein; or

(g)    **Voluntary Bankruptcy; Appointment of Receiver, Etc.**  The Borrower or the Guarantor shall institute a voluntary case seeking liquidation or reorganization under Chapter 7 or Chapter 11, respectively, of the Bankruptcy Code or any similar proceeding under any other Applicable Law, or shall consent thereto; or shall consent to the conversion of an involuntary case to a voluntary case; or shall file a petition, answer a complaint or otherwise institute any proceeding seeking, or shall consent to or acquiesce in the appointment of, a receiver, liquidator, sequestrator, custodian, trustee or other officer with similar powers of it or to take possession of all or a substantial portion of its property or to operate all or a substantial portion of its business; or shall make a general assignment for the benefit of creditors; or shall generally not pay its debts as they become due; or the Board of Directors of the Borrower (or any committee thereof) adopts any resolution or otherwise authorizes action to approve any of the foregoing; or

(h)    **ERISA Liabilities.**  (i) Any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan, or any Lien in favor of the PBGC or a Plan shall arise on the assets of the Borrower or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Lender, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) the Borrower or any Commonly Controlled Entity shall, or in the reasonable opinion of the Lender shall be likely to, incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect or result in an exposure to the Borrower in an amount in excess of $25,000; or

(i)    **Termination of Loan Documents, Etc.**  Any Loan Document, or any material provision thereof, shall cease to be in full force and effect for any reason, or any Lien in favor of the Lender thereunder shall fail to have the priority required thereunder, except upon a release or termination of such Loan Document or Lien pursuant to the terms thereof; or the Borrower or the Guarantor shall contest or purport to repudiate or disavow any of its obligations

36

under or the validity of enforceability of any Loan Document or any material provision thereof; or

        (j)    **Judgments and Attachments.**  (i) The Borrower or the Guarantor shall suffer (A) any money judgments, fines, writs or warrants of attachment or similar processes that, individually or in the aggregate, involve an amount or Fair Market Value in excess of $25,000 (excluding therefrom money judgments to the extent covered by insurance as to which the carrier has accepted liability) or (B) any other material non-monetary judgment or decree (including a judgment for injunctive relief), and, in any such case, such judgments, fines, writs, warrants or other orders shall continue unsatisfied and unstayed (1) for a period of thirty (30) days, (2) in the case of any such writ or warrant of attachment or similar process, until ten (10) days prior to the date of any proposed sale thereunder or (3) in the case of any such non-monetary judgment, until the effectiveness of such judgment; or (ii) a judgment creditor shall obtain possession of any assets of the Borrower or the Guarantor with a Fair Market Value in excess of $25,000 by any means, including levy, distraint, replevin or self-help; or

        (k)    **City of Miami Beach Lien.**  The Lien upon the Guarantor's real and personal property resulting from the Guarantor's violation of Miami Beach City Code Chapter 14, Sections 14-31 and 14-33, ordered by the Special Master for the City of Miami Beach on March 12, 2008, and recorded in the Public Records of Miami-Dade County, Florida, on April 9, 2008, shall not be discharged and satisfied for a period of thirty (30) days after the Closing Date; or

        (l)    **Material Adverse Change.**  A Material Adverse Change shall occur after the Closing Date; or

        (m)    **Change of Control.**  A Change of Control shall occur; or

        (n)    **Default under Option Agreement.** The Borrower or the Guarantor shall fail to perform, comply with or observe any agreement, covenant or obligation under any provision of the Option Agreement and such failure shall not have been remedied within the period of grace provided therefor in the Option Agreement; or

        (o)    **Default under Employment Agreement.**  The Guarantor shall fail to perform, comply with or observe any agreement, covenant or obligation under any provision of the Guarantor's Employment Agreement and such failure shall not have been remedied within the period of grace provided therefor in such Employment Agreement.

        **SECTION 8.2**    <u>Remedies.</u>  Upon the occurrence, and during the continuation, of an Event of Default, the Lender (at its election but without notice of its election and without demand) may do any one or more of the following, all of which are authorized by Borrower:

        (a)    declare all Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, or otherwise, immediately due and payable;

37

(b)     cease advancing money or extending credit to or for the benefit of the Borrower under this Agreement, under any of the Loan Documents, or under any other agreement between the Borrower and the Lender;

(c)     terminate this Agreement and any of the other Loan Documents as to any future liability or obligation of the Lender, but without affecting any of the Lender's Liens in the Collateral and without affecting the Obligations;

(d)     settle or adjust disputes and claims directly with the Borrower's Account Debtors for amounts and upon terms which the Lender considers advisable, and in such cases, the Lender will credit the Borrower with only the net amounts received by the Lender in payment of such disputed Accounts after deducting all costs, fees, charges and expenses incurred or expended in connection therewith;

(e)     cause the Borrower to hold all of its returned Inventory in trust for the Lender, segregate all such Inventory from all other assets of the Borrower or in the Borrower's possession;

(f)     without notice to or demand upon the Borrower, make such payments and do such acts as the Lender considers necessary or reasonable to protect its security interests in the Collateral. The Borrower agrees to assemble the Collateral if the Lender so requires, and to make the Collateral available to the Lender at a place that the Lender may designate which is reasonably convenient to both parties. The Borrower authorizes the Lender to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any Lien that in the Lender's determination appears to conflict with the Lender's Liens in and to the Collateral and to pay all expenses incurred in connection therewith. With respect to any of the Borrower's owned or leased premises, Borrower hereby grants the Lender a license to enter into possession of such premises and to occupy the same, without charge, in order to exercise any of the Lender's rights or remedies provided herein, at law, in equity, or otherwise;

(g)     ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell (in the manner provided for herein) the Collateral. The Borrower hereby grants to the Lender a license or other right to use, without charge, the Borrower's Intellectual Property Rights, and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and Borrower's rights under all licenses and all franchise agreements shall inure to the Lender's benefit;

(h)     sell the Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including the Borrower's premises) as the Lender determines is commercially reasonable. It is not necessary that the Collateral be present at any such sale;

(i)     Lender shall give notice of the disposition of the Collateral as follows:

(i)     the Lender shall give the Borrower a notice in writing of the time and place of public sale, or, if the sale is a private sale or some other disposition other

NY 71391948

than a public sale is to be made of the Collateral, the time on or after which the private sale or other disposition is to be made; and

(ii)    the notice shall be personally delivered or mailed, postage prepaid, to the Borrower as provided in <u>Section 9.7</u>, at least ten (10) days before the earliest time of disposition set forth in the notice; no notice needs to be given prior to the disposition of any portion of the Collateral that is perishable or threatens to decline speedily in value or that is of a type customarily sold on a recognized market;

(iii)    the Lender may credit bid and purchase at any public sale;

(iv)    the Lender may seek the appointment of a receiver or keeper to take possession of all or any portion of the Collateral or to operate same and, to the maximum extent permitted by law, may seek the appointment of such a receiver without the requirement of prior notice or a hearing; and

(v)    the Lender shall have all other rights and remedies available at law or in equity or pursuant to any other Loan Document; <u>provided</u>, <u>however</u>, that upon the occurrence of any Event of Default described in <u>Section 8.1(f)</u> or <u>Section 8.1(g)</u>, in addition to the remedies set forth above, without any notice to the Borrower or any other Person or any act by the Lender, the Loan and all other Obligations then outstanding, together with all accrued and unpaid interest thereon and all fees and all other amounts due under this Agreement and the other Loan Documents, shall automatically and immediately become due and payable, without presentment, demand, protest, or notice of any kind, all of which are expressly waived by the Borrower.

## ARTICLE IX

## MISCELLANEOUS

SECTION 9.1    <u>Expenses</u>.  The Borrower shall pay promptly after demand:

(a)    any and all fees and disbursements of the Lender's advisors and attorneys and other out-of-pocket costs and expenses incurred by the Lender in connection with (i) the development, drafting and negotiation of, and due diligence associated with, the Loan Documents and the closing of the transactions contemplated thereby and (ii) any amendments to or the administration of the Loan Documents; and

(b)    any and all costs and expenses (including fees and disbursements of attorneys, appraisers and consultants) incurred by the Lender in any workout, restructuring or similar arrangements or, after a Default, in connection with the protection, preservation, exercise or enforcement of any of the terms of the Loan Documents or in connection with any foreclosure, collection or bankruptcy proceedings.

SECTION 9.2    <u>Indemnity</u>.

(a)    The Borrower shall indemnify, defend and hold harmless the Lender and the officers, directors, employees, agents, attorneys, affiliates, successors and assigns of the

39

Lender (collectively, the "Indemnitees") from and against (i) any and all transfer taxes, documentary taxes, assessments or charges made by any Governmental Authority by reason of the execution delivery, filing or recording of the Loan Documents or the making of the Loan, and (ii) any and all liabilities, losses, damages, penalties, judgments, claims, costs and expenses of any kind or nature whatsoever (including attorneys' fees and disbursements in connection with any actual or threatened investigative, administrative or judicial proceeding, whether or not such Indemnitee shall be designated a party thereto) that may be imposed on, incurred by or asserted against such Indemnitee, in any manner relating to or arising out of the Loan Documents, the Loan, and the use or intended use of the proceeds of the Loan (the "Indemnified Liabilities"); provided that no Indemnitee shall have the right to be indemnified or held harmless hereunder for its own gross negligence or willful misconduct, as determined by a final judgment of a court of competent jurisdiction.

(b)     Without limiting the generality of the foregoing, the Borrower further agrees to fully and promptly pay, perform, discharge, defend, indemnify and hold harmless each Indemnitee from and against any Environmental Damages; provided that the Borrower shall have no obligation to any Indemnitee hereunder with respect to any Environmental Damages to the extent such Environmental Damages arise solely from the gross negligence or willful misconduct of that Indemnitee as determined by a final judgment of a court of competent jurisdiction. To the extent that the undertaking to defend, indemnify, pay and hold harmless set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under Applicable Law to the payment and satisfaction of all Environmental Damages incurred by the Indemnitees or any of them subject to the same type of qualifications and exclusions provided in this Section 9.2 with respect to indemnification for other Indemnified Liabilities.

(c)     To the extent that the undertaking to indemnify and hold harmless set forth in Section 9.2(a) may be unenforceable as violative of any Applicable Law or public policy, the Borrower shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities that is permissible under Applicable Law. All Indemnified Liabilities shall be payable on demand.

SECTION 9.3    Demand; Protest.    The Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, Chattel Paper, and guarantees at any time held by the Lender on which the Borrower may in any way be liable.

SECTION 9.4    Lender's Liability for Collateral.    The Borrower hereby agrees that: (a) so long as the Lender complies with its obligations, if any, under the UCC, the Lender shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by the Borrower.

SECTION 9.5    Waivers; Amendments in Writing.

40

NY 71391948