UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CONCORD CAPITAL MANAGEMENT,
LLC f/k/a InsCap Management, LLC

        Plaintiff,

v.

GARY BRECKA,

        Defendant.

Case No. 11 Civ. 5545 (DLC)
ECF Case

**AFFIDAVIT OF GARY BRECKA IN SUPPORT OF MOTION TO SET ASIDE AND VACATE DEFAULT JUDGMENT PURSUANT TO RULES 55 AND 60**

STATE OF FLORIDA    )
                              )
COUNTY OF COLLIER  )

GARY BRECKA, sworn, declares as follows:

1.    I am a resident and domiciliary of the State of Florida and have lived in Florida since 2000. I am the named Defendant in the above-referenced action captioned <u>CONCORD CAPITAL MANAGEMENT, LLC f/k/a InsCap Management, LLC, Plaintiff, v. Gary Brecka, Defendant</u>, Case No. 11 Civ. 5545 (DLC) (the "<u>Federal Action</u>"). My address is 9146 Quartz Lane, Naples, Florida, and I have lived at that address since April 2012.

2.    I submit this Affidavit for the purpose of setting aside and vacating the Default Judgment entered in this Action. The matters set forth herein are based upon my personal knowledge or, where stated, on information and belief.

3.    As set forth in greater detail below, the Motion should be granted because, among other things, the documents that form the basis for Concord Capital Management, LLC's ("Concord")[1] complaint in this action were procured by Concord through its false

---

[1] Concord Capital Management LLC was initially "InsCap Management LLC". All Concord entities and its predecessor-in-interest InsCap are collectively referred to throughout this Motion as "Concord" unless otherwise specified.

misrepresentations and other wrongful conduct. The transaction underlying this action was between Concord and Life Asset Group, LLC ("LAG").

### Concord and InsCap

4.    The documents attached to Concord's Complaint as Exhibit 1 (the "LAG Loan")[2] were part of a larger picture of Concord's business activities. Concord was a life insurance premium finance company. Concord, its predecessor-in-interest InsCap, and its financial backer Columbus Nova, created what it called the "Ultra" Program in September 2007. The Ultra Program involved Concord making premium finance loans to irrevocable life insurance trusts (ILITs) established by high-net worth individuals who were not required to pay any premiums until after the two-year incontestability period, and for as long as five years from the initiation of the loan. The trustee of each ILIT entered into a Loan and Security Agreement" pursuant to which the ILIT "borrowed" funds from Concord to pay very high life insurance premiums on the life of the insured. Concord received, upon information and belief, very substantial fees associated with the loan. If the individual insured had not died in the 2-5 year time frame, he or she forfeited the policy to Concord absent payment of a very high premium. Concord then owned a very valuable policy on an individual for which Concord could maintain premium payments until the individual insured died, at which point Concord collected the proceeds. This is known in the industry as "stranger-originated life insurance."

5.    Concord intended to use the insurance policies as collateral to secure financing from its lender, Fifth Third Bank ("Fifth Third") and, upon information and belief, to re-sell them in a secondary market.

---

[2] While disputing that the transaction was a true loan, I am referring to the transaction in this affidavit as the "LAG Loan" for the sake of simplicity.

6. LAG was a life settlement brokerage in the insurance industry that operated from 2002 to 2009. I served as an executive and Manager of LAG from June 2003 to May 2008, when I joined Concord as "Head of Distribution" as part of the transaction that led to Concord's acquisition of LAG. Prior to being acquired by Concord, LAG's equity interests were held by myself and 15 other shareholders. Compl. Ex. 1 at Sched. 1.1(a).

7. Prior to my joining Concord as an employee, in January 2008, Concord engaged LAG to use its knowledge of the life settlement industry to validate loan models Concord intended to use in connection with the Ultra Program.

8. Subsequently, I was asked to join InsCap as the head of distribution and sell the policies under the Ultra Program to high-net worth individuals. The proposal included InsCap's desire to acquire LAG.

9. The transaction Concord proposed was, at its core, a stock purchase agreement whereby Concord agreed to purchase the equity interests and shares (units) of LAG for $2.8 million. Other than $1,105,000 to pay LAG's 15 shareholders as a down-payment on 50% of the purchase of their shares (which became collateral for the "loan"), and $500,000 for my shares and to repay my prior loan to LAG. The remaining $1.2 million balance of the proceeds could only be used pursuant to an "Account Control Agreement" effectively controlled by Concord, not LAG or myself. I had no signatory control over the account into which the $1.2 million was deposited. I did not acquire any equity interest in Concord at any time.

10. The transaction resulted in InsCap's intended objective of a pledge of 100% of LAG shares, including its various divisions and business units and LAG's valuable proprietary software CRM system, to InsCap. InsCap thus acquired total control over all LAG bank accounts (including those containing InsCap's money). Essentially, Concord paid itself to

acquire the LAG company and its assets. LAG employees began to work exclusively for InsCap on InsCap clients and loans and were eventually acquired as InsCap's own employees.

11. Concord, Columbus Nova, and Concord's counsel Stroock Stroock & Lavan prepared the transaction documents. I was not represented by counsel in that transaction. Compl. Ex. 1 at pp. 41-42 (Section 9.7).

12. Concord and Columbus Nova wanted to structure the transaction as a "loan" and avoid titling it as an outright stock purchase agreement for its own business reasons which, upon information and belief, included InsCap's desire to say publicly that it was not engaged in the Life Settlement industry.

13. By way of further inducement to procure my consent to the transaction, Concord agreed to give LAG a share of proceeds (7.5%) from Concord's "premium finance loan facility" called "HSH", which Concord defined in the LAG Loan document. *See* Compl. Ex. 1 (at p. 7, p. 14 at 2.5(B)(ii)). Concord represented that the proceeds from the HSH program to LAG would be very high and that the 7.5% would be sufficient to repay the "note." The 7.5% (derived from Concord in the first place) could then be returned right back to Concord and used to "pay back" the alleged loan. Although not known to me at the time, the HSH program proved to be a fictional scheme designed by Concord that never came into existence or had a hope of yielding any profit, let alone a profit that would allow 7.5% to amount to $2.8 million. The structure is very similar to the same structure Concord used in the Ultra program, in which Concord "loaned" money to a borrower that eventually resulted in the collateral of that sale reverting back to Concord, thereby converting the loan into a sale.

14. Concord eventually gave $2.8 million pursuant to a document titled a "Term Loan" that was governed by an "Account Control Agreement" that was not attached to

4

the Complaint. An unsigned copy of the Account Control Agreement that, upon information and belief, was signed and is Concord's possession, is attached hereto as Exhibit A. The Account Control Agreement provided as follows:

### Article 1 DEFINITIONS AND RELATED MATTERS

**"Account Control Agreement"** *means an agreement in form and substance satisfactory to the Lender entered into with respect to any Deposit Account or Securities Account of the Borrower or any Guarantor, pursuant to which the Lender shall have "control" (with the meaning of the Uniform Commercial Code) over such account.*

**Section 2.2 Use of Proceeds.** *The proceeds of the Loan shall be used by the Borrower (I) Partially to fund the Repurchase in the amounts and to the persons listed in the Schedule 1.1(a) (ii) to refinance the Promissory Note, and (iii) for working capital needs and general corporate purposes of the borrower in accordance with the Budget.*

**Section 2.5 (b) (ii) Repayments and Prepayments:** On each date on or after the Closing Date upon which the Borrower receives any cash proceeds from the HSH Hybrid Program, the Loan shall be prepaid by an amount equal to the amount of such cash proceeds.

**ARTICLE III CONDITIONS TO CLOSING AND LOAN: SECTION 3.1 (d):** *Other Collateral Documents. The Lender shall have received the Account Control Agreement, duly executed, and each such document shall be in full force and effect.*

15. Ultimately, the "HSH Program" never materialized. Concord acquired 100% of LAG's shares, and absorbed all of LAG's assets, including its employees. The Collateral acquired by Concord was sufficient to satisfy any obligations that arose from the LAG Loan. There was therefore no deficiency to be recovered by the personal guarantee.

16. I permanently resigned from Concord in October 2009.

### The New York Action

17. On the afternoon of August 30, 2010, Concord's representatives asked me to meet with Richard Kellner, Concord's agent, and Jason Epstein, a member of Concord's Board of Directors, in New York to discuss their intentions of commencing legal action for claims arising out of the Ultra program. My request to reschedule the conference was rebuffed.

18. I quickly retained Nolan Sheehan 24 hours prior, to represent me at the meeting. I flew to New York in the early morning of August 31, 2010 for the meeting, held at the offices of Concord's attorney, Kasowitz Benson, and returned to Florida that night. I did not stay overnight in New York. I did not attend to any matters in New York other than the meeting at Kasowitz's office.

19. During the August 31st meeting, Kellner told me and Nolan Sheehan that Concord would not name me as a defendant in the dispute with Fifth Third if I cooperated with Concord and gave them information and documentation that, in Concord's view, would help Concord's case and investigation. I agreed to do so and Concord agreed not to involve me in litigation arising out of the Ultra program. I left New York that night.

20. When I returned to Florida, Concord sent a forensic computer company (selected by Concord) to retrieve the information in my possession. I gave the representative multiple hard drives, a laptop computer, servers, storage media, and hardware containing years of backup data and storage of electronic communications. Concord still has, upon information and belief, possession of these materials and has not returned them to me. The material I gave to Concord in reliance on its representations that it would not litigate against me includes information that I need to support my action. I have no way of knowing if Concord has destroyed or damaged the data I gave them in reliance on their representations.

21. Concord's representatives also asked me at that meeting and multiple times thereafter to give them an affidavit supporting its case against Matt Ross, a Fifth Third executive which I did not do.

22. Concord brought a separate action in the Supreme Court of the State of New York, New York County, captioned <u>Concord v. Fifth Third Bank National Association, et al.</u>, Index No. 650478/2010 (the "NY Action"). The NY Action named Fifth Third, Bank of America, and Ira Brody (Concord's director) as defendants alleging, among other things, that Fifth Third funded loans that it knew were under-collateralized and ignored the manipulation of underwriting criteria because it received large fees from each Ultra transaction. Concord did not name me as a defendant in the NY Action it filed.

## The Federal Action

23. Although I became embroiled in a heavily contested divorce and custody dispute which required much of my time and attention, I continued to communicate with Richard Kellner of Concord throughout 2010 and 2011, long after the supposed "Maturity Date" of the LAG Loan in May 2009.

24. I have a vague recollection of receiving a legal document sometime in 2011 that resembled the same complaint that Concord had drafted and showed me in advance of the August 31st meeting. Still relying on Concord's assurance that it would not sue me, I asked Richard Kellner and Eric Kosta (Concord's general counsel) why I received the document. I was told "not to worry" and that it was necessary for them to treat all guarantors equally but that they did not intend to pursue it. I relied on their representations. I continued to help Richard Kellner and Concord and provide them with information to the best of my ability and in good faith that they would keep their word.

7

25. During this time period, I communicated directly with Richard Kellner by telephone and email from Florida to resolve any issues arising out of the LAG transaction. He continued to assure me that the filing was not intended to result in any action against me but was done for the purpose of strengthening Concord's litigation in other areas. I continued to offer additional email back up files that were stored after their forensic computer company retrieved my files.

26. I was previously told both by Ira Brody and Harish Rhagavan (Concord's CFO and CEO, respectively) that there was no outstanding obligation on the LAG Loan and that it had been satisfied in full on Concord/InsCap's books. I communicated that fact to Richard Kellner.

27. Other than the Complaint, I did not receive any other information about the Federal Action. I recently learned from my counsel that Concord filed an Order to Show Cause for Default Judgment on October 10, 2011 that required service of the Order to Show Cause by email and regular mail to me. Although Concord's attorney apparently filed an affidavit of service of those papers, upon information and belief, I did not receive them. I also did not receive service of the Default Judgment.

28. Even though Concord and I are co-defendants in an Illinois action that is currently pending, and I continue to communicate with Concord's representatives, Concord never communicated to me or my attorneys that it had obtained the Default Judgment.

29. I consulted my attorney in Florida and retained local counsel in New York upon discovery of the Default Judgment. This motion to set aside and vacate the default judgment was filed as soon as practically possible upon discovery of the default.

## Concord's Claims Are Without Merit

30. There are meritorious defenses to Concord's claims. <u>First</u>, there was no loan. Concord and its counsel drafted transaction documents that reflect a stock purchase agreement disguised as a loan to conceal its ownership of a life settlement company for its own business purposes. <u>Second</u>, Concord received the stock and assets of LAG in exchange for any monies it transferred to accounts that Concord itself controlled through bank administered, account control agreements. Concord then absorbed all of LAG's assets and its employees, most of whom wound up on Concord's payroll. Concord thus received benefits that were valued far in excess of any monies "loaned" to LAG (which, upon information and belief, eventually found their way back into Concord's coffers. <u>Third</u>, upon entering into the stock exchange with LAG, Concord absorbed hundreds of LAG clients and agents. Fourth, the personal guarantee, the alleged "Term Loan", and the Account Control Agreement were all procured by Concord and its agents' fraudulent activities in this and other transactions. A copy of the Proposed Answer and Affirmative Defenses is attached hereto as Exhibit B.

31. As set forth above, Concord's Federal Action is premised on a transaction that was designed by Concord to be fraudulent. More importantly, any obligations that arose under that transaction were fully satisfied when Concord acquired LAG's stock and all its assets.

32. Concord thus filed the Federal Action seeking recovery on a personal guarantee that was without basis. It induced my reliance on their representations that the complaint was not intended to result in a judgment to be enforced against me. It is respectfully submitted that Concord's conduct constitutes a fraud on the Court for pursuing a frivolous action and obtaining a baseless judgment. Concord's false representations and accusations have had

9

and continue to have a detrimental impact on my livelihood, financial services career, my licenses, my carrier appointments and my reputation.

33. Throughout the time that Concord filed its Federal Action (August 2011) and the time it entered its Default (December 3, 2011), and thereafter, Concord has continued to communicate with me through its representatives and through its counsel in the Illinois action. At no time has any of Concord's representatives or attorneys ever communicated that they intended to pursue and enforce a default judgment against me. Compounding the craftiness with which it sought to obtain an invalid judgment, Concord continued to represent that it would not involve me in its litigation and to date has not returned any of my computer materials.

### There is No Personal Jurisdiction Over Me in New York State

34. The personal guarantee is both unenforceable and void as it was procured as a result of Concord's fraudulent representations. To the extent that it is invalid, any consent to jurisdiction contained therein is also invalid. There is no other independent basis for the exercise of personal jurisdiction over me in New York.

35. I am a resident and domiciliary of Florida and have lived there since 2000. I do not maintain a place of business in New York. I am not a controlling or other member of any corporation registered to do business in New York or with a place of business in New York State. I do not have any phone number, facsimile number, mailing address, or officers or agents in New York State other than counsel in this action. I do not own any real or personal property in New York. I do not and have never paid any New York State income taxes or corporate taxes

36. My trip to New York at Plaintiff's request was not made in connection with the personal guarantee, which had been signed years earlier in May 2008. All of the events


relating to the personal guarantee, the "Term Loan", and Concord's de facto acquisition of LAG occurred outside of New York State.

37. I do not personally derive any, let alone substantial, revenue from the State of New York. Accordingly, I respectfully submit to the Court that there is no basis for New York to exercise jurisdiction over me and that the Default Judgment does not comport with due process or the requirements of the C.P.L.R.

WHEREFORE, I respectfully request that the Court set aside and vacate the Default Judgment pursuant to Rules 55 and 60, together with such other legal and equitable relief as this Court may find just, proper, and necessary.

_____
Gary Brecka

STATE OF FLORIDA        )
                        )
COUNTY OF COLLIER       )

SWORN TO AND SUBSCRIBED before me, an officer duly authorized to administer oaths and take acknowledgments, personally appeared, GARY BRECKA, known to me to be the person described in and who executed the foregoing instrument, who acknowledged before me that he executed same and that an oath was taken.

WITNESS my hand and official seal in the County and State last aforesaid this 19th day of October, 2012.

Alicia Barnes

Notary Public State of Florida
Alicia Barnes
My Commission EE 834296
Expires 09/11/2016

_____
Notary Public