# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------- x

CONCORD CAPITAL MANAGEMENT, LLC,
CONCORD PARTNERS, LLC, CONCORD
CAPITAL FUNDING, LLC, and CONCORD
CAPITAL FUNDING, INC.,

          Plaintiffs,

    - against -

FIFTH THIRD BANK (as successor in interest to
FIFTH BANK, NATIONAL ASSOCIATION),
BANK OF AMERICA, N.A. (as successor in
interest to LASALLE BANK NATIONAL
ASSOCIATION), and IRA L. BRODY,

          Defendants.

-------------------------------------------------- X

Index No. 650478/2010
Date Purchased: May 28, 2010

**AMENDED SUMMONS
WITH NOTICE**

Plaintiffs designate New York
County as the place of trial.

The basis of the venue is
C.P.L.R. § 501

TO THE ABOVE-NAMED DEFENDANTS:

    YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiffs' attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York), and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in notice set forth below.

**Notice:** This is an action for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, conversion, breach of contract, gross negligence, and breach of the implied covenant of good faith and fair dealing arising from the collapse of Concord Capital Management, LLC, Concord Partners, LLC, Concord Capital Funding, LLC, and Concord Capital Funding, Inc. due to defendants' tortious conduct and breaches of contract in connection with a credit facility known as "Ultra." The relief sought is monetary and punitive damages, interest, costs, and fees.

Upon your failure to appear, judgment will be taken against you by default for the sum of not less than $70 million plus statutory interest thereon and fees as the Court may award.

Dated: New York, New York
September 14, 2010

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

By: _____
Marc E. Kasowitz
Andrew K. Glenn
Charles M. Miller
Kanchana Wangkeo Leung

1633 Broadway
New York, NY 10019
(212) 506-1700
Attorneys for Plaintiffs

TO:

Fifth Third Bank
38 Fountain Square Plaza
Cincinnati, OH 45202
Attn: Legal Department

Fifth Third Bank
Legal Department
5050 Kingsley Drive
Mail Drop 1 MOC 2Q
Cincinnati, OH 45263

Graydon, Head and Ritchey LLP
511 Walnut Street
Cincinnati, OH 45202

Fifth Third Bank National Association
1000 Town Center Drive, Suite 1400
Southfield, MI 48075
Attn: Legal Department

Fifth Third Bank
222 South Riverside Plaza, Suite 3000
Chicago, IL 60606
Attn: Legal Department

Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
Attn: Michael J. Gill
(Attorneys for Fifth Third Bank)

Bank of America, N.A.
(as successor in interest to LaSalle Bank National Association)
2600 W. Big Beaver Road, Suite 140
Troy, MI 48084
Attn: Legal Department

Bank of America, N.A.
(as successor in interest to LaSalle Bank National Association)
135 S. LaSalle Street
Chicago, IL 60674
Attn: Legal Department

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022
Attn: Andrew B. Messite

Ira L. Brody
6815 Halls Hill Pike
Murfreesboro, TN 37130

Ira L. Brody
613 Purchase Street
Rye, NY 10580-1863

Marc E. Kasowitz (mkasowitz@kasowitz.com)
Andrew K. Glenn (aglenn@kasowitz.com)
Charles M. Miller (cmiller@kasowitz.com)
Kanchana Wangkeo Leung (kleung@kasowitz.com)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Tel:   (212) 506-1700
Fax:   (212) 506-1800

Attorneys for Plaintiffs

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------- x

CONCORD CAPITAL MANAGEMENT, LLC,
CONCORD PARTNERS, LLC, CONCORD
CAPITAL FUNDING, LLC, and CONCORD
CAPITAL FUNDING, INC.,

     Plaintiffs,

  - against -

FIFTH THIRD BANK (as successor in interest to
FIFTH THIRD BANK, NATIONAL
ASSOCIATION), BANK OF AMERICA, N.A.
(as successor in interest to LASALLE BANK,
NATIONAL ASSOCIATION), and IRA L.
BRODY,

     Defendants.

-------------------------------------------------------------- X

Index No. 650478/2010

**COMPLAINT**

**JURY TRIAL DEMANDED**

  Plaintiffs CONCORD CAPITAL MANAGEMENT, LLC (f/k/a InsCap Management, LLC), CONCORD PARTNERS, LLC (f/k/a InsCap Partners, LLC), CONCORD CAPITAL FUNDING, LLC, and CONCORD CAPITAL FUNDING, INC. (collectively, "Concord" or the "Company"), for their complaint against defendants FIFTH THIRD BANK (as successor in interest to Fifth Third Bank, National Association) ("Fifth Third"), BANK OF AMERICA, N.A.

(as successor in interest to LaSalle Bank, National Association) ("BofA"), and IRA L. BRODY ("Brody"), allege as follows:

### Preliminary Statement

1. This action arises from a shocking scheme, involving fraud, forgery, and bribery, in which a renegade group of executives of plaintiff Concord (the "Insiders"), a life insurance premium finance company -- aided and abetted by Concord's bank, defendant Fifth Third -- looted the assets of Concord. Fifth Third's participation in and assistance to the fraudulent scheme was substantial. Among other things, Fifth Third: knowingly funded loans that it knew posed unacceptable credit risks or were fraudulent, but that generated millions of dollars in fraudulent fees; knowingly and repeatedly covered overdrafts on Concord's bank accounts, which the renegade executives, led by Brody, looted to make huge illegal payments to themselves and Fifth Third; and otherwise participated in the misappropriation of assets. In addition, BofA, the loan servicer and collateral agent charged with monitoring compliance with loan criteria, utterly failed to do so in breach of its contractual obligations to Concord. Indeed, this fraudulent scheme would not have been accomplished without the active and illegal participation and assistance of Fifth Third and BofA.

2. As a result of the looting and the bogus loans generated by the Concord executives, Concord lost hundreds of millions of dollars, and its business was destroyed. Accordingly, Concord, now controlled by its largest equity holder, Nina Investments LLC ("Nina"), brings this action to recover the damages it has suffered as a result of Brody and the Insiders' breaches of fiduciary duty, Fifth Third's aiding and abetting those breaches, and BofA's gross negligence and egregious breaches of contract to service the premium loans.

3. Brody and the Insiders executed their unlawful scheme by, among other things, portraying as successful a defective new loan product -- known as "Ultra" -- that they and other

Concord executives, in conjunction with Fifth Third, conceived and developed in 2007. Pursuant to Ultra, high net worth individuals would (through trusts) purchase life insurance policies and finance the premiums and origination fees with loans originated by Concord, financed by Fifth Third, and secured by the market value of the policies (unlike traditional life insurance premium loans, which were secured by policy cash surrender values and letters of credit). Because of the stringent Ultra underwriting requirements as specified in the facility documents, the Concord executives could not generate meaningful legitimate business with qualified insureds, so they embarked on a criminal campaign to secure for Concord bogus business from unqualified insureds and to charge and generate excessively high fees -- fees which were included in the borrowers' premium loan balances -- which they then misappropriated for themselves and for Fifth Third. Brody and the Insiders implemented their fraudulent scheme by, among other things, falsifying loan documentation and manipulating collateral valuations.

4. Defendants' scheme began to unravel in 2009 when Concord's legal department and newly appointed Chief Operating Officer discovered indications that the executives had looted the Company and forged documentation for Ultra loans. In response, the outside Concord directors appointed by Nina created a special committee and retained outside counsel to investigate the extent of the malfeasance and to recommend remedial action. The special committee uncovered, among other things, forgery of purported insureds' signatures and the generation of fraudulent and excessive fees, amounting to $19.5 million, charged to insureds' trusts. The defendants succeeded in concealing from the special committee not only the participation of Fifth Third and BofA in Concord's losses, but also their systemic fraud in underwriting Ultra loans that did not qualify under the applicable underwriting criteria -- loans that were doomed to default and which amounted to substantially all of the Ultra loan portfolio.

5. In 2009, Fifth Third, aware that Concord was on the verge of collapse and would be unable to repay debts stemming from the fraud in the Ultra facility, set about to locate a "deep pocket" to limit its losses on the Ultra facility. Fifth Third convinced Columbus Nova Investments IV, Ltd. ("CNI"), another investment vehicle under common management with Nina, to guarantee a new $19.5 million loan from Fifth Third to Concord to be used to finance refunds to the defrauded trusts, by falsely representing to CNI that, among other things, Fifth Third was negotiating and would continue to negotiate in good faith to fund a new $50-$100 million facility comparable to Ultra, which it falsely represented would be free of Ultra's forgeries and fraud and would enable Concord to earn its way out of its liabilities and resuscitate its business. However, Fifth Third fraudulently concealed from CNI that: it had participated in the unlawful scheme that resulted in the very liabilities requiring the $19.5 million loan; Ultra had been a sham because virtually no Ultra loans met the underwriting criteria; and that it was not acting and had no intention of acting in good faith to negotiate the funding of a new facility of at least $50 million.

6. In early 2010, the outside directors and CNI discovered that substantially all of the Ultra loans were fraudulent and that, as a result of defendants' egregious misconduct, Concord could not be salvaged. This action followed.

## PARTIES

7. Plaintiff Concord Capital Management, LLC ("Concord Management") is a Delaware limited liability company, with its principal place of business in New York.

8. Plaintiff Concord Partners, LLC ("Concord Partners") is a Delaware limited liability company, with its principal place of business in New York.

9. Plaintiff Concord Capital Funding, LLC is a Delaware limited liability company, with its principal place of business in New York.

10. Plaintiff Concord Capital Funding, Inc. is a California corporation, with its principal place of business in New York.

11. Concord Management is the sole member of Concord Partners, which in turn is the sole member of Concord Capital Funding, LLC and sole shareholder of Concord Capital Funding, Inc. Concord Management manages and controls Concord Partners, Concord Capital Funding, LLC, and Concord Capital Funding, Inc.

12. Defendant Fifth Third Bank is an Ohio banking corporation with its principal place of business in Ohio. Fifth Third Bank is the successor in interest to Fifth Third Bank, National Association, which was, until September 30, 2009, a national banking association, with its principal place of business and main office in Tennessee.

13. Defendant Bank of America, N.A. is a national banking association with its principal place of business and main office in North Carolina. Bank of America, N.A. is the successor in interest to LaSalle Bank, National Association, which was, until October 17, 2008, a national banking association, with its principal place of business in Illinois.

14. Defendant Ira L. Brody is a citizen of Tennessee, and at all relevant times, was the Chief Financial Officer, and from August 2007, the Chief Operating Officer, of Concord Management.

## JURISDICTION AND VENUE

15. This Court has personal jurisdiction over the defendants pursuant to C.P.L.R. §§ 301 and 302, and has personal jurisdiction over Fifth Third and BofA because they consented to jurisdiction in this State pursuant to the Master Funding Agreement and Participation and Servicing Agreement identified in paragraph 23 hereof.

16. Venue is proper in this Court pursuant to C.P.L.R. § 503 because one or more of the parties reside in this County, and because Fifth Third and BofA consented to venue in this

County in the Master Funding Agreement and Participation and Servicing Agreement identified in paragraph 23 hereof.

## STATEMENT OF FACTS

I.  **Background**

   A.  **Concord**

17.     Concord Management, through its subsidiaries, engaged in, among other things, traditional premium finance -- *i.e.*, originating loans to high net worth individuals to pay their life insurance premiums, collateralized by the cash surrender value of their policies and a letter of credit in an amount equal to the difference between the cash surrender value and the loan. Concord was typically compensated by a relatively modest structuring fee and interest on the loan.

18.     Concord Capital Funding, LLC and Concord Capital Funding, Inc. were the subsidiaries that originated premium finance loans for Concord. Although traditional premium finance was a stable source of business for Concord, the margins were low.

19.     To raise capital in order to develop other lines of business, Concord Management convinced Columbus Nova Partners ("CN"), a private investment management firm, to invest in Concord. In April 2005, CN caused Nina, an investment vehicle, to make a capital contribution of approximately $6.7 million to Concord Management, with an option to contribute more, and $74 million to Concord Partners. In connection with its investment, Nina later appointed Jason Epstein ("Epstein") and Michael Sloan ("Sloan," and together with Epstein, the "Outside Directors") to Concord's board of directors. The Outside Directors held no other positions with Concord and did not participate in Concord's day-to-day business.

### B. The Creation of the Ultra Facility

20. In 2007, Concord, in conjunction with Fifth Third, developed a new, more complex, premium finance product called "Ultra." Premium finance loans made under the Ultra facility enabled wealthy individuals, through trusts ("Trusts"), to obtain life insurance policies for up to five years without any cash outlay, which were secured by the market value, rather than the cash surrender value (as in traditional premium finance, where cash values were higher), of the policies. At the end of the term of the loan, the borrowers (the Trusts) could (i) pay off the loan and accrued interest and keep the policy or (ii) surrender the policy by selling the policy in the secondary market, paying off the loan and interest and keeping any remaining amount as profit. The market value of their policies was supposed to be sufficient or increase enough to pay off the loan balances and potentially generate profit. As a commercial lender in the insurance and life settlement industries, Fifth Third understood premium finance and the secondary market for life insurance policies, and worked hand-in-hand with the Concord executives on the terms of the Ultra facility, eligibility, and underwriting criteria needed to satisfy the bank's credit requirements.

21. To be eligible for Ultra, the potential insured had to meet age, net worth, liquidity, credit, and other financial and insurance underwriting requirements. For example, the insured had to meet carrier risk ratings, and the insured's life expectancy had to be between 2 and 12.5 years. Life expectancies were to be provided by one of three life expectancy providers -- *i.e.*, specialized, independent companies with actuarial and medical expertise that issue reports estimating the life expectancy of the individual on whose life the insurance policy is written. Finally, the market value of the policy had to be sufficient to meet the minimum collateral requirement for the term of the loan, absent secondary collateral. Although secondary collateral was often required under the loan documents because the insured's net worth fell within the

7

lower range of acceptability, additional collateral was never secured. The enforcement of these requirements was critical to ensuring that Ultra loans were adequately collateralized.

22. The Ultra program required upfront payments by the borrowing Trusts of substantial fees to Concord and Fifth Third, which were financed by the loans and included in the loan balances. Under the original Ultra documentation, the borrower paid Concord a "structuring fee" equal to 1.5% of the face amount of the insurance policy, an "arrangement fee" of 1.55% of the total projected loan amount, and potentially a "credit fee." Because these fees were financed, they greatly increased the size of the loan and, on average, amounted to approximately 35% of the loan balance. Initially, Concord paid approximately 97% of the arrangement fee to Fifth Third as a "facility" or other fee and kept the structuring fee for itself. The "credit fee" or "service fee" charged by Concord was essentially the maximum amount that Concord could charge before the loan balance would exceed the collateral value. Brody and the Insiders aimed to collect up to 5% of the face amount of the policy in such credit fees. After meeting resistance to credit fees, Concord eliminated the arrangement fee and increased the structuring fee to 2.5% of the policy face amount, of which 40% (amounting to 1% of the policy face amount) now went to Fifth Third, thereby dramatically increasing Fifth Third's share of the fees.

23. The Ultra transaction closed on September 27, 2007. The Ultra facility was a $100 million credit facility from Fifth Third that enabled Concord to make premium finance loans, and was implemented primarily through three interdependent agreements: (1) a Master Funding Agreement among Fifth Third, BofA, and LIPF Funding Program II, LLC ("LIPF"), a special purpose vehicle formed by Fifth Third (the "MFA"); (2) a Participation and Servicing

Agreement among Concord, BofA, and LIPF (the "PSA"); and (3) a Loan and Security Agreement among Concord, each Trust, and the insured (as guarantor) (each an "LSA").

24. Pursuant to the Ultra structure, Concord acted as the originator of the premium finance loan; Fifth Third was the ultimate lender. The insured would form the irrevocable life insurance Trust to purchase a life insurance policy, with BofA as trustee. The Trust would borrow from Concord the money to purchase the policy, and Concord would obtain the money to make the loan by selling a 100% participation interest in the loan to LIPF. LIPF, in turn, would borrow from Fifth Third an amount equal to the premiums payable on an eligible insurance policy, plus all related financing fees and expenses for making the loan.

25. Pursuant to the LSA, to obtain the loan, the Trust would submit a "borrowing request" to Concord. Pursuant to the PSA, Concord would then submit a "participation request" to LIPF, and if certain loan and collateral conditions were met, LIPF would accept the request and purchase a 100% participation interest in the loan originated by Concord. Pursuant to the MFA, LIPF, in turn, would finance its purchase of the participation by submitting a "funding request" to Fifth Third. Pursuant to the MFA, Fifth Third then would advance the funds through LIPF to Concord. Subject to satisfactory trust and policy documentation certified by BofA, Concord would advance the loan funds to the Trust, and to secure its payment obligations, the Trust would assign the policy and other collateral to Concord. BofA, in turn, would pay the premiums to the insurance carrier on behalf of the Trust and disburse the financing fees and expenses to Concord and Fifth Third.

26. As a result of these transactions, the Trust would be indebted to Concord, LIPF would have a participation interest in the loan made by Concord, and LIPF would be indebted to Fifth Third. Concord would assign its beneficial interest in the collateral to LIPF, and LIPF

would grant Fifth Third a security interest in its participations and related securities. The collateral test -- which was supposed to be satisfied for the entire term of the loan -- required that the outstanding loan balance not exceed 85% of the policy's market value for loans with balances of less than $10 million, or 60% for loans with balances over $10 million.

27. Pursuant to the PSA and MFA, funding would only be provided for "Eligible Premium Loans," which required, among other things, that the loan be secured by an eligible life insurance policy; the insured meet certain requirements (*e.g.*, age, net worth, etc.); a valid life expectancy evaluation, life settlement evaluation, and funding model analysis be delivered; and the minimum collateral requirements be met and continue to be met for the life of the loan. BofA, as servicer, was to certify that all required documentation had been received and was in compliance. Pursuant to the PSA, if a funded premium finance loan did not qualify for Ultra, Concord could be forced to repurchase the participation, and LIPF would pay the money back to Fifth Third. In addition, Concord agreed to indemnify Fifth Third with respect to such ineligible transactions. Thus, Concord -- not Fifth Third -- bore the risk of poor underwriting.

### C. The Ultra Facility Was Doomed from the Start

28. Ultra thus differed from traditional premium finance in two critical respects. First, in Ultra, the market value of the policies served as the primary collateral for the loans, rather than the cash surrender value, and the policies were expected to be sold at maturity to pay off the outstanding loan balance. Second, in Ultra, borrowers would agree -- often unwittingly because they were not required to pay anything out of pocket -- to incur loans which included much larger fees to Concord and Fifth Third, financed by the premium loans. Thus, from the lender's perspective, the transaction was designed for the upfront fees, not to obtain the death benefit, and the market value of the policy had to be high enough to pay off the loan in case of default during the term of the loan and at maturity. An accurate estimation of the market value --

*i.e.*, the present value of the expected death benefit less the present value of the expected periodic premium payments until the insured's death -- for each policy was thus critical to Ultra. The longer the insured's life expectancy, the lower the current market value of the policy; the longer an insured lives, the more premiums would be paid before receipt of the death benefit.

29.   Ultra attracted inferior loan applicants. Brokers steered individuals with higher net worth, liquidity, and good credit to traditional premium finance because such individuals posed little risk to the lenders; they had the ability to pay off the loans, could put up the necessary letters of credit, and otherwise easily met the requirements for the traditional loans. In other words, the better loan applicants did not need to rely on the market value of their policies and therefore did not need to pay higher fees to secure the type of "free" insurance provided by Ultra. Those who might need to do so were referred to Concord for Ultra.

30.   Most importantly, the fact that the defendants charged exorbitant fees and included them in the loan balances ensured that almost no cases could qualify for funding because the loan would be undercollateralized from the start. The size of the fees, and thus the size of the loan, meant that the market value of a policy would rarely be high enough or appreciate fast enough to support the loan. Indeed, the defendants, including Fifth Third, knew or were reckless in not knowing that the success of Ultra was highly sensitive to policy valuations and fee expenses, but structured and implemented Ultra to glean as much in upfront fees as possible. As set forth below, Fifth Third dictated that non-market-based assumptions be used in preparing the valuations with full knowledge that this would result in inflated values, which, in turn, would allow Fifth Third, Brody, and the Insiders to charge higher fees.

31.   While structuring the terms of Ultra, Fifth Third had insisted that the policy valuations be performed by Life Asset Group ("LAG"), then headed by Gary E. Brecka

("Brecka"), even though LAG was unqualified to do so because it was a life settlement broker, not an expert valuation provider. Moreover, using LAG posed a conflict of interest because for some time LAG had been soliciting Concord to make an investment in LAG. Indeed, just months before the Ultra facility closed, Fifth Third's attorneys at McDermott Will & Emery ("MWE") told Fifth Third's Matt Ross ("Ross"), Managing Director of the Insurance Finance Group, that the valuation company could not be an affiliate of Concord and had to use proper actuarial estimates in valuing policies. Fifth Third ignored MWE's advice and replaced MWE with the Mayer Brown law firm just before closing the Ultra facility. In early 2008, Brody and the Insiders arranged for Concord to invest in LAG. Notwithstanding the advice it received from the MWE law firm, Fifth Third permitted the Insiders to continue using LAG as the valuation company until March 2009, ten months after Concord invested in LAG using funds loaned by Fifth Third.

32.     The combination of Concord's using its control over LAG to manipulate policy valuations and the changes to the Ultra fee structure yielded huge financial benefits for Fifth Third, Brody, and the Insiders. The valuation manipulation and new fee structure meant that not only would there be more fees as a result of the greater volume of loans, but that Concord and Ultra would take a bigger piece of each loan as fees. Indeed, in the period before the changes, Concord and Fifth Third took as fees on average 30% of the first year premiums -- a total of $2.9 million. Using the new fee structure, Concord and Fifth Third more than doubled their take, paying themselves on average 78% of the first year premiums -- a total of $31 million.

II.     **With Fifth Third's Knowledge and Substantial Assistance, Brody and the Insiders Generated Fraudulent Fees Through Forgery, Fraud, and Misrepresentation**

33.     During the first five months that Ultra was available, Concord extended only ten Ultra premium finance loans, seven of which were refinancings of existing policies that had been