made to two members of one family, and it became clear to Brody and the Insiders that Ultra was a failure.

### A.   Brody and the Insiders Manipulated and Falsified Policy Valuations

34.    After arranging for Brecka to join Concord in May 2008 and investing in his company LAG, Fifth Third, Brody, and the Insiders accelerated their campaign to generate fraudulent business and collect exorbitant fees. Although there was no material increase in sales leads for Ultra, after Brecka joined Concord's payroll, deals suddenly started closing. To accomplish this, Fifth Third directed and encouraged Brody, the Insiders, and the valuation provider to manipulate and falsify valuations to satisfy loan criteria, which they did. Their tactics included, but were not limited to:

> (i)     using an unreasonable discount rate, as specifically dictated by Fifth Third;
>
> (ii)    understating expected mortality rates, as specifically dictated by Fifth Third, by using VBT 2001, an outdated actuarial table, instead of the market-standard VBT 2008, which lengthened life expectancies;
>
> (iii)   shopping for the shortest life expectancy from several providers, even if the number was an extreme outlier;
>
> (iv)    using life expectancies from providers not approved under the PSA;
>
> (v)     using stale life expectancy data for particular insureds;
>
> (vi)    updating life expectancies by merely subtracting the number of months that had passed since the last report, rather than performing an actual analysis;
>
> (vii)   providing valuations to LAG for approval, rather than the reverse;
>
> (viii)  falsifying the outputs in the valuation model to make loans qualify; and
>
> (ix)    forging signatures on LAG valuations.

35.    Fifth Third was well aware that the sole valuation provider was highly conflicted, and despite the issue being raised several times, did nothing about it. For example, when Brecka

was first hired in May 2008, Ross informed BofA: "We are also going to have to get a new appraiser (Maple Life) for all life settlement valuations going forward, as Gary Brecka @ Life Asset Group is now conflicted out." Then in September 2008, Ross told Brody: "Going forward, we will be requiring someone other than Gary [Brecka] to do the life settlement valuations…. This will be for all new policies as well as updates on existing policies" because Ross was "getting heat about this straight from the top." Nonetheless, LAG was not replaced as the valuation provider until March 2009.

36.       Further, Fifth Third, as an institution experienced in the life insurance market, knew or was reckless in not knowing that the valuations applied to the Ultra policies were false. For example, in one instance, Fifth Third provided a loan of $1.86 million to fund the purchase of an insurance policy. Of that loan, only $140,000 was used to pay actual premiums while approximately $1.7 million was paid out in fees to Concord and Fifth Third. To qualify that loan for the Ultra program, LAG had to represent, and Fifth Third and LaSalle had to accept, that the insurance policy collateralizing the loan, which had a paid premium of only $140,000 could, on the day of issuance, be sold for $2.2 million -- 1,570% of the premium paid. Fifth Third accepted such absurd valuations, and collected its fees.

**B.       Brody Forged Required Ultra Documentation**

37.       Moreover, because insurance carriers and agents balked at allowing Concord to charge credit fees, Brody and the Insiders charged credit fees to Trusts without the insureds' consent, based on forged documents. Brody used software to electronically cut and paste the insureds' signatures onto loan models and altered executed LSAs by inserting different fee schedules into the agreement from what had been agreed upon by the Trusts. Thus, two sets of loan documents were maintained in and/or transmitted from Concord's New York offices to the carriers, Fifth Third, and BofA. In at least one instance, the documents submitted to the carriers

14

falsely showed that no credit fees had been charged, while the Insiders submitted a second, forged, set to Fifth Third and BofA which included the fees. Fifth Third knowingly participated in this fraud against carriers as it was fully aware that carriers would not accept the excess credit fees and would not accept loan models that showed the loans being under water in less than five years. Yet Fifth Third regularly waived these requirements, knowing that Brody and the Insiders were not disclosing these facts to the insurers.

38.    Brody and the Insiders also decided to collect, through forged consent letters, additional unexplained and post-closing "service fees" not authorized by the governing documents. In total, Brody forged at least six fee letters by "Photoshopping" the insureds' signatures on letters approving the addition to the loan balance of such bogus secondary "service fees" to Concord, after the loan had already closed, for no additional services rendered. Fifth Third approved these fees even though the facility documents did not allow for them, and there was no reasonable basis to believe that a borrower would approve of these additional fees after their loans had already funded.

39.    The long list of forgeries included forged letters from accountants. As a precondition to an Ultra loan, Concord was required to obtain a letter from a CPA confirming the net worth of the potential insured. At least twenty Ultra loans were predicated on CPA letters that Brody forged, some of which involved cutting and pasting the CPAs' signatures onto the letters.

40.    In addition to the forgeries, Brody and the Insiders also collected illegitimate fees ($6.8 million) from bogus loans extended to empty trusts (*i.e.*, trusts that had not purchased policies) and illegitimate fees ($1.1 million) based on higher policy face amounts than those of the policies actually purchased by the Trusts.

15

41.     Fifth Third was aware that the financing it was extending to Concord was, in many cases, based on illegitimate, bogus documentation. For example, in one case, in March 2008, a loan to an empty Trust was approved, notwithstanding that not all required documents had been provided and there was no policy collateral for the loan. In fact, Brody forged the documents that needed the insured's signature (e.g., the LSA, loan model, trust agreement, and disclosure statement). In an email exchange, Fifth Third's Ross asked Brody about a missing acknowledgement of policy assignment from the carrier, to which Brody responded: "We are at risk for [rescission], just like with [another previous case] we cover it. Remember." Ross replied: "Shhhh. Not so loud," while Brody reassured him: "I did not cc everyone else. I went [to] Spitzer school of secrecy." Indeed, the defendants used the fraudulently-obtained loan not only to generate fees, but also to cover a $250,000 overdraft in a Concord account at Fifth Third. The day before, Fifth Third's Ross had complained by email to Brody about the overdraft: "You are making it very difficult for me to help you when you have me tell everyone that it was going to be cleared yesterday and it wasn't." Brody assured Ross that the bogus deal he was working on would cure the problem: "Just so you don't freek [sic] out that means the overdraft is fixed first thing in the morning."

42.     In this example, of the $6.5 million loan to the Trust, $3.8 million went to Concord and Fifth Third as fees. When BofA wired the remaining $2.7 million to the carrier to pay premiums, the carrier returned the money because no policy was pending to be issued. No one enforced the requirement that the premium finance loan actually be used for its intended purpose to pay premiums. Instead, with Ross's and BofA's knowledge, the $2.7 million sat in the Trust for months before Fifth Third and the Insiders misappropriated it, as alleged in paragraph 47 hereof. As this loan had no policy and no collateral, the facility documents

16

required that Fifth Third and BofA declare an event of default in March 2008, which would have unveiled the fraud. There were four cases where loans were made, fees were paid, and no policies were issued, and Fifth Third and BofA concealed the events of default.

43.     Also in March 2008, there was a significant change in the industry: the publication of VBT 2008, a new actuarial table that lengthened life expectancies, which decreased the market value of the Ultra policies. Thus, the collateral values in the reports prepared by BofA thereafter should have reflected lower collateral values. Despite the significance of this industry-wide change, Fifth Third did not require that LAG or Concord utilize VBT 2008 going forward or that existing policies be revalued based on VBT 2008. Instead, Ross permitted Brody and the Insiders to shop for and use the shortest life expectancy estimates among various life settlement providers, even if the number was an outlier by several years.

44.     During the period from June to October 2008, Brody and the Insiders generated millions of dollars in fees from additional bogus Ultra loan transactions, which required Fifth Third to waive such critical underwriting requirements as the insureds' life expectancy, net worth, and liquidity, involved additional forgeries by Brody and the Insiders, and/or involved, with Fifth Third's and BofA's knowledge, additional empty trusts.

45.     By September 2008, Brody, the Insiders, and Fifth Third were faced with the issue of what to do about low collateral values, empty trusts, and continuing Concord overdrafts (due, in large part, to looting by Brody and the Insiders). To mask these problems, on September 9, Ross told Brody to fraudulently inflate the Ultra loan portfolio value: "Let's only project default dates for those that we anticipate will blow up in 12 months or less." Shortly thereafter,

17

they reduced 12 months to 6 months. If the portfolio reports had projected default dates for the entire term of the loans, the high default rates would have revealed the underwriting deficiencies.

46.     In the fall of 2008, Brody and the Insiders also continued manipulating the policy valuations in the portfolio. The fraudulent portfolio collateral reports started to reflect just enough appreciation to make the loans stay afloat, and Brody and the Insiders manipulated valuations to get more deals done, to generate more fees, and to cover Concord overdrafts, which were continuing despite Ross's complaints. For example, on September 23, Ross approved a loan to a Trust after the Insiders had supervised the alteration of data to make the loan qualify. Brecka supervised and signed off on a valuation process in which the Insiders shortened the insured's life expectancy by 6 months. Notably, the loan would have qualified without falsifying the data if the Brody and the Insiders had not insisted on the full 2.5% structuring fee.

## C.     Brody and the Insiders Misappropriated Trust Assets

47.     Because of Concord's liquidity problems -- and especially to cover an existing $2 million overdraft -- the Insiders approached Ross in or about September 2008 about increasing the size of Concord's revolving loan from $2 million to $4 million. To collateralize this increase, Ross and the Insiders briefly discussed the possibility of a corporate officer pledging his personal securities. Instead, they jointly decided to use assets of the Trust containing $2.7 million, as alleged in paragraph 42 hereof. To implement this fraud, the corporate officer opened up a personal pledge account with Fifth Third, and Fifth Third had $2 million wired into that account. The $2 million that was wired into the account came from the Trust's account as directed by Ross. On October 1, 2008, Brody emailed BofA's Bob Bockrath, instructing him to "[p]lease repay to Concord (our account at 5/3 [account number]) two million dollars out of the [] Trust. This will constitute a partial prepayment [of the Ultra loan] by [the] Trust. Matt [Ross] will confirm this transaction." Ross replied to all, "Confirmed," thereby misrepresenting the use

18

of proceeds and intentionally deceiving BofA into making the wire transfer. Ross further covered up the misappropriation of Trust assets when he confirmed to a colleague that he had received the $2 million to pay down the Trust's Ultra loan. Nonetheless, BofA breached its duties in making the transfer, because the account number given was not an Ultra collection or expense account. Thus, the Trust's money was wired into the personal pledge account to support a Concord payment obligation. Fifth Third thus piled more debt (by increasing the revolver) onto what it knew to be a financially troubled company, and then covered its exposure by misappropriating Trust assets.

48.     Concord's situation continued to worsen into November 2008, with overdrafts continuing to the point where Concord's cash flow problems prevented Fifth Third from taking its share of Ultra fees. On December 5, Ross complained to Brody: "These seemingly continuous 'timing' issues are wearing thin with the powers that be. I have promised for the nth time that we could absolutely take the fee today, but once again you guys are asking me to wait until the 17th at the earliest. I can't express to you enough how these broken promises have damaged both my reputation and yours."

49.     In December, 21 Ultra loans were approved, with Fifth Third indiscriminately granting waivers in all 21 cases to get business done regardless of the risks: in 20 cases, Ross waived the minimum liquidity; in 11 cases, the minimum net worth; in 5 cases, the life expectancy requirement; in 19 cases, the loan commitment amount; and in 1 case, the minimum age. In 14 cases, Ross permitted Concord to use life expectancies from unapproved providers, AVS Underwriting and EMSI. The fees generated in December alone amounted to almost $4.3 million. Fifth Third's share of that was approximately $1.7 million.

19

**D.    Brody and the Insiders Made Misrepresentations to the Outside Directors to Hide Their Misconduct**

50.    Concord's Insiders made clear that they did not care whether the loans were viable. Indeed, Concord's Credit Committee regularly approved clearly ineligible loans. In addition to Brody's forgeries, in which he was assisted by other Insiders, Brecka, in conjunction with some of the Credit Committee members, supervised and directed faulty valuations to make ineligible loans pass the models.

51.    Unbeknownst to the Outside Directors, the majority of funded cases did not qualify and/or were the subject of fraud committed by Brody, the Insiders, and Fifth Third, with the assistance of BofA. The defendants repeatedly made oral and written misrepresentations to the Outside Directors, including at periodic status meetings, that the revenues generated from Ultra were legitimate. Brody, the Insiders, and Fifth Third concealed from the Outside Directors the facts that: almost none of the funded loans qualified for Ultra; waivers of loan requirements occurred in 66 out of 67 cases; and Fifth Third was only approving and funding Ultra loans to generate excess fees for itself, Brody, and the Insiders.

52.    In total, approximately $80 million of fraudulent loans were made under the Ultra facility.

**III.    BofA Breached Its Duties to Concord**

53.    In connection with the Ultra facility, BofA served as collateral agent, servicer, and trustee. In its role as servicer under the PSA, BofA was responsible for reviewing and certifying that the premium finance loans complied with all the requirements of the Ultra facility before any loans were advanced. For each loan, BofA was required to verify, among other things, that: the insured met eligibility requirements; a life insurance policy existed or was pending; the policy was from an eligible carrier with the required ratings; the life insurance

20

policy had been assigned as collateral for the loan; the minimum collateral requirement was satisfied; original documents had been obtained; and all deliverables had been received and reviewed, including life expectancy and life settlement evaluations. As such, BofA's role in the Ultra facility was to act as an independent review mechanism in order to prevent fraud and ensure full compliance with the Ultra facility documents.

54.    Under the PSA, BofA was also required, for the benefit of Concord, to:  issue monthly portfolio reports, stating the minimum collateral requirement, policy collateral value, and the value of any additional credit support supporting each LSA; periodically obtain updated collateral valuations to determine whether the collateral complied with the minimum collateral requirements, and if not, to collect additional credit support necessary for such compliance; and act as custodian of records and obtain originals of all transaction documents. In servicing the premium loans, BofA was required to use the degree of skill and care that it exercises with respect to payment obligations that it services for itself, and it was not empowered to waive any covenant in an LSA or amend or modify it without the prior written consent of Concord. As collateral agent under the MFA, BofA assumed similar duties.

55.    BofA breached its contractual duties to Concord and was grossly negligent by, among other things, failing to obtain and maintain original documents, falsely certifying loan compliance, affirmatively and purposely misreporting collateral values in portfolio summary and collateral reports, failing to mandate the receipt of letters of credit or additional collateral needed to satisfy the minimum collateral requirements, failing to verify the issuance of insurance policies for Trusts and subsequently failing to properly report the absence of insurance policies, failing to take appropriate action to investigate what BofA knew were suspicious looking letters and signatures, failing to question the charging of fees which were not supported by the Ultra

21

facility documents, and failing to designate events of default or termination events under the Ultra facility documents.

56.     BofA has even acknowledged that it was in breach of the facility documents. In September 2008, BofA's Bob Donaldson wrote to Fifth Third's Ross regarding four empty trusts: "It is our understanding that you have been kept informed by Concord of the situation we have with several of the advances taken under the LIPF II facility that have not yet been used to purchase policies.... In our servicing capacity, we should be reflecting on our collateral reports the fact that there is effectively a policy valuation of zero and therefore the Minimum Collateral Requirement is not satisfied for these loans. I'm not sure what the fallout on your end will be when we start reporting in this manner...."

## IV.     Brody and the Insiders Looted Concord
### With Fifth Third's Knowledge and Assistance

57.     Brody and the Insiders looted Concord of millions of dollars in corporate assets. They used the funds to pay for their personal extravagant lifestyles without any benefit to Concord. They used Concord's funds to, among other things, pay for personal expenses, engage in undisclosed related-party transactions, award themselves excessive and unearned compensation, incur unnecessary and inappropriate business expenses, and purchase huge life insurance policies for themselves and other Concord executives.

58.     As alleged above, in May 2008, Brody and the Insiders arranged for Concord to invest $2.5 million in Brecka's insolvent brokerage company, LAG, and to hire, with Fifth Third's knowledge, Brecka as the head of origination at Concord. Brody and the Insiders caused Concord to borrow the money from Fifth Third, of which $1 million went directly to Brecka. The "investment" was nothing more than a payoff to Brecka that provided no benefit to Concord.

22

59.    The diversion of Concord's assets by Brody and the Insiders for personal use
included payments of, among other things, tuition at Rye Country Day School, a Disney World
vacation, 200 computers, home furnishings, outings to Miami night clubs, limousines, sports
tickets, jewelry, and other luxury goods. Brody and the Insiders bought others' silence by
buying them gifts, as well, or not questioning their personal expenses -- for example, by using
Concord funds to pay for spa retreats at Canyon Ranch, vacations in Miami and Las Vegas,
electronics, and sports equipment.

60.    Fifth Third knew that Concord continually was overdrawn because of the looting
by Brody and the Insiders. Among other things, Fifth Third issued and maintained records for all
of Concord's credit cards on which many of the expenses were charged. As Concord's long-time
banker, Fifth Third monitored Concord's ability to repay the loans it had extended to Concord
and knew that the Insiders' spending outpaced Concord's revenue sources. Moreover, Ross
himself was a direct beneficiary of the looting, as he was showered with gifts of travel, sports,
concert and theater tickets, and political access, among other things. Further, the exorbitant fees
Fifth Third was receiving via Ultra cemented Ross's reputation within Fifth Third as a top
revenue producer, with Concord as his principal client.

61.    Brody and the Insiders also looted the Company by engaging in undisclosed
related-party transactions. One vendor purportedly used by Concord was Lone Star Volunteers
LLC ("Lone Star"), a lobbying firm owned and controlled by Brody. From 2005 through 2008,
payments to Lone Star totaled approximately $4.5 million, millions of which were funneled to
Brody and the Insiders, including hundreds of thousands of dollars to Brody's bank accounts.

62.    Brody and the Insiders further enriched themselves by increasing their
compensation and awarding themselves excessive, unearned bonuses. The executive

compensation structure was such that base salaries and bonuses were tied to revenue benchmarks. Because Brody and the Insiders concealed their fraudulent scheme, Concord's board approved enormous pay packages to the Insiders based on fraudulent revenues.

63.    Brody and the Insiders also wasted corporate assets on such extravagances as private jets, limousines, ticket brokers, boxes at sports arenas, and office leases in New York and Tennessee that were priced well above market and were unnecessary to support Concord's bona fide business activities.

64.    Although Concord was a struggling business, Brody, the Insiders, and Fifth Third presented the false picture to the Outside Directors that, because of Ultra, Concord was thriving. In fact, over a period of 12 months, Concord's accounts were overdrawn 45 times for a total of 71 days, in an aggregate amount of over $47 million.

## V.    Concord's Outside Directors Discover the Looting and Fraud

65.    Brody resigned, as of December 31, 2008, to pursue a government appointment as treasurer of Tennessee. After Brody left -- and he could no longer block access to Concord's books and records -- the forgeries, empty trusts, and looting were discovered.

66.    In January 2009, even after his departure, Brody tried to charge a $2 million service fee on an existing loan to an insurance Trust by forging a letter to BofA. For the first time, however, despite later acknowledging that it had been suspicious of such letters, BofA forwarded the forged letter to Concord's legal department. The legal department was baffled by the letter as the Ultra facility did not permit such secondary fees. When the legal department told BofA that the letter looked unusual and that it was investigating, BofA volunteered that it had received and disbursed monies after receiving other such secondary fee letters. After an investigation, the legal department discovered that the letters purportedly signed by the insureds had all been forged.

24

67.    Consequently, the Outside Directors caused Concord's board of directors to form a special investigation committee and to retain the law firm of Skadden, Arps, Slate, Meagher & Flom ("Skadden"), which prepared a report detailing Brody and the Insiders' fraud in generating fees. Because Skadden's investigation was limited and directed towards the fee fraud and the looting, Skadden did not investigate or uncover the Insiders' underwriting fraud or Fifth Third's integral role in the fraud.

68.    The Outside Directors held no other positions with Concord and did not participate in Concord's day-to-day business. Consequently, prior to 2009, the Outside Directors lacked knowledge of the form, substance, or magnitude of Brody and the Insiders' fraudulent scheme. The Outside Directors could have and would have stopped the fraudulent scheme prior to 2009 had they become aware of it, by among other things: firing Brody and the Insiders; replacing management; terminating the Ultra facility; allocating resources to other products; and otherwise seeking relief in the courts.

## VI.    Fifth Third Fraudulently Induced a New Concord Loan and a CNI Guaranty

69.    Having made $80 million of undercollateralized and ineligible loans to generate fees, Fifth Third took steps to try to cover Fifth Third's exposure to Concord.

70.    In January 2009, when the fee fraud was uncovered, Concord recognized that it may need to reimburse the Trusts for the fraudulent fees that had been included in their loan balances. While, pursuant to the PSA, Fifth Third could seek to put ineligible loans back to Concord, Fifth Third knew that would be futile because Concord lacked liquidity.

71.    Fifth Third therefore concocted a fraudulent scheme to get Concord to incur a debt to repay the fraudulent fees, and CNI, another investment vehicle managed by CN, rather than Nina, to guarantee that debt, by a series of misrepresentations. As he explained in an email,

Ross chose CNI as the guarantor because CNI, in contrast to Nina, had "a shit-pile (this is a new technical financial term) of assets."

72.    To convince CNI to guarantee the loan, Fifth Third falsely represented to CNI, among other things, that: Fifth Third was negotiating in good faith to extend to Concord a new $50-$100 million facility to fund a new, improved premium finance loan program free of Ultra's forgeries and fraud, when in fact it was not acting and had no intention of acting in good faith; and material facts concerning the new facility and its economics. Crucially, Fifth Third fraudulently concealed from CNI its participation in and assistance to Brody and the Insiders' breaches of fiduciary duty.

73.    Thus, in or about January 2009, Ross knowingly misrepresented to Outside Director Epstein that Concord could earn its way out -- *i.e.*, generate enough revenues to pay back the fraudulent fees and then start generating real profits -- if Concord and Fifth Third were able to structure the new credit facility ("Ultra Plus" or the "Ultra Plus Facility"). What Ross failed to disclose was that Ultra, and therefore Ultra Plus, was a sham because of the underwriting fraud (*i.e.,* the manipulation of valuations and waiver of underwriting requirements). Accordingly, the Outside Directors were unaware that lending opportunities would be negligible or non-existent under Ultra Plus when the facility requirements were actually followed. For Ultra Plus -- unlike Ultra -- loans could not be approved and funded on the basis of faulty policy valuations because an independent third party performed accurate valuations and effectively screened out ineligible loans. Fifth Third had required that Ultra Plus loans be secured with lender protection insurance coverage ("LPIC") for the amount of the collateral requirement; upon a loan default, the LPIC provider would pay Fifth Third, take possession of the policy, and try to sell the policy in the secondary market. Because it bore the

26

ultimate risk of loss, the LPIC insurer would perform its own valuations and would not provide the necessary coverage unless the policy that served as collateral had sufficient value to support the size of the loans. As alleged above, the capitalization of enormous fees into the loan balances made this virtually impossible.

74.    To maintain the appearance that Ultra was fundamentally sound, Ross continued to approve and fund Ultra deals that did not meet loan requirements during the first few months of 2009. In January and February, all nine loans that were funded to Trusts failed to meet underwriting criteria including, among others, life expectancy range. To the Outside Directors, however, it appeared that Concord's business could survive if premium finance loans could be funded similarly under Ultra Plus. In addition to this carrot, Ross threatened the stick of cutting off Concord's funding altogether unless the Outside Directors acceded to his demands.

75.    When Concord agreed to take a $19.5 million loan to remediate the fee fraud and CNI agreed to guarantee it, Concord's independent decision makers and CNI did not know -- because Fifth Third had concealed -- that Fifth Third had aided and abetted Brody and the Insiders' breaches of fiduciary duty and that Ultra was a sham. Had Concord and CNI known of these facts and of Fifth Third's complicity, they would not have executed a loan agreement or guaranty.

76.    Fifth Third did not establish a new facility for Concord until September 2009, and then only for a wholly-insufficient $35 million. Further, because the LPIC provider valued the insurance policies accurately and because Ross, unlike his arrangement with Brody, insisted that each and every stringent restriction of the new facility be enforced to the letter, not one loan was approved and funded under Ultra Plus. Even if Concord had used the entire facility to originate

27

legitimate Ultra Plus loans, it would have been impossible for Concord to earn its way out; it could not generate $19.5 million in fees from making $35 million worth of loans.

77.     In October 2009, still hoping that the business could be salvaged, CN, on behalf of Nina, engaged outside consultants to assist in restarting Concord's business. With Brody and the Insiders gone, CN's consultants were able to view all of Concord's records in connection with their efforts, and it was then that they uncovered the massive, systemic underwriting fraud. As CN discovered, the business model that Fifth Third developed for Concord generated revenues through the use of fraudulent, vastly inflated policy market values.

## VII.    Concord Collapsed from the Fraudulent Scheme

78.     Defendants' scheme caused Concord to become insolvent and its investors to lose their entire investment. Brody, the Insiders, and Fifth Third siphoned substantially all of Concord's cash to themselves and ruined Concord's creditworthiness, preventing it from engaging in other lines of business. The scheme destroyed the value of Concord's traditional premium finance business because Concord's lender refused to renew the facility after discovering the fraud, and it also destroyed the value of Concord's asset management business, which had previously been valued at $25 million. When new business could not be written under Ultra Plus, Concord finally had to be put into runoff. Concord is unable to repay any of its debts.

## VIII.    Fifth Third Tried to Cover Up Its Involvement

79.     Having participated in and aided and abetted Brody and the Insiders' wrongdoing, Fifth Third's Ross sought to destroy and/or steal information from Concord when CN began to suspect Fifth Third's role in Brody and the Insiders' fraudulent scheme.

80.     Thus, in April 2009, Ross asked Life Exchange, Inc., under the false premise of a facility workout, to demand that Concord give Fifth Third unfettered access to Concord's

servers. There was no legitimate business reason for Fifth Third to need unlimited access to the computer system.

81.     Ross also contacted a former Concord employee to ask for help hacking into Concord's servers. On April 7, 2010, Ross asked:

> Can you give me the name and contact info of the IT guy from Inscap. We need to get in touch with him to help us get info off of their servers. [CN] is trying to fuck us, so we are going to crush them. (emphasis added)

82.     When the former employee asked him what had happened, Ross explained: "Jason the J** [an Outside Director] pushed things too far and the whole restructuring blew up as a result. He then went to Cinci to accuse me of being involved with Ira [Brody] and the fraud (bullshit diversion to try and weasel out of their gty. It's going to get super ugly. I can't say more other than we want what is on their servers and I think the IT guy can (and may want to out of spite for CNP assholes) help us."

### FIRST CAUSE OF ACTION
### (Against Brody for Breach of Fiduciary Duty)

83.     Plaintiffs repeat and reallege paragraphs 1 through 82 hereof as if fully set forth herein.

84.     Brody, as an officer, director, and/or agent, owed fiduciary duties of care, loyalty, good faith, and trust to Concord. As set forth above, Brody violated his fiduciary duties to Concord.

85.     Brody's conduct was outrageous, willful and wanton, and perpetrated with malice and reckless indifference to the rights of Concord. At all relevant times, Brody's conduct was hostile and adverse to the interests of Concord, and was motivated solely by greed and self-interest. Brody completely abandoned Concord's interests.

29

86.     By reason of the foregoing, Concord has been damaged and is entitled to compensatory damages, in an amount of at least $70 million, to be determined at trial, as well as to punitive damages, in an amount of at least $250 million, to be determined at trial.

## SECOND CAUSE OF ACTION
### (Against Fifth Third for Aiding and Abetting Breach of Fiduciary Duty)

87.     Plaintiffs repeat and reallege paragraphs 1 through 86 hereof as if fully set forth herein.

88.     Fifth Third knew or recklessly disregarded the fact that Brody and the Insiders were breaching their fiduciary duties to Concord.

89.     As alleged above, Fifth Third knowingly and substantially assisted Brody and the Insiders' breaches of their fiduciary duties. Absent the participation of Fifth Third, Brody and the Insiders' breaches of their fiduciary duties to Concord would have failed.

90.     The conduct of Fifth Third was outrageous, willful and wanton, and perpetrated with malice and a reckless indifference to the rights of Concord.

91.     By reason of the foregoing, Concord has been damaged and is entitled to compensatory damages, in an amount of at least $70 million, to be determined at trial, as well as to punitive damages, in an amount of at least $250 million, to be determined at trial.

## THIRD CAUSE OF ACTION
### (Against Brody for Conversion)

92.     Plaintiffs repeat and reallege paragraphs 1 through 91 hereof as if fully set forth herein.

93.     Brody unlawfully converted Concord assets for his own benefit.

94.     Brody deprived Concord of its rights in diverted funds without Concord's consent and without lawful justification. Brody intended to and did exercise dominion and control over the diverted funds in a manner inconsistent with Concord's interest in those funds. Because of

Brody's unlawful conversion of monies belonging to Concord, Concord has incurred significant losses.

95.    By reason of the foregoing, Concord is entitled to compensatory damages, in an amount of at least $70 million, to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Against BofA for Breach of Contract)

96.    Plaintiffs repeat and reallege paragraphs 1 through 95 hereof as if fully set forth herein.

97.    Concord and BofA entered into valid and binding contracts.

98.    Concord is not in breach of any contractual obligation to BofA.

99.    As alleged above, BofA has breached its contractual obligations to Concord by, among other things: (a) certifying compliance with the Ultra facility and disbursing loan proceeds, when the requirements had not been met; (b) issuing incorrect, false, and misleading portfolio summaries and collateral reports; (c) failing to obtain and keep original documents; and (d) failing to exercise the requisite degree of skill and care in performing its duties.

100.    By reason of the foregoing, Concord has been damaged and is entitled to judgment against BofA for compensatory damages, in an amount of at least $70 million, to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Against BofA for Gross Negligence)

101.    Plaintiffs repeat and reallege paragraphs 1 through 100 hereof as if fully set forth herein.

102.    As servicer and collateral agent under the Ultra facility, BofA had a duty of care to Concord and a duty to perform its obligations without gross negligence or recklessness.

103.    BofA breached its duties to Concord and was grossly negligent and reckless by, among other things: (a) misrepresenting that the premium finance loans requested, approved, and funded were in compliance with the Ultra facility; (b) misrepresenting that the minimum collateral requirements had been met and continued to be met; (c) disbursing funds to improper accounts; (d) disbursing fees that were not permitted under the Ultra facility; and (e) failing to obtain original documents.

104.    The conduct of BofA was outrageous, willful and wanton, and perpetrated with malice and a reckless indifference to the rights of Concord.

105.    By reason of the foregoing, Concord has been damaged and is entitled to compensatory damages, in an amount of at least $70 million, to be determined at trial.

## SIXTH CAUSE OF ACTION
### (Against Fifth Third for Breach of the Implied Covenant of Good Faith and Fair Dealing)

106.    Plaintiffs repeat and reallege paragraphs 1 through 105 as if fully set forth herein.

107.    Concord and Fifth Third entered into a valid and binding agreement to provide financing capacity to make premium finance loans.

108.    As alleged above, Fifth Third exercised its discretion arbitrarily and capriciously and deprived Concord of the benefits of the agreement and breached the implied covenant of good faith in the agreement.

109.    By reason of the foregoing, Concord has been damaged and is entitled to compensatory damages, in an amount of at least $70 million, to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment:

(i)     on the First Cause of Action against Brody, awarding compensatory and punitive damages in amounts to be determined at trial, but at least $70 million and $250 million, respectively;

(ii)    on the Second Cause of Action against Fifth Third, awarding compensatory and punitive damages in amounts to be determined at trial, but at least $70 million and $250 million, respectively;

(iii)   on the Third Cause of Action against Brody, awarding compensatory damages in an amount to be determined at trial, but at least $70 million;

(iv)    on the Fourth and Fifth Causes of Action against BofA, awarding compensatory damages in an amount to be determined at trial, but at least $70 million; and

(v)     on the Sixth Cause of Action against Fifth Third, awarding compensatory damages in an amount to be determined at trial, but at least $70 million.

Dated:  September 14, 2010

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

By: _____

Marc E. Kasowitz (mkasowitz@kasowitz.com)
Andrew K. Glenn (aglenn@kasowitz.com)
Charles M. Miller (cmiller@kasowitz.com)
Kanchana Wangkeo Leung (kleung@kasowitz.com)

1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
Fax: (212) 506-1800

Attorneys for Plaintiffs