# EXHIBIT B

FILED: NEW YORK COUNTY CLERK 12/05/2011    INDEX NO. 650478/2010

NYSCEF DOC. NO. 148    RECEIVED NYSCEF: 12/05/2011

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: **JUSTICE SHIRLEY WERNER KORNREICH** PART ___54___

| | |
|---|---|
| Index Number : 650478/2010 | |
| CONORD CAPITAL MANAGEMENT, | INDEX NO. _____ |
| vs | MOTION DATE _____ |
| FIFTH BANK[AS SUCCESSOR | MOTION SEQ. NO. _____ |
| Sequence Number : 002 | MOTION CAL. NO. _____ |
| DISMISS ACTION | |

The following papers, numbered 1 to _____ were read on this motion to/for _____

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | 21,22,23 |
| Answering Affidavits — Exhibits _____ | 41,42,43-58, |
| Replying Affidavits _____ | 79, 83,82 |

Cross-Motion: ☐ Yes ☐ No

Upon the foregoing papers, it is ordered that this motion *is decided in accordance with the annexed decision and order*

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

Dated: _____    **JUSTICE SHIRLEY WERNER KORNREICH**
J.S.C.

Check one: ☐ FINAL DISPOSITION    ☒ NON-FINAL DISPOSITION

Check if appropriate: ☐ DO NOT POST    ☐ REFERENCE

☐ SUBMIT ORDER/ JUDG.    ☐ SETTLE ORDER/ JUDG.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  PART 54

----------------------------------------------------------------------X

CONCORD CAPITAL MANAGEMENT, LLC,
CONCORD PARTNERS, LLC, CONCORD
CAPITAL FUNDING, LLC, and CONCORD
CAPITAL FUNDING, INC.,

              Plaintiffs,
                                        Index No. 650478/2010
                                        DECISION and ORDER

      -against-

FIFTH THIRD BANK (as successor in interest to
FIFTH THIRD BANK, NATIONAL
ASSOCIATION), BANK OF AMERICA, N.A. (as
successor in interest to LASALLE BANK,
NATIONAL ASSOCIATION), and IRA L. BRODY,

              Defendants.

----------------------------------------------------------------------X

KORNREICH, J.:

      Motion sequence numbers 002 and 003 are consolidated for disposition herein.

      This is an action arising out of a massive fraud allegedly orchestrated by executives of

Concord Capital Management, LLC, Concord Partners, LLC, Concord Capital Funding, LLC,

and Concord Capital Funding, Inc. (collectively, plaintiff or Concord) that led to Concord's

insolvency and ultimate demise.  The fraudulent scheme centered around a $100 million credit

facility that was set up to finance life insurance policies for high net worth individuals under a

program called "Ultra."

      In short, Concord alleges that a group of its executives (the Insiders), led by Concord's

Chief Operating Officer, defendant Ira L. Brody (Brody), originated loans that either did not meet

Ultra's stringent underwriting requirements or were fraudulent, but that generated millions of

1

dollars in upfront fees for Concord, which the Insiders subsequently misappropriated for themselves. The Insiders accomplished their scheme by, among other things, falsifying loan documentation and manipulating collateral valuations.

Additionally, Concord alleges that defendant Fifth Third Bank (as successor in interest to Fifth Third Bank, National Association) (Fifth Third) knowingly aided the Insiders' looting by funding loans that it knew were either under-collateralized or otherwise did not meet Fifth Third's internal credit requirements. According to the complaint, Fifth Third, which set up the Ultra facility and structured its terms, assisted in the manipulation of underwriting criteria, or waived them entirely, because: (i) it received enormous up-front fees from each Ultra transaction; and (ii) under the relevant agreements, it was Concord alone that bore the risk of non-compliant underwriting and loan default.

Concord also alleges that defendant Bank of America, N.A. (as successor in interest to LaSalle Bank, National Association) (BofA), as loan servicer and collateral agent for loans issued under the Ultra program, failed to: (i) properly review closing documentation to ensure compliance with loan criteria; and (ii) failed to perform its monitoring duties, including ascertaining whether minimum collateral requirements continued to be met during the terms of the loans.

Based on these allegations, the complaint sets forth the following causes of action: (i) against defendant Brody, for breach of fiduciary duty (first cause of action) and conversion (third cause of action); (ii) against defendant BofA, for breach of contract (fourth cause of action) and gross negligence (fifth cause of action); and (iii) against defendant Fifth Third, for aiding and abetting breach of fiduciary duty (second cause of action) and breach of the implied covenant of

2

good faith and fair dealing (sixth cause of action).

BofA now moves for an order, pursuant to CPLR 3211 (a) (1) and (7), to dismiss the complaint as asserted against it. (mot. seq. no. 002). Fifth Third moves for an order, pursuant to CPLR 2011, 3211(a) (1), (4), (5) and (7), to dismiss or in the alternative stay the complaint as asserted against it. ( mot. seq. no. 003). For the reasons that follow, both motions are granted.

I.    *Background*

Unless otherwise indicated, the following facts are drawn from plaintiff's complaint, dated September14, 2010.

In 2007, Concord, together with Fifth Third, developed a premium finance product called Ultra, backed by a $100 million credit facility provided by Fifth Third. As a commercial lender in the insurance and life settlement industries, Fifth Third understood premium finance and the secondary market for life insurance policies. It worked hand-in-hand with Concord's executives on the terms of the Ultra facility, eligibility and underwriting criteria needed to satisfy Fifth Third's credit requirements.

The Ultra product was designed to make loans to wealthy individuals, through trusts, to purchase large life insurance policies without an up-front cash outlay. The loans would be originated by Concord, financed by Fifth Third, and secured by the policies' market values in the secondary market (unlike traditional life insurance premium loans, which are typically secured by policy cash surrender values and letters of credit). By the time a loan reached the end of its term, a policy's market value was supposed to be sufficient or increase enough to pay off the loan balances and potentially generate profit.

To be eligible for Ultra, the potential insured had to meet rigorous underwriting

3

requirements, and the market value of the policy had to meet and maintain certain loan-to-value ratios. These requirements were crucial to ensuring that loans issued under Ultra were adequately collateralized. In particular, accurate valuations of each life insurance policy -- the collateral -- were essential.

As devised by Brody and Fifth Third, Ultra required a borrowing trust to pay high upfront fees to Concord and Fifth Third, which were financed and included in the loan balances. These fees greatly increased the size of the loans, rendering the loans under-collateralized relative to the underlying policy. The fact that defendants charged exorbitant fees and included them in the loan balances ensured that almost no loan could qualify for funding because the loan would be under-collateralized from the outset.

It soon became clear that Ultra, as originally structured, would not be successful. Instead, Brody and the Insiders, with Fifth Third's assistance, began to manipulate collateral valuations in order to qualify more loans. As a result, the Insiders were able to generate more revenue for Concord, which they ultimately misappropriated for themselves. For example, in December 2008 alone, Ultra transactions generated almost $4.3 million in fees for Concord and Fifth Third. In addition, Concord alleges that Brody personally forged loan models, CPA letters, and service fee letters, and altered already-executed agreements with existing trusts in order to obtain unauthorized "credit" fees and "service" fees (the fee fraud).[1]

To garner more fees for itself (as a result of the greater volume of approved loans), Fifth Third encouraged and directed the Insiders to manipulate valuations to satisfy loan criteria, and

---

[1] The complaint also alleges that Brody and the Insiders engaged in undisclosed related-party transactions, enriched themselves by increasing their compensation and awarding themselves excessive unearned bonuses and wasted corporate assets.

4

in some cases, waived underwriting requirements entirely (the underwriting fraud). In total, approximately $80 million of fraudulent loans were made under the Ultra facility during the two years the program existed. In addition, Concord alleges that Fifth Third aided the Insiders' misappropriation by repeatedly covering overdrafts on Concord's bank accounts, which Brody and the Insiders looted to make illegal payments to themselves.

With respect to BofA, the complaint alleges that, in its role as loan servicer and collateral agent, BofA was responsible for reviewing closing documents and certifying that loan transactions complied with all the requirements of the Ultra facility before any amounts were advanced. Concord contends that BofA was required to ensure that minimum collateral requirements were being met through the term of a loan. Given these contractual obligations, Concord alleges that BofA's role was to act as an independent review mechanism to prevent fraud, and its failure to do so, contributed to the losses Concord suffered as a result of the Insiders' scheme.

The Insiders' looting, self-dealing, and waste first came to light in January 2009. In response, Concord's independent outside directors caused the board to create a special committee and retain counsel (Skadden Arps) to investigate the Insiders' looting and forgeries. The special committee uncovered Brody's and the Insiders' generation of $19.5 million in fraudulent and excessive fees, charged to the borrowing trusts. However, Fifth Third's and BofA's alleged role in Concord's losses remained undetected. Concord also was unaware of the systemic underwriting fraud affecting substantially all of the Ultra loan portfolio.

In 2009, aware that Concord (the party that bore all the risk for losses resulting from ineligible transactions) lacked liquidity, still concealing its own role in Concord's losses, Fifth

5

Third fraudulently induced Concord to enter into a new loan agreement for a $19.5 million term loan to finance Concord's refund of fraudulent fees to the defrauded trusts. In addition, Fifth Third fraudulently induced a "deep pocket," Columbus Nova Investments IV, Ltd (an investment vehicle under common management with Concord's largest equity holder) (CNI), to guarantee the new debt. In particular, Fifth Third misrepresented to Concord's outside directors that it would set up a new loan facility, free of fraud, that would allow Concord to earn its way out of debt and to become profitable. However, Fifth Third knew that lending opportunities would be negligible or non-existent under the new facility because, unlike Ultra, an independent third party performed accurate valuations and effectively screened out ineligible loans.[2] Concord alleges that, had it and CNI known these facts and Fifth Third's role in the underwriting fraud, they would not have executed a loan agreement or guaranty (which, as discussed more fully below, contained general releases in favor of Fifth Third).

Fifth Third was able to conceal its role in the Insiders' scheme from the Outside Directors through 2009. It was not until early 2010 that Concord's outside directors discovered that substantially all of the Ultra loans were fraudulent and that Fifth Third had assisted the Insiders to perpetrate their scheme.[3]

*II.*   *Discussion*

In deciding a motion to dismiss pursuant to CPLR 3211(a) (7), the court must afford the

---

[2] As described above, the capitalization of large fees in the loan balances made it virtually impossible for a prospective policy to satisfy minimum collateral requirements.

[3] On June 11, 2010, Fifth Third filed an action in Illinois state court (the Illinois Action) against Concord and other Concord-related defendants, seeking to enforce various loan agreements and guaranties, including those related to the $19.5 million loan. *See* affidavit of Michael Gill, dated December 6, 2010, ¶ 7.

6

pleadings a liberal construction, accept the allegations of the complaint as true and give the plaintiff the benefit of every favorable inference. *EBC I, Inc. v Goldman Sachs & Co.*, 5 NY3d 11, 19 (2005). However, "allegations consisting of bare legal conclusions as well as factual claims either inherently or flatly contradicted by the documentary evidence are not entitled to such consideration." *Stuart Lipsky, P.C. v Price*, 215 AD2d 102, 103 (1st Dept 1995).

To succeed on a motion to dismiss pursuant to CPLR 3211(a) (1), the documentary evidence that forms the basis of the defense must "utterly refute[] plaintiff's factual allegations, conclusively establishing a defense as a matter of law." *Goshen v Mutual Life Ins. Co. of N.Y.*, 98 NY2d 314, 326 (2002).

### A.     Motion Sequence 002

BofA's principal argument in support of its motion, is that plaintiff's claims are barred by the doctrine of *in pari delicto*, which bars wrongdoers from recovering for losses arising from their own misconduct. Specifically, BofA contends that the allegations contained in the complaint clearly demonstrate that Concord's own wrongdoing, *i.e.*, that of its agents, far exceeds any wrongdoing BofA is alleged to have committed. Given this pronounced disparity, BofA argues that application of *in pari delicto* is appropriate even at the pleading stage.

Under the doctrine of *in pari delicto*, "courts will not intercede to resolve a dispute between two wrongdoers." *Kirschner v KPMG LLP*, 15 NY3d 446, 464 (2010). Effectively, this defense will bar a plaintiff from recovering against a defendant where the plaintiff's fault is equal to or greater than that of the defendant. *Stahl v Chemical Bank*, 237 AD2d 231, 231 (1st Dept 1997); *Bullmore v Ernst & Young Cayman Is.*, 20 Misc 3d 667, 670 (Sup Ct, NY County 2008). Two fundamental public policy goals underlie the doctrine: (i) deterring illegality by "denying

7

judicial relief to an admitted wrongdoer"; and (ii) avoiding "entangling courts in disputes between wrongdoers." *Kirschner*, 15 NY3d at 464.

Here, Concord admits, throughout its complaint, that its own executives engaged in criminal and fraudulent acts. The complaint accuses Concord's senior management of orchestrating "a shocking scheme, involving fraud, forgery, and bribery," to loot Concord's assets. Compl. ¶ 1. As more fully alleged, Brody and the Insiders' scheme included: (i) "portraying as successful a defective new loan product" (*id.*, ¶ 3, *see also id.*, ¶¶ 45, 46); (ii) "embark[ing] on a criminal campaign to secure for Concord bogus business from unqualified insureds" (*id.*, ¶ 3, *see also id.*, ¶ 34), (iii) "falsifying loan documentation" (*id.*, ¶ 3, *see also id.*, ¶¶ 34, 37, 38, 39), (iv) "manipulating collateral valuations" (*id.*, ¶ 3, *see also id.*, ¶¶ 43, 50), (v) "forg[ing] purported insureds' signatures" (*id.*, ¶ 4, *see also id.*, ¶¶ 34, 37, 38, 39, 41), and (vi) "collect[ing] illegitimate fees ($6.8 million) from bogus loans extended to empty trusts" (*id.*, ¶ 40).

By contrast, BofA is not alleged to have willfully aided Concord's management's wrongful conduct or to have benefitted from their scheme.[4] Rather, the complaint alleges that BofA simply failed to prevent Concord's management from committing fraud by not properly performing its contractual duties as loan servicer and collateral agent. *Id.*, ¶¶ 2, 53-56. Moreover, Concord admits that its executives were responsible for "intentionally deceiving BofA" through misrepresentations (*id.*, ¶ 47) and the delivery of forged documents (*id.*, ¶¶ 37, 66).

Thus, taking all of the allegations in the complaint as true, Concord's own acknowledged (imputed) fault outweighs any purported fault it attributes to BofA. Consequently, the claims

---

[4] BofA's total fees for acting as loan servicer and collateral agent were effectively capped at $70,000 per year, irrespective of the success of the Ultra program.

asserted against BofA are subject to dismissal by application of the *in pari delicto* doctrine. *See Kirschner*, 15 NY3d at 464 (observing that "[t]he justice of the in pari delicto rule is most obvious where a willful wrongdoer is suing someone who is alleged to be merely negligent"); *Buechner v Avery*, 38 AD3d 443, 444 (1st Dept 2007) (affirming dismissal under CPLR 3211 on, inter alia, *in pari delicto* grounds, where complaint alleged that management of plaintiff corporation cooperated with defendant third parties in committing alleged wrongs).

In opposition, Concord raises several arguments to resist this conclusion.  First, Concord argues that, categorically, *in pari delicto* is not available as a defense for a claim sounding in breach of contract.  Concord is mistaken.

In the first instance, *Kirschner* itself recognizes that, as a general matter, a contract claim can be dismissed on *in pari delicto* grounds at the pleadings stage.  *See Kirschner*, 15 NY3d at 459 n 3 (citing *Donovan v Rothman*, 302 AD2d 238, 239 [1st Dept 2003]); *see also Globaltex Group Ltd. v Trends Sportswear Ltd.*, 2010 WL 1633438, *4 (ED NY 2010) ("In pari delicto is applicable to claims of breach of contract, unjust enrichment, conversion, rescission, or damages in tort").

Moreover, one of the appeals at issue in *Kirschner* was *Teachers' Retirement Sys. of La. v PricewaterhouseCoopers LLP*, in which the Delaware Chancery Court had dismissed, *inter alia*, derivative plaintiffs' breach of contract claim on *in pari delicto* grounds under New York law. *See In re American Intern. Group, Inc.*, 965 A2d 763, 827-28 (Del Ch 2009).  In answering the question certified to it by the Delaware Supreme Court, the Court of Appeals was fully cognizant that a contract claim would rise or fall as a direct result of its response. *See e.g.* appellate brief for respondent PricewaterhouseCoopers LLP, 2010 WL 4109439, *8 (July 20, 2010).  Nevertheless,

9

the Court of Appeals did not exclude or otherwise limit contract claims from application of the *in pari delicto* defense. To the contrary, the Court of Appeals reaffirmed the breadth of the doctrine: "[T]he principle that a wrongdoer should not profit from his own misconduct is so strong in New York that we have said the defense applies even in difficult cases and should not be 'weakened by exceptions.'" *Kirschner*, 15 NY3d at 464 (quoting *McConnell v Commonwealth Pictures Corp.*, 7 NY2d 465, 470 [1960]). Indeed, after the Court of Appeals decided *Kirschner* and returned the matter to Delaware, the Delaware Supreme Court, relying on *Kirschner*, affirmed the Chancery Court's dismissal of the derivative plaintiffs' claims, including for breach of contract, on *in pari delicto* grounds. *Teachers' Retirement Sys. of La. v PricewaterhouseCoopers LLP*, 2011 WL 13545, *1 (Del 2011).

Concord's reliance on *Hilgendorff v Hilgendorff*, 241 AD2d 481 (2d Dept 1997) to support its argument, is misplaced. To be sure, the court there held that a breach of contract claim may survive "even though [a plaintiff] engages in unlawful activity in the [] performance" of a contract that is lawful on its face. *Id.* at 482. However, the *Hilgendorff* court qualified its ruling, adding that this was only true "provided the [plaintiff] does not require the aid of the illegal transaction to make out his case." *Id.* Here, inescapably, the complaint admits that Concord's management engaged in illegal conduct under cover of the very contract(s) on which it now seeks to sue BofA. Consequently, *Hilgendorff* does nothing to rescue Concord's breach of contract claim from BofA's assertion of the *in pari delicto* defense.

Next, Concord argues, with respect to both of its claims against BofA, that it is entitled to the benefit of the "adverse interest exception" to the *in pari delicto* rule. Anchoring its argument on allegations in the complaint that defendant Brody "completely abandoned Concord's interest,"

10

and his conduct "was hostile and adverse to the interest of Concord, and was motivated solely by greed and self-interest" (Compl. ¶ 85), Concord claims that it can overcome the presumption of imputation that lies at the heart of BofA's *in pari delicto* defense. Concord's argument, however, does not succeed.

Normally, acts -- including fraudulent ones -- committed by corporate agents acting within the scope of their authority "are presumptively imputed to their principals." *Kirschner*, 15 NY3d at 465. The rationale for this principle of agency law is that it "fosters an incentive for a principal to select honest agents and delegate duties with care." *Id.* at 466. This presumption may be overcome where a plaintiff can show that its agent's actions were absolutely and completely adverse to plaintiff's own interests. As stated by the Court of Appeals, for the adverse interest exception to apply:

> the agent must have *totally abandoned* his principal's interests and be acting entirely for his own or another's purposes. It cannot be invoked merely because [the agent] has a conflict of interest or because he is not acting primarily for his principal. This rule avoids ambiguity where there is a benefit to both the insider and the corporation, and reserves this most narrow of exceptions for those cases -- outright theft or looting or embezzlement -- where the insider's misconduct benefits only himself or a third party; i.e., where the fraud is committed *against* a corporation rather than on its behalf.

*Kirschner*, 15 NY3d at 466-67 (internal quotation marks and citation omitted) (emphases in original). Thus, if a fraud brings money into the company's own coffers, the adverse interest exception is unavailable, irrespective of whether the benefit to the agent is great and the benefit to the company is small. *See e.g. Bullmore*, 20 Misc 3d at 672 ("where a corporation benefits to any extent from the fraudulent acts of its agents, the agents cannot be said to have 'totally' abandoned

11

the interests of the corporation").

Applying the test articulated in *Kirschner* to Concord's own version of events, it is clear that Concord's top executives did not "totally" abandon the interests of the company. For example: (1) Concord's executives "embarked on a criminal campaign to secure *for Concord* bogus business" (Compl. ¶ 3); (2) "[t]he Ultra program required upfront payments of *substantial fees to Concord*" (*id.*, ¶ 22); (3) "the borrower *paid Concord* a 'structuring fee' equal to 1.5% of the face amount of the insurance policy" and "*Concord* . . . kept the structuring fee for itself" (*id.*); (4) "[t]he valuation manipulation and new fee structure meant that . . . *Concord* and Ultra would take a bigger piece of each loan as fees" (*id.*, ¶ 32); (5) "in the period before the changes, *Concord* and Fifth Third took as fees . . . a total of $2.9 million. Using the new fee structure, *Concord* and Fifth Third more than doubled their take, paying themselves . . . a total of $31 million" (*id.*); (6) "approximately $1.7 million was paid out in fees *to Concord* and Fifth Third" (*id.*, ¶ 36). (emphasis added). The complaint, filed before *Kirschner* was issued, acknowledges that Concord itself benefitted from the Insiders' fraudulent activity, as a result of the substantial fees it received. Consequently, Concord cannot claim, as a matter of law, that the Insiders "totally abandoned" Concord's interests.

Nevertheless, Concord strenuously argues that its allegations do not run afoul of *Kirschner*. In particular, Concord asserts that the complaint should be read to allege a single unified scheme conceived by the Insiders to loot the corporation, with Concord simply serving as the conduit through which the Insiders carried out their fraud. As such, Concord contends that any benefit it obtained from the millions of dollars in fraudulently-generated fees was, at most, transitory. Therefore, according to Concord, the fact that Ultra fees first passed through Concord

12

before being looted does not in any way negate the Insiders' complete adversity to Concord.

However, this very argument was rejected by the Court of Appeals in *Kirschner* when it refused to adopt a rule, championed by one of the appellants, "'under which the insider's intent is the touchstone and a short term, illusory benefit to the company does not defeat the adverse interest exception.'" *Kirschner*, 15 NY3d at 470. *Kirschner* stated that such a rule "would explode the exception, turning it into a nearly impermeable rule barring imputation in every case." *Id.* (inner quotation marks and citation omitted); *see also id.* at 467 ("To allow a corporation to avoid the consequences of corporate acts simply because an employee performed them with his personal profit in mind would enable the corporation to disclaim, at its convenience, virtually every act its officers undertake.").

Concord also argues that here, unlike the two certified cases in *Kirschner*, it was the scheme itself, not the discovery of the fraud, that harmed the corporation. Compl. ¶ 2 ("As a result of the looting and bogus loans . . . Concord lost hundreds of millions of dollars, and its business was destroyed."). However, a fair reading of the complaint shows that the conduct complained of allowed Concord to continue to operate from 2007 through 2009. Compl. ¶¶ 3, 4. As *Kirschner* notes, "[s]o long as the corporate wrongdoer's fraudulent conduct enables the business to survive," "[e]ven where the . . . fraud can be said to have caused the company's ultimate bankruptcy, it does not follow that the insiders 'totally abandoned' the company." *Kirshner*, 15 NY3d at 468

In sum, Concord's allegations of corporate wrongdoing by its own management must, under *Kirschner*, be imputed to Concord itself, leaving its claims against BofA subject to the *in*

13

*pari delicto* defense.[5]

B.    *Motion Sequence No. 003*

In moving to dismiss the complaint as asserted against it, Fifth Third initially argues that Concord released and waived the very claims that it now seeks to assert. CPLR 3211 (a) (5). Specifically, in exchange for the $19.5 million Fifth Third lent it in 2009, Concord agreed to "release[] the Lender from and affirmatively waive[] any and all claims, counterclaims, or affirmative defenses [Concord] may have against the Lender from the beginning of time to the date hereof." *See* affidavit of Daniel S. Shamah, dated December 6, 2010 (Shamah aff.), Ex. Q (Amended and Restated Demand Loan and Security Agreement, dated June 4, 2009) § 8.17; Ex. R (Waiver Agreement, dated June 4, 2009) § 7; Ex. S (Limited Recourse Guaranty and Collateral Pledge Agreement, dated June 4, 2009) at 8; Ex. T (Consent and First Amendment to Amended and Restated Demand Loan and Security Agreement, dated December 2009) § 11.

Although Concord explicitly alleges that it first discovered the circumstances giving rise to its claims against Fifth Third in "early 2010" (Compl. ¶ 6), *after* Concord executed releases, Fifth Third asserts that New York courts routinely enforce broad releases such as the ones Concord entered into and dismiss claims even when they are unknown to the releasing party. *See e.g. Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V.*, 76 AD3d 310, 318 (1st Dept 2010). To further strengthen its argument, Fifth Third also contends that Concord knew or should have known of its potential claims against Fifth Third prior to executing releases in June and December 2009. According to Fifth Third, had Concord not limited the scope of the January 2009

---

[5] As such, the court need not reach BofA's remaining arguments in support of dismissal.

14

Skadden Arps' investigation to the Insiders' looting and fee fraud, it could have uncovered Fifth Third's role in the underwriting fraud before it entered the June releases. Compl. ¶¶ 66-67. Fifth Third further argues that Concord was certainly aware of its claims against Fifth Third by the time Concord executed the December 2009 release. In this regard, Fifth Third points to Concord's allegation that, in October 2009, consultants for Concord's largest equity holder "view[ed] all of Concord's records," "uncovered the massive, systemic underwriting fraud" in the Ultra program, and learned that "the business model that Fifth Third developed for Concord generated revenues through the use of fraudulent, vastly inflated policy market values." *Id.*, ¶ 77. Hence, Fifth Third argues Concord knew or should have known that it was releasing the very claims asserted in the present action.

In opposition, Concord raises several challenges to successfully defeat these arguments. First, Concord argues, and Fifth Third does not dispute (*see* Fifth Third's reply memorandum of law, at 2 n 3), that Illinois law applies to the releases as a result of the choice of law provisions contained in the various loan documents. Under Illinois law, a general release does not bar claims that were unknown to the releasor at the time the underlying contract was executed. *Farm Credit Bank of St. Louis v Whitlock*, 144 Ill 2d 440, 448, 581 NE2d 664, 667 (1991) ("A general release is inapplicable to an unknown claim").

Concord next observes that any inference Fifth Third relies on with respect to the timing of Concord's actual knowledge, is belied by Concord's express allegation that it did not discover Fifth Third's role in the underwriting fraud until 2010. Compl. ¶ 6 ("In early 2010, [Concord] discovered that substantially all of the Ultra loans were fraudulent and that, as a result of defendants' egregious misconduct, Concord could not be salvaged."). Assuming the truth of the

15

allegations in the complaint and according Concord (not defendant Fifth Third) the benefit of all favorable inferences, as this court must on a motion to dismiss, the October 2009 investigation referred to in paragraph 77 of the complaint was not completed and did not reveal Fifth Third's alleged role in the Insiders' scheme, until 2010.

For much the same reason, Fifth Third's claim that Concord's January 2009 discovery of the Insiders' looting should have led to the uncovering of Fifth Third's role, is similarly flawed. The string of inferences on which Fifth Third relies to support this argument, is contradicted by express allegations in the complaint that Fifth Third concealed its role in the scheme. *See, e.g.,* Compl. ¶¶ 5, 75. Aside from this defect, Fifth Third's argument does not comport with Illinois law: "The appropriate inquiry is not whether [plaintiff] could or should have been able to discover his fraud claim. The question rather is whether that claim was a claim which the parties intended to release when they signed the release document." *Carlile v Snap-On Tools*, 271 Ill App 3d 833, 840, 648 NE2d 317, 322 (Ill App, 4th Dist 1995) (finding general release unenforceable with respect to fraud claim because plaintiff did not have actual knowledge of defendant's fraud when release was executed).[6] Therefore, Fifth Third cannot rely on the releases contained in the June 2009 loan agreement and guaranty and the December 2009 amended loan

---

[6] On reply, Fifth Third cites federal cases for the proposition that a general release extends to claims that a releasing party "could have discovered upon reasonable inquiry." *See e.g. Fair v Int'l Flavors & Fragrances, Inc.*, 905 F2d 1114, 1116 (7th Cir 1990). Putting aside the question as to whether this additional consideration conflicts with or can be harmonized with Illinois state cases which do not appear to recognize this standard (*see* n 7, *infra*), whether or not Concord could have discovered its claims "upon reasonable inquiry" is, given Concord's allegations of active concealment by Fifth Third, a factual determination that cannot be resolved, as a matter of law, at this stage of the litigation.

agreement to dismiss the claims asserted against it in this action.[7]

Next, echoing BofA, Fifth Third argues that plaintiff's claims are barred as a matter of law by the *in pari delicto* doctrine. *See Kirschner*, 15 NY3d at 464 ("The justice of the in pari delicto rule is most obvious where a willful wrongdoer is suing someone who is alleged to be merely negligent . . . But . . . the principle also applies where both parties acted willfully."). In this regard, Fifth Third contends that Concord's allegations make clear that its own executives were central figures in the alleged fraud, and basic agency principles provide that Concord's management's wrongful acts must be imputed to Concord. Relying on *Kirschner*, Fifth Third argues that the benefits that inured to Concord as a result of its managements's fraud (through the receipt of millions of dollars in loan proceeds), precludes Concord from qualifying for the adverse interest exception.

In opposition, Concord argues that, under the internal affairs doctrine, Delaware law applies to its aiding and abetting breach of fiduciary duty claim (as it does to its underlying breach of fiduciary duty claim against Brody) because three of the four plaintiff-entities in this action are Delaware limited liability companies. Compl. ¶¶ 7-9. It therefore follows, according to Concord, that Delaware law applies to Fifth Third's *in pari delicto* defense. Taking its argument further, Concord asserts that, under Delaware's construction of the adverse interest exception, the Insiders' wrongdoing cannot be imputed to Concord. This argument fails to persuade.

"[T]he internal affairs doctrine, [] is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs -- matters peculiar

---

[7] The court hearing the Illinois Action apparently reached the same conclusion. *See* letter from Marc E. Kasowitz, dated June 2, 2011, Ex. A (transcript), at 14-16.

17

to the relationships among or between the corporation and its current officers, directors, and shareholders -- because otherwise a corporation could be faced with conflicting demands." *In re Adelphia Communications Corp.*, 365 BR 24, 40 (Bankr SD NY 2007) (inner quotation marks and citation omitted). The Court of Appeals has rejected the automatic application of the internal affairs doctrine where another jurisdiction has an overriding interest in the issue to be determined. *See Greenspun v Lindley*, 36 NY2d 473, 478 (1975). Thus, many courts, including in this commercial division, that have engaged in a choice of law analysis with respect to aiding and abetting claims have concluded that the law of the state with the greatest interest in the outcome of the dispute should be applied. *See MediaXposure Ltd. (Cayman) v Omnireliant Holdings, Inc.*, 29 Misc 3d 1215(A), 2010 NY Slip Op 51835(U), *10 n 10 (Sup Ct, NY County 2010 Fried, J.); *See also In re Adelphia Communications Corp.*, 365 BR at 40-41; *Cromer Fin. Ltd. v Berger*, 2003 WL 21436164, *8-9 (SD NY 2003); *Granite Partners, L.P. v Bear, Stearns & Co. Inc.*, 17 F Supp 2d 275, 306 n 16 (SD NY 1998); *Solow v Stone*, 994 F Supp 173, 177 (SD NY 1998); *but see Buckley v Deloitte & Touche USA LLP*, 2007 WL 1491403, *13 (SD NY 2007).

The reasoning followed in these cases is compelling -- an aiding and abetting claim directed against a non-fiduciary outsider, like Third Bank, with no role in the corporation's governance, does not implicate any interests of the law of the state of incorporation. *See In re Magnesium Corp. of Am.*, 399 BR 722, 742 (Bankr SD NY 2009) (holding that "normal 'interest analysis' principles applicable in all tort cases should apply to claims for aiding and abetting breaches of fiduciary duty, warranting application of the law of the jurisdiction with the greatest interest in a particular case.").

Here, Concord's aiding and abetting claim does not involve strict corporate governance,

18

such as a corporate merger, or matters peculiar to the relationships among or between Concord and its "current officers, directors, and shareholders" (*Edgar v MITE Corp.*, 457 US 624, 645 [1982]), such that application of the internal affairs doctrine is warranted or necessary. Indeed, the only connection Delaware has to this case is that it happens to be the state of incorporation of three of the four plaintiff-entities. New York's connections to this case, on the other hand, are far greater. Concord's principal place of business is New York. Compl. ¶¶ 7-10. Brody's and the Insiders' alleged misconduct and Concord's purported injuries occurred in New York. *See* transcript of oral argument, dated March 17, 2011, at 33. In addition, Concord brought this litigation in New York. In short, this lawsuit "was brought in[] New York by . . . entities and individuals located in New York and based on facts alleged to have occurred in New York." *Granite Partners*, 17 F Supp 2d at 306 n 16. Ergo, Concord cannot avoid application of New York law as applied to its aiding and abetting breach of fiduciary duty claim.[8]

Repeating its arguments in opposition to BofA's motion to dismiss, Concord contends that its allegations would also suffice to establish the adverse interest exception under New York law. However, as set forth in II (A) of this decision, all of Concord's arguments fail in the face of *Kirschner*'s narrow construction of the exception.[9]  Accordingly, it is

---

[8] *Matter of Allion Healthcare Inc.*, 28 Misc 3d 1228(A), 2010 NY Slip Op 51519(U) (Sup Ct, Suffolk County 2010), cited by Concord, does not require a different result. There, aiding and abetting claims were asserted (and dismissed) against the purchaser of a public company on allegations that certain insider shareholders improperly approved a merger, the terms of which unfairly favored the insiders over the corporation's unaffiliated public shareholders. However, unlike the instant case, the underlying allegations in *Allion* involved issues of internal corporate governance and the relations among shareholders, officers, and directors, and thus, more readily implicated the internal affairs doctrine.

[9] This decision is not intended to limit the court before which the Illinois Action is pending from applying Illinois law and its construction of the adverse interest exception to the

**ORDERED** that the motion of defendant Bank of America, N.A. (as successor in interest to LaSalle Bank, National Association) to dismiss the complaint is granted, and the complaint is dismissed in its entirety as against said defendant, with costs and disbursements as taxed by the Clerk of the Court, and the Clerk is directed to enter judgment accordingly in favor of said defendant; and it is further

**ORDERED** that the motion of defendant Fifth Third Bank (as successor in interest to Fifth Third Bank, National Association) to dismiss the complaint herein is granted and the complaint is dismissed in its entirety as against said defendant, with costs and disbursements as taxed by the Clerk of the Court, and the Clerk is directed to enter judgment accordingly in favor of said defendant; and it is further

**ORDERED** that the action is severed and continued against the remaining defendant Ira L. Brody.

Dated: December 1, 2011

ENTER:

_____
J.S.C.

---

counterclaim allegations raised by Concord and other Concord-related defendants in that action. *See* Shamah aff., Ex. V (Answer and Counterclaims).

20